# Exhibit B

Copyright 2005 The New York Times Company
The New York Times

May 22, 2005 Sunday
Late Edition – Final

**SECTION:** Section 1; Column 5; Foreign Desk; Pg. 1

**LENGTH:** 2290 words

**HEADLINE:** Army Faltered In Investigating Detainee Abuse

**SERIES:** THE BAGRAM FILE: Second of two articles.

**BYLINE:** By TIM GOLDEN

**BODY:**

Despite autopsy findings of homicide and statements by soldiers that two prisoners died after being struck by guards at an American military detention center in Bagram, Afghanistan, Army investigators initially recommended closing the case without bringing any criminal charges, documents and interviews show.

Within days after the two deaths in December 2002, military coroners determined that both had been caused by "blunt force trauma" to the legs. Soon after, soldiers and others at Bagram told the investigators that military guards had repeatedly struck both men in the thighs while they were shackled and that one had also been mistreated by military interrogators.

Nonetheless, agents of the Army's Criminal Investigation Command reported to their superiors that they could not clearly determine who was responsible for the detainees' injuries, military officials said. Military lawyers at Bagram took the same position, according to confidential documents from the investigation obtained by The New York Times.

"I could never see any criminal intent on the part of the M.P.'s to cause the detainee to die," one of the lawyers, Maj. Jeff A. Bovarnick, later told investigators, referring to one of the deaths. "We believed the M.P.'s story, that this was the most combative detainee ever."

The investigators' move to close the case was among a series of apparent missteps in an Army inquiry that ultimately took almost two years to complete and has so far resulted in criminal charges against seven soldiers. Early on, the documents show, crucial witnesses were not interviewed, documents disappeared, and at least a few pieces of evidence were mishandled.

While senior military intelligence officers at Bagram quickly heard reports of abuse by several interrogators, documents show they also failed to file reports that are mandatory when any intelligence personnel are suspected of misconduct, including mistreatment of detainees. Those reports would have alerted military intelligence officials in the United States to a problem in the unit, military officials said.

Those interrogators and others from Bagram were later sent to Iraq and were assigned to Abu Ghraib prison. A high-level military inquiry last year found that the captain who led interrogation operations at Bagram, Capt. Carolyn A. Wood, applied many of the same harsh methods in Iraq that she had overseen in Afghanistan.

Citing "investigative shortfalls," senior Army investigators took the Bagram inquiry away from agents in Afghanistan in August 2003, assigning it to a task force based at the agency's headquarters in Virginia. In October 2004, the task force found probable cause to charge 27 of the military police guards and military intelligence interrogators with crimes ranging from involuntary manslaughter to lying to investigators. Those 27 included the 7 who have actually been charged.

"I would acknowledge that a lot of these investigations appear to have taken excessively long," the Defense Department's chief spokesman, Larry Di Rita, said in an interview on Friday. "There's no other way to describe an

Army Faltered In Investigating Detainee Abuse The New York Times May 22,

investigation that takes two years. People are being held accountable, but it's taking too long."

Mr. Di Rita said the Pentagon was examining ways to speed up such investigations, "because justice delayed is justice denied."

A spokesman for the Criminal Investigation Command, Christopher Grey, would not discuss details of the case, but played down the significance of the agents' early proposal to close it. He said that the investigation had been guided by a desire for thoroughness rather than speed, and that it eventually included more than 250 interviews around the world.

"Case agents make recommendations all the time," Mr. Grey said. "But the review process looks at investigations constantly and points to other things that need to be completed or other investigative approaches."

While the proposal to close the case was ultimately rejected by senior officials, documents show that the inquiry was at a virtual standstill when an article in The New York Times on March 4, 2003, reported that at least one of the prisoner's deaths had been ruled a homicide, contradicting the military's earlier assertions that both had died of natural causes. Activity in the case quickly resumed.

The details of the investigation emerged from a file of almost 2,000 pages of confidential Army documents about the death on Dec. 10, 2002, of Dilawar, a 22-year-old taxi driver. The file was obtained from a person involved in the inquiry who was critical of the abuses at Bagram and the military's response to the deaths.

The file presents the fates of Mr. Dilawar and another detainee who died six days earlier, Mullah Habibullah, against a backdrop of frequent harsh treatment by guards and interrogators who were in many cases poorly trained, loosely supervised and only vaguely aware of or attentive to regulations limiting their use of force against prisoners they considered to be terrorists.

According to interviews with military intelligence officials who served at Bagram, only a small fraction of the detainees there were considered important or suspicious enough to be transferred to the American military prison at Guantanamo Bay, Cuba, for further interrogation. Two intelligence officers estimated that about 85 percent of the prisoners were ultimately released.

Still, most new detainees at Bagram were hooded, shackled and isolated for at least 24 hours and sometimes as long as 72 hours, the commander of the military police guards at Bagram, Capt. Christopher M. Beiring, told investigators. Prisoners caught in infractions like talking to one another were handcuffed to cell doors or ceilings, often for half an hour or an hour, but sometimes for far longer. Interrogators trying to break the detainees' resistance sometimes ordered that they be forced to sweep the same floor space over and over or scrub it with a toothbrush.

The responsibility of senior officers at Bagram for carrying out such methods is not clear in the Army's criminal report.

In several instances, the documents show Captain Wood and her deputy, Staff Sgt. Steven W. Loring, sought clarification about what techniques they could use. "Numerous requests for strict guidance on P.U.C. treatment have been voiced to the Staff Judge Advocate," Sergeant Loring said, referring to the detainees by the initials for Persons Under Control, "but no training has been offered."

Major Bovarnick, the former legal adviser to the detention center, told investigators that the shackling of detainees with their arms overhead was standard operating procedure when he arrived at Bagram in mid-November 2002. On Nov. 26, after complaints from the International Committee of the Red Cross, he convened a group of military and C.I.A. officials at Bagram to discuss methods of interrogation and punishment, including shackling to fixed objects.

"My personal question then was, 'Is it inhumane to handcuff somebody to something?'" he said. Referring to his consultations with the two senior lawyers at Bagram, he added, "It was our opinion that it was not inhumane."

After the deaths, officers who served at Bagram said, there was a similar debate over whether criminal charges were warranted.

Military lawyers noted that the autopsies of the two dead detainees had found severe trauma to both prisoners' legs — injuries that a coroner later compared to the effect of being run over by a bus. They also acknowledged statements by more than half a dozen guards that they or others had struck the detainees. But the lawyers and other officers did not press for a fuller accounting, two officers said in interviews.

Army Faltered In Investigating Detainee Abuse The New York Times May 22,

Instead, statements showed, they pointed to indications that both detainees had some existing medical problems when they arrived at Bagram, and emphasized that it would be difficult to determine the responsibility of individual guards for the injuries they sustained in custody.

"No one blow could be determined to have caused the death," the former senior staff lawyer at Bagram, Col. David L. Hayden, said he had been told by the Army's lead investigator. "It was reasonable to conclude at the time that repetitive administration of legitimate force resulted in all the injuries we saw." Both Major Bovarnick and Colonel Hayden declined requests for comment.

As late as Feb. 7 — nearly two months after the first autopsy reports had classified both deaths as homicides — the American commander of coalition forces in Afghanistan, Lt. Gen. Daniel K. McNeill, said in an interview that he had "no indication" that either man had been injured in custody.

General McNeill, who has since been promoted, declined repeated requests to clarify his remarks.

In retrospect, the investigators' initial interviews with guards, interrogators and interpreters at the detention center appear cursory and sometimes contradictory. As transcribed, many of the statements are little more than a page or two long.

Most of the guards who admitted punching the detainees or kneeing them in the thighs said they did so in order to subdue prisoners who were extraordinarily combative. But both detainees were shackled at the hands and feet throughout their time at Bagram. One of them, Mr. Dilawar, weighed only 122 pounds and was described by interpreters as neither violent nor aggressive. Both detainees also complained of being beaten and seemed to have trouble walking, some witnesses said.

The early interviews also included statements by two of the interpreters that they had been so troubled by the abusive behavior of some interrogators that they had gone to the noncommissioned officer in charge of the military intelligence group, Staff Sergeant Loring, to complain. One of the interrogators, Specialist Damien M. Corsetti, refused to speak to the agents at all, and another told of the guards' beating one of the detainees who died.

Even so, investigators failed to interview some crucial witnesses, including the officer in charge of the interrogators, Captain Wood, and the commander of the military police company, Captain Beiring. They also neglected an interrogator who had been present for most of Mr. Dilawar's questioning. When he finally went to investigators at his own initiative, he described one of the worst episodes of abuse.

Many of the guards who later provided important testimony were also initially overlooked. Computer records and written logs that were supposed to record treatment of the detainees were not secured and later disappeared. Blood taken from Mr. Habibullah was stored in a butter dish in the agents' office refrigerator, from which it was only recovered — or "seized" as a report explains it — when the office was later moved.

The record of the investigation indicated that Army investigators almost entirely stopped interviewing witnesses within three weeks after Mr. Dilawar's death. And although Major Bovarnick, the detention center's legal adviser, said he told Captain Beiring after the first death "that there would be no shackling to the ceiling ever again," the issue was largely ignored in the initial investigation.

While the Army's criminal inquiry continued, General McNeill ordered a senior officer, Col. Joseph G. Nesbitt, to conduct a separate, classified examination of procedures at the detention center. That led to changes including prohibitions against the shackling of prisoners for sleep deprivation and interrogators' making physical contact with detainees.

Documents from the criminal investigation suggested that Colonel Nesbitt was also dismissive of the notion that the two deaths pointed to wider wrongdoing. He concluded that military police guards at the detention center "knew, were following and strictly applying" proper rules on the use of force, documents showed, and he cited a "conflict between obtaining accurate, timely information and treating detainees humanely."

Senior officials at the Criminal Investigation Command's headquarters took a different view. On April 15, 2003, they rejected the field agents' proposal to close the case, sending it back "for numerous investigative, operational, administrative and security classification–related issues, which required additional work, pursuit, clarification or scrutiny." Four months later, the headquarters officials reassigned the case to the task force that eventually implicated the 27 soldiers.

Army Faltered In Investigating Detainee Abuse The New York Times May 22,

INVESTIGATIONS

Dec. 2002 — Military spokesmen at Bagram say the men died from natural causes.

Dec. 12 — Lt. Gen. Daniel K. McNeill, commander of allied forces in Afghanistan, orders an investigation that finds serious problems at the detention center.

Dec. 31 — The Army's Criminal Investigation Command conducts the last full interview of their initial inquiry into the deaths of the two men. Weeks later, they recommend that the case be closed without seeking charges against any of the soldiers.

April 15, 2003 — Bagram report is sent back by Criminal Investigation Command headquarters for many issues that "required additional work, pursuit, clarification or scrutiny."

Aug. 6 — After "a review of investigative shortfalls" by senior officials at the Criminal Investigation Command, the Bagram inquiry is assigned to the agency's headquarters.

Oct. 8 — The Army's criminal investigation ends, finding probable cause to charge 27 officers and soldiers with crimes related to the deaths of Mr. Dilawar, and 15 of the personnel were charged in the case of Mr. Habibullah.

Aug. 2004 — Report into abuses at Abu Ghraib by Lt. Gen. Anthony R. Jones finds that Captain Wood instituted methods at the Iraqi prison that were "remarkably similar" to those she applied at Bagram.

(pg. 18)

URL: http://www.nytimes.com

GRAPHIC: Photos: Two Afghan detainees died from their injuries in December 2002 after being shackled and beaten at the American military base in Bagram, Afghanistan, above. (Photo by Wally Santana/Associated Press)(pg. 18)Chart/Photos: "Time Lag: Detainee Deaths and Military Investigations"519TH MILITARY INTELLIGENCE BATTALIONJuly 2002 — The 519th M.I. Battalion arrives at the Bagram detention center in Afghanistan.Jan. 2003 — Interrogators from the battalion return home to Fort Bragg, N.C. The operations officer, Capt. Carolyn A. Wood (left), is awarded a Bronze Star for meritorious service.March — Personnel from the battalion deploy to Iraq.July — Personnel from the battalion take over interrogations at Abu Ghraib prison under the direct leadership of Captain Wood.DETAINEE DEATHSNov. 30-Dec. 4, 2002 — Mullah Habibullah arrives at the Bagram detention center. He dies after days of beatings by guards.Dec. 5-10 A second Afghan man, Dilawar (left), is taken into custody. He dies after being shackled to the ceiling of his cell for much of five days.Dec. 8, 13 — Initial autopsy reports show both men were victims of homicide.

LOAD-DATE: May 22, 2005