## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**MOHABAT KHAN**                          )
Guantánamo Bay Naval Station,             )
Guantánamo Bay, Cuba                      )
      Petitioner                      )
                                          )
  v.                                     )
                                          )    Civil Action No: 05-cv-01 (RJL)
**GEORGE W. BUSH**                        )
    President of the United States      )
    The White House                     )
    1600 Pennsylvania Avenue, N.W.      )
    Washington, D.C. 20500;             )
                                          )
**DONALD RUMSFELD**                       )
    Secretary, United States            )
    Department of Defense               )
    1000 Defense Pentagon               )
    Washington, D.C. 20301;             )
                                          )
**ARMY BRIG. GEN. JAY HOOD**              )
    Commander, Joint Task Force - GTMO  )
    APO AE 09360; and                   )
                                          )
**ARMY COL. MIKE BUMGARNER**              )
    Commander, Joint Detention          )
    Operations Group - JTF-GTMO         )
    APO AE 09360,                       )
                                          )
    Respondents                         )
_____)


## PETITIONER'S REPLY BRIEF IN SUPPORT OF MOTION FOR AN ORDER REQUIRING ADVANCE NOTICE OF ANY REPATRIATIONS OR TRANSFERS FROM GUANTÁNAMO BAY

NOW COMES Petitioner, by and through undersigned counsel, and files this reply in

support of his motion seeking an order requiring Respondents to provide him, through counsel

with 30 days advance notice of Respondents' intended removal of Petitioner from the

Guantánamo Bay Naval Base in Cuba ("Guantánamo Bay") to a jurisdiction outside the United States. Petitioners continue to press this motion because Respondents' counsel has indicated an unwillingness to give even two weeks notice before transferring Petitioner—an otherwise simple solution to this problem. Without the relief requested, Petitioner will suffer irreparable harm because he is at risk of torture or continued prolonged detention without charges or review by a or any neutral legal authority and by depriving this Court of jurisdiction over Petitioner's habeas and civil claims, he will never have the opportunity to vindicate his loss of liberty through the legal process which the Supreme Court has indicated he is entitled to pursue. *See Rasul v. Bush*, 542 U.S. 466 (2004). Respondents have failed to demonstrate any cognizable harm they would suffer from the modest relief Petitioner requests, whereas the harm to Petitioner from being rendered into foreign custody is serious and irreparable. This Court should grant Petitioner's motion.

## I.

## OVERVIEW

The risks Petitioner faces should this Court not grant this motion are severe. Torture, once inflicted, cannot be undone, and its effects may be permanent. In addition, petitioners have strong interests in having their claims vindicated in federal court. In stark contrast, Respondents' claims that they will suffer irreparable harm if this Court grants Petitioner's motion are belied by the limited nature of the relief Petitioner seeks.

Significantly, many judges of this Court have granted similar motions, finding that petitioners have demonstrated irreparable injury and/or a substantial likelihood of success on the merits. *See, e.g., Kurnaz v. Bush*, 2005 WL 839542 (D.D.C. Apr. 12, 2005) ("petitioners must be given notice of a potential transfer in a limited type of circumstance. In particular, if respondents have not reached a diplomatic understanding with the transferee country that a petitioner's transfer from Guantanamo is for release only, respondents must provide that petitioner's counsel with thirty days advance notice of the proposed transfer"); *Al-Marri v. Bush,*

No. 04-2035 (D.D.C. Apr. 4, 2005); *Al-Joudi v. Bush,* No. 05-0301 (D.D.C. Apr. 4, 2005);

*Al-Shiry v. Bush,* No. 04-0490 (D.D.C. Apr. 1, 2005); *Al-Oshan v. Bush,* No. 05-0520 (D.D.C.

Mar. 31, 2005); *Abdah, et al. v. Bush,* et al., 2005 WL 711814 (D.D.C. March 29, 2005)

(preliminary injunction requiring notice prior to transfer from Guantanamo warranted); *Abdullah,*

*et al. v. Bush, et al.*, No. 05-cv-0023 (RWR) (D.D.C. March 16, 2005) (order) (petitioners

can"seek emergency relief from this court in appropriate circumstances, such as when petitioners

have reason to believe that they are facing the possibility of continued detention at the request of

the United States in a location that does not provide access to this court," and affirmatively

ordering that the government that disclose, by specified date "whether, at the time the statement is

filed, Respondents have plans, or reasonably anticipate making plans . . . to move [each]

petitioner, and if so, to where, when, and under what terms and conditions").[1]  Respondents

declarations do not assert that these previously issued orders by other judges have caused any sort

of harm to befall them.

     This Court's ability to enforce its orders, if lost, may be impossible to regain.  Petitioner's

requested relief does nothing more than preserve this Court's jurisdiction and ability to enforce

its orders.  Contrary to Respondents' assertions, this Court need not stand aside while

Respondents transfer illegally-held prisoners into the custody of a torture-practicing foreign state,

---

[1]  While Respondent accurately notes that several other judges of this Court have
concluded that no such preliminary injunction was warranted, at least one such decision appears
to be based on a far more extensive record and government concessions that are not apparent
here.  *See Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 196 (D.D.C. 2005) and the others did not
decide all the legal arguments addressed in Petitioner's pleadings.  Finally, that a number of
different judges from this same Court have decided these important issues differently and the
issues are currently the subject of interlocutory appeals as averred by Respondent in his
opposition at 1-2 n.1, strongly favors preserving the status quo and entering a preliminary
injunction.  *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844
(D.C. Cir. 1977); *Teva Pharmaceuticals, USA, Inc. v. FDA,* ___ F. Supp. 2d ___, 2005 WL
3475676 (D.D.C. Dec. 8, 2005) (reaffirming existence of principle that in complex cases where
there are "genuine issues . . . to grapple with . . .  [t]hat alone may arguably satisfy the first prong
of the test for injunctive relief. (citing *Holiday Tours,* 559 F.2d at 843-44).

in violation of the United States' obligations under international and domestic law. Petitioner's interest in having this Court adjudicate his claims is equally strong and not outweighed by Respondent's interests.[2]  This Court should grant Petitioner's motion, and require Respondents to give Petitioner at least 30 days notice of any planned transfer.

**II.**

**ARGUMENT AND CITATION OF AUTHORITIES**

**A.**    **Petitioner is Entitled to the Limited Injunctive Relief That He Seeks**

This is an extraordinary situation warranting extraordinary relief.  In an ordinary case, a petitioner is not held incommunicado by the Respondent, is not wholly at the Respondent's mercy, and is not at risk of being shipped off to a foreign country, outside of the Court's jurisdiction, that is known to practice torture.  In an ordinary case, a petitioner has the opportunity to present his own testimony, and the respondent does not have the power to unilaterally deprive the petitioner of that right.  In an ordinary case involving a request for habeas relief, there typically have been extensive prior legal proceedings subject to full judicial review. None of these "ordinary" facts exist here.

In analyzing whether a preliminary injunction is warranted, a four-factor balancing test is employed where the following are examined: 1)  whether a movant can demonstrate a substantial likelihood of success on the merits, 2) whether he can demonstrate irreparable injury if the injunction is not granted, 3) whether he can demonstrate that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.  However, the four-factor test is a balancing test and this Circuit holds that in performing the balancing test required for the preliminary injunction inquiry;  the district court must balance the strengths of the requesting party's arguments in each of the four required areas.

---

[2]  Indeed if Respondents have no plans to  "render" or transfer petitioner outside of Guantanamo into detention in Afghanistan or to any other country, then requiring them to simply give notice of any intention to do so in the future would pose no detriment whatsoever.

If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.   An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.  *CityFed Financial Corp. v. OTS*, 58 F.3d 738, 747 (D.C.Cir. 1995).  In addition, this Circuit also holds that "[a]n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Holiday Tours, Inc.,* 559 F.2d at 844.  Furthermore, such an order is appropriate when "[t]here is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.*

 Because Petitioner presents several serious legal questions and little if any harm will befall Respondents should the Court grant Petitioner's requested relief, and denial of the order likely would inflict irreparable injury on Petitioner, this Court should grant Petitioner's motion.

**1.      Petitioner's Underlying Claims Present Serious Legal Questions**

Despite Respondents' assertions to the contrary, Petitioner has presented serious and substantial claims that this Court should hear without unilateral interference by Respondents.  In his Civil Complaint and First Amended Petition for Writ of Habeas Corpus, Petitioner raises numerous independent claims for relief, including claims arising under the United States Constitution, United States law, and international law and treaties.  Respondents focus on Petitioner's challenge to his prolonged detention, completely ignoring the broader relief that Petitioner seeks.  However, all of Petitioner's challenges require are properly before this Court and require this Court's attention.

The Supreme Court itself has noted the viability of Petitioner's habeas corpus claim: Petitioner's allegations—that, although he has engaged neither in combat nor in acts of terrorism, he has been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and

without being charged with any wrongdoing—unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States." *Rasul,* 542 U.S. at 483 n.15 (quoting 28 U.S.C. 2241(c)(3)).

In an order filed in the consolidated Guantánamo cases, Judge Green of this Court followed the Supreme Court's directive and found that identically-situated petitioners raised meritorious claims in habeas corpus petitions. *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). In particular, Judge Green found that the Guantánamo Bay detainees in eleven consolidated cases stated viable claims under the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Third Geneva Convention. *Id.* at 481. Like these other detainees, Petitioner states viable claims.

Respondents argue that Petitioner has not established that he possesses some independent, judicially enforceable right to challenge his repatriation or transfer, and thus that Respondents need not give Petitioner notice of such repatriation or transfer. However, this argument misses the point. As noted above, the Supreme Court in *Rasul* confirmed this Court's jurisdiction, and Judge Green in the consolidated Guantánamo Cases ruled that valid claims exist. The issue, then, is not simply whether Petitioner might—in the abstract—have standing to file a separate lawsuit alleging independent grounds to block the government's planned transfers. Instead, the issue is whether this Court, having already accepted jurisdiction over a live controversy, may act to preserve its properly exercised jurisdiction. The answer to that question must be "yes."

At any rate, Petitioner does assert the right to challenge his repatriation or transfer. Obviously, Petitioner contests the legality of his detention. He asks that the Court issue the writ of habeas corpus as a result. Traditionally, courts view possession of an item as encompassing not only the actual possession of it, but also the right to dispose of it as the possessor sees fit. Here, Respondents, having unlawfully acquired "possession" of petitioner, assert a right to "dispose" of him as they see fit, by transferring him to a third party without his consent, without

consultation with him, and under such circumstances as respondents unilaterally arrange. *Cf.*
*United States v. Williams*, 952 F.2d 418, 420 (D.C. Cir. 1991) (defendant's attempt to dispose of
drugs was evidence of his possession). The claimed right to effect such a transfer is not so much
the termination of the unlawful custody as another manifestation of it. By challenging his
unlawful detention, Petitioner also challenges Respondents' right to "dispose" of him.

More fundamentally, Petitioner also disputes Respondent's authority to transfer him to
another country for the purpose of criminal prosecution in that country. *See* Resp. Br. at 4. As
the Supreme Court has made clear, "there is no authority vested in any department of the
government to seize a fugitive criminal and surrender him to a foreign power." *Valentine v.*
*United States ex rel. Neidecker*, 299 U.S. 5, 8-9 (1936) (internal quotations, citation omitted).
*Accord In re Extradition of Howard,* 996 F.2d 1320, 1329 (1st Cir. 1993) ("no branch of
government has authority to surrender an accused to a foreign country except in pursuance of a
statute or treaty"); *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir. 1986) (same). *Valentine*'s
analysis is based upon first principles:

> It rests upon the fundamental consideration that the Constitution creates no
> executive prerogative to dispose of the liberty of the individual. Proceedings
> against him must be authorized by law. There is no executive discretion to
> surrender him to a foreign government, unless that discretion is granted by law.

*Id.* at 9. In short, Petitioner contends that Respondents lack "*any* authority to surrender [him] to a
foreign government except as provided by statute or treaty." *Quinn*, 783 F.2d at 782 (emphasis
added). Respondents have invoked no such authority.

Finally, Petitioner's presence in Guantanamo confers on him constitutional and statutory
rights, the assertion of which would be frustrated should he be transferred to another country
without any opportunity to object. *See generally Gherebi v. Bush*, 374 F.3d 727, 737 n.14 (9th
Cir. 2004) (citing *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir. 1992),
*vacated as moot sub. nom., Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918 (1993)). *Gherebi*
adopted the Second Circuit's analysis in *Haitian Ctrs. Council*, a case that involved issues very

similar to those presented here.  *See id.*  In *Haitian Ctrs. Council*, the Second Circuit affirmed a

district court's grant of a preliminary injunction to Haitian asylum seekers who were interdicted

in international waters and then taken to Guantanamo.  Specifically, it found that the aliens'

"raise[d] serious questions going to the merits of [their] claim that the fifth amendment applies to

non-accused, non-hostile aliens held incommunicado on a military base within the *exclusive*

control of the United States, namely Guantanamo Bay."  *Haitian Ctrs. Council*, 969 F.2d at 1343

(emphasis in original).  Based on this analysis, the Ninth Circuit adopted *Haitian Ctrs. Council*'s

conclusion:

> "It does not appear to us to be incongruous of overreaching to conclude that the
> United States Constitution limits the conduct of United States personnel with
> respect to officially authorized interactions with aliens brought to and detained by
> such personnel on a land mass exclusively controlled by the United States ... given
> the undisputed applicability of federal criminal laws to incidents that occur there
> and the apparent familiarity of the government personnel at the base with the
> guarantees of due process, fundamental fairness and human treatment which this
> country purports to afford to all persons."

*Gherebi*, 374 F.3d at 737 n.14 (quoting *Haitian Ctrs. Council*, 969 F.2d at 1343).

*Haitian Ctrs. Council* also concluded that the district court correctly found that the aliens

in that case faced irreparable harm: "[d]eportation to a country where one's life would be

threatened obviously would result in irreparable injury."  969 F.2d at 1339 (citation, internal

quotations omitted).  The irreparable harm resulting from rendition or transfer to a state in which

torture is practiced is equally obvious.  Thus, Petitioner has raised a substantial challenges to

Respondents' assertion of a unilateral right to transfer him to a country of its choosing.

**2.     The Requested Injunction Will Cause Respondents No Cognizable Harm**

Respondents fail to demonstrate that they would be harmed if this Court enjoins

Respondents from transferring Petitioner into the custody of a foreign government without notice

or an opportunity for Petitioner to be heard.

Petitioner requests exceedingly modest relief.  He requests *notice*.  It is by no means clear

that this motion will ever prevent any transfers that Respondents wish to effect; nor is it clear that

Petitioner will ever attempt to prevent any transfers. All Petitioner seeks here is 30 days advance notice of the government's intent to transfer Petitioner. If this Court grants Petitioner's motion, and the government provides such notice, Petitioner may well decide not to challenge the government's proposed transfer. Alternatively, if this Court grants the motion, the government may decide not to render Petitioner into another country's detention. Thus, the Respondents' dire predictions of judicial interference in foreign policy decisions of the Executive Branch, and separation of powers concerns, ring hollow. At this stage, where Petitioner asks for nothing more than notice and an opportunity to be heard -- the most fundamental attributes of due process -- Respondents' predictions are premature, if not completely irrelevant.

The fundamental nature of notice and an opportunity to be heard before any deprivation of liberty occurs is a bedrock constitutional principle. *Fuentes v. Shevin*, 407 U.S. 67, 82. (1983). This "bedrock principle" was recently reaffirmed in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), where the Court held that Mr. Hamdi must receive notice and a fair opportunity to be heard before a neutral decision maker. *Id*. at 533 (citations omitted). The Supreme Court further quoted *Fuentes*, noting that "[f]or more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.' " *Id*. at 533 (quoting *Fuentes,* 407 U.S. at 80). Mr. Khan seeks only that "bedrock" protection assured under the Fifth Amendment.

Contrary to Respondents' assertions, the requested injunction does not prevent or prohibit Respondents from obtaining "assurances" from a foreign government, although such "assurances" appear to be of limited value in any event. *See "Empty Promises": Diplomatic Assurances No Safeguard Against Torture*, Human Rights Watch, Vol. 16, No. 4 (Apr. 2004); *see also* Amnesty International, *Torture and secret detention: Testimony of the 'disappeared' in the 'war on terror'* AMR 51/108/2005 (Aug. 4, 2005), *available at*

http://web.amnesty.org/library/pdf/AMR511082005ENGLISH/$File/AMR5110805.pdf (last visited on Dec. 27, 2005).

Certainly, this Court may lift or modify an injunction if the Respondents can demonstrate a justification for doing so, and the only effect that an injunction would have in this case would be to permit the Petitioner to challenge a transfer, and prevent the possible loss of this Court's jurisdiction, before that transfer takes place.  Nor is there any legitimate fear of "disclosure" of confidential communications with a foreign government arising from there mere giving of notice. *Cf. Padilla v. C.T. Hanft, U.S.N.*, __ F.3d __, 2005 WL 3489526, *3 (4th Cir. Dec. 21, 2005) (rejecting potential future disclosure of information as a basis for the government's conduct in the Padilla litigation).

Respondents' also allege, in general terms  that a  chilling effect would come from public disclosures and that judicial review could negatively affect the ability to succeed in the war on terrorism.  Waxman Declaration at 5.  However, as Respondents well know, in this case, secure facilities have already been established for the handling, review and maintenance of sensitive classified information.  In the course of their representation of the Guantánamo Bay detainees, counsel for Guantánamo Bay detainees (including Petitioner's counsel) will have access to extensive information that they cannot—and will not—share, either with the public or with their clients.  Respondents have failed to identify how "sensitive" negotiations would be affected if they were "disclosed" only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established.  In addition, other than the conclusory sentence, Mr. Waxman does not demonstrate how providing 30 days notice of a proposed transfer of Mr. Khan will damage the war on terrorism.

In the end, the "parade of horribles" that Respondents conjure in their attempts to obfuscate the reasonableness and simplicity of the relief Petitioner seeks here is ephemeral.  If this Court orders Respondents to provide Petitioner's counsel with notice of an intended transfer, Respondents will not be harmed and the status quo will be preserved.  *See Padilla*, 2005 WL

3489526 at *5 ("On an issue of such surpassing importance, we believe the rule of law is best served by maintaining on appeal the status quo in all respects and allowing Supreme Court consideration of the case in the ordinary course, rather than by an eleventh-hour transfer and vacatur... .").

3.      **Petitioner Will Suffer Irreparable Harm if He is Rendered to a Foreign Nation Without Notice or Opportunity to Be Heard; He Will Also Be Irreparably Harmed if His Claims Cannot Be Adjudicated in this Court.**

In stark contrast, there is ample evidence that the Petitioner is subject to a very real and imminent risk of being rendered into the custody of a foreign government.[3]  Furthermore, there is ample evidence that Afghanistan, the most likely country to which Petitioner would be sent, routinely engages in torture and that individuals who are incarcerated there languish without even the most rudimentary due process of law.

There is no question that Guantánamo Bay detainees, such as Petitioner have been transferred at Respondents' discretion.  In their opposition brief, Respondents concede that "[a]lmost 250 Guantanamo detainees have been so transferred, over a period spanning several years."  *See* Resp. Br. at 3, Resp. Br. Ex. A (Waxman Decl.¶ 4).  Recent news reports confirm that the United States government has a "plan to cut by more than half the population at its detention facility in Guantánamo Bay, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials." *See* Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba,* N.Y. Times, Mar. 11, 2005; *see also* Douglas Jehl & David Johnston, *Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails*, N.Y. Times, Mar. 6, 2005.  Thus, there is a very real possibility that an un-noticed transfer of Petitioner is imminent.

---

[3]  If it is such a remote possibility that Petitioner would be transferred to be further incarcerated or tortured, then why do Respondents insist on refusing to even notify the Court and counsel (even with such notice subject to stringent confidentiality protections)?

        In this case, the home country for the detained Petitioner is Afghanistan, a country well-known for its frequent use of torture.  There are two distinct and equally important harms that Petitioner would suffer if Respondents render him to Afghanistan with no opportunity to challenge a transfer.

        First, after transferring Petitioner to Afghanistan, Respondents would surely turn around and argue that this Court no longer has jurisdiction over the case.  *See* Resp. Br. at 4-5.  In his declaration, Mr. Waxman unequivocally acknowledges that transferee foreign governments include "the government of a detainee's home country, or a country other than the detainee's home country that may have law enforcement or prosecution interest in the detainee." Resp. Br. Ex. A (Waxman Decl. at ¶ 3).  However, the Supreme Court has made it plain that this Court presently has jurisdiction over Petitioner's claims, and that such claims are actionable under United States law. *See Rasul*, 542 U.S. at 483  n.15.  The requested injunction does nothing more than preserve this Court's well-established jurisdiction over this dispute, and prevent the Respondents from exercising self-help to avoid that jurisdiction by "disposing" of an inconvenient litigant  *See Padilla,* 2005 WL 3489526 at *5 (preserving the "status quo").

        Second, while Respondents apparently deny that the government of Afghanistan routinely engages in torture, this position is contrary to the views held by experts in the field.  The recent newspaper reports Petitioner cites in his motion are in accord with extensive, historical data from others—including the United States government itself.  On February 28, 2005, the United States State Department issued its 2004 Country Report on Human Rights Practices for Afghanistan ("2004 Afghanistan Country Report"), which contained, among other things, the following overall summary:

> The Government's human rights record remained poor; although there were some improvements in a few areas, serious problems remained.  There were instances where local security forces and police committed extrajudicial killings, and officials used torture in prisons.  Efforts to bring to justice serious human rights offenders were often ineffective; impunity from the law remained a serious concern.  Punishment of officials usually took the form of administrative actions

rather than prosecution. Prolonged pretrial detention and poor prison conditions
led to deteriorating health conditions and death among some prisoners.

*Id.*, attached as Exhibit 1.

Specifically, although "[t]he Constitution prohibits [torture and other cruel, inhuman, or

degrading treatment or punishment] . . . there were reports of some abuses.  For example, there

were continued reports that some local police authorities in Herat and other locations routinely

employed torture on detainees . . . ."  *Id.* at 3.  Furthermore, "[s]ecurity forces reportedly used

excessive force during their fight against Taliban and al-Qa'ida remnants, including looting,

beating, and torturing of civilians."  *Id.*

Prison conditions were unacceptably poor, subjecting detainees to unsanitary conditions,

starvation, and torture:

> Prison conditions remained poor, and there were reportedly many other secret or
> informal detention centers in the country (see Section 1.d.). Prisoners lived in
> overcrowded, unsanitary conditions in collective cells and were not sheltered
> adequately from severe winter conditions. Prisoners reportedly were beaten,
> tortured, or denied adequate food. The Justice Ministry's assumption of prison
> management from the Interior Ministry in March 2003 improved conditions
> marginally. The humanitarian NGO Emergency reported in January that infectious
> diseases were common among prisoners.

*Id.*  As reiterated elsewhere in the report, "[t]here were credible reports that some detainees were

tortured to elicit confessions while awaiting trial."  *Id.* at 4.

Although Respondents may argue that this information is outdated, because the state of

Afghanistan's government is in flux, the 2004 Afghanistan Country Report makes clear that

coalition forces, too, have engaged in the conduct reported.  For example, "[i]n March, Human

Rights Watch (HRW) claimed that coalition forces operating in the country arbitrarily detained

civilians and committed cruel, inhumane, and degrading acts against detainees."  *Id*. at 3.

In evaluating Respondents' comments regarding the importance of foreign countries'

laws and "assurances" against torture, it is also worth noting that the United States State

Department itself has acknowledged Afghanistan's widespread failures to abide by its own laws

and assurances.  *See id.*  (although "[t]he Constitution prohibits [torture and other cruel,

inhuman, or degrading treatment or punishment] . . . there were reports of some abuses").

      Finally, the State Department's recent report provides little hope that Petitioner's rights will be protected by Afghanistan's judiciary if Respondents transfer him there.  This is because "justice" in Afghanistan is spotty and subject to widespread corruption:

> The courts' procedures did not meet internationally accepted standards for fair trials.  The administration and implementation of justice varied from area to area, as many judges were uneducated or poorly trained and based their judgments on a combination of their personal understanding of Islamic law and tribal codes of honor. Low pay was a factor in reports of widespread corruption. Insecurity and pressure from public officials and the family of the accused also threatened judicial impartiality.

*Id.* at 4.  Although "[d]efendants had the right to an attorney under the law . . . this right was inconsistently applied." *Id.*  To exacerbate matters, "[c]itizens' lack of awareness of their constitutional rights was a problem, and there was no functioning public defender system." *Id.* In addition, "[j]uries were not used, and defendants were not allowed to confront or question witnesses." *Id.*

      This assessment of the state of affairs in Afghanistan comes from the United States government itself.[4]  Additionally, non-governmental organizations and news agencies consistently have reported on the Afghanistani government's practice of torture and other abuses, even in the wake of coalition involvement, painting a grim picture of what awaits Petitioner if Respondents transfer or render him without notice.  *See*, Human Rights Watch, *U.S. Operated Secret 'Dark Prison' in Kabul*, (Dec. 19, 2005) *available at* http://www.hrw.org/english/docs/2005/12/19/afghan12319.htm (last visited on Dec. 19, 2005); Eric Talmadge, *Group Claims U.S. Torture in Afghan Prison*, Guardian Unlimited (Dec. 19, 2005), <u>available at</u>

---

    [4]  In view of these extensive, pointed, and highly negative comments about Afghanistan made *in a formal United States report*, Respondents' claims that providing Petitioner's counsel with advance notice of an impending transfer will seriously and irreparably undermine United States diplomacy, because Petitioner might suggest that Afghanistan engages in torture, is disingenuous—even more so given that proceedings involving Petitioner, unlike the United States government's report, would be sealed.

htp://www.guardian.co.uk/worldlatest/story/0,1280,-5488796,00.html (last visited on Dec. 27, 2005); B.B.C. News, *Torture in Afghan 'secret prison*' (Dec. 19, 2005), *available at* http://news.bbc.co.uk/1/hi/world/south_asia/4541056.stm (last visited on Dec. 27, 2005).

In fact, it is hard to understand how Respondents can seriously contend that Petitioner's concerns about the potential that he will be tortured are based upon "unfounded speculation." *See* Resp. Br. at 12.  Surely the State Department does not based its very own country reports upon "unfounded speculation."  Nor would Respondents have seen it as being in their interest to claim that they have received "assurances" of humane treatment if petitioner's concerns were based on "unfounded speculation."  The threat of torture is real and undeniable; it is the notion that Respondents' "assurances" have any value that is "unfounded speculation."

Not only is there a strong likelihood that Petitioner will be transferred into the hands of government that tortures detainees, the need for this Court to grant the requested relief is especially pressing due to the increasing number of accounts in which Respondents have engaged in extraordinary rendition.  According to several news reports, including several cited in Petitioner's Amended Petition for Habeas Corpus, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process.  This practice—known as "rendition," "irregular rendition," or "extraordinary rendition"—is used to facilitate interrogations involving torture.

_____Respondents have also engaged in rendition to avoid judicial orders and judgments.  *See generally Padilla*, 2005 WL 3489526 at *3 (noting that the government's actions in the *Padilla* case "have given rise to at least an appearance that the purpose of [its] actions may be to avoid consideration of our decision by the Supreme Court").  For example, when another judge of this Court recently found that the allegations of Omar Abu Ali— an American citizen claiming that he was being detained and tortured in Saudi Arabia at the direction of the United States—were sufficiently credible to warrant jurisdictional discovery, *see Ali v. Ashcroft,* 350 F. Supp. 2d 28,

69 (D.D.C. 2004), the United States acted to moot Ali's habeas case by returning him to the United States to face criminal proceedings. *See* Daniel Eisenberg, *The Rough Justice of War,* Time Magazine, Feb. 28, 2005. Respondents' documented practice of transferring suspects outside the United States substantiates Petitioner's fears of being deprived of United States judicial protection. Moreover, whether Petitioner is subject to a transfer tomorrow, or next week, or the week after that, is exclusively within Respondents' control.

In sum, there is substantial evidence of Respondents engaging in the practice of rendition, including Respondents' own statement that Respondents will not disclose whether or when such transfers will take place. Petitioner has presented a sufficiently severe and substantial risk of harm to justify the limited injunctive relief requested here.

**4.      Public Policy Strongly Favors Providing Petitioner With the Requested Notice**

Respondents assert that they, and only they, can determine whether or when a Guantánamo Bay detainee should be transferred to a foreign country—and that they will do so unless they, in their alleged sole and unreviewable discretion, find it "more likely than not" that the transferee "will" be tortured. Resp. Br. Ex. A (Waxman Decl. at ¶ 6); Ex. B (Prosper Decl. at ¶ 4). In other words, Respondents claim that this Court can do nothing to prevent the loss of its jurisdiction or the violation of applicable law, so long as the Secretary of the Navy can convince himself that there is only a 50% or less chance that a detainee will be tortured.

Federal courts have repeatedly rejected such claims of unfettered discretion, specifically in the Supreme Court's decision in *Rasul*, 542 U.S. 466. As the United States District Court for the District of South Carolina astutely observed in rejecting yet another recent argument for unfettered executive discretion, "[certainly, Respondent does not intend to argue here that, just because the President states that Petitioner's detention is 'consistent with the laws of the United States . . .' that makes it so. Not only is such a statement in direct contravention to the well settled separation of powers doctrine, it is simply not the law." *Padilla v. Hanft*, Civil Action No. 2:04-2221-26-AJ, Opinion and Order at 18 (D.S.C., filed Feb. 28, 2005).

Regardless of how satisfied the Executive Branch may feel about its own decisions, when a federal litigant is properly before a Court that has exercised jurisdiction over the underlying claims in a case, that litigant must be provided a meaningful opportunity to contest a transfer seeking to place him outside the Court's jurisdiction or into the hands of torturers. *See Hamdi Hamdi*, 542 U.S. at 533 ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard;  and in order that they may enjoy that right they must first be notified.'   It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.' " (quoting *Fuentes,* 407 U.S. at 80).

For this reason, Respondents' lengthy discussion of extradition proceedings is simply beside the point.  *See* Resp. Br. at 17-20.  This is not an "extradition" issue, because Respondents in no way claim that the "renderings" Respondents are utilizing in this context follow the formal extradition process and its attendant procedural protections.

In the alternative, even if extradition bears on Petitioner's challenge to his continued detention, Petitioner has also claimed that his current detention is illegal under United States law, and the Supreme Court has expressly held that this Court has jurisdiction over Petitioner's substantive claims.  *Rasul*, 542 U.S. 466.  Thus, whether or not extradition factors into Petitioner's habeas claim, the "rule of non-inquiry" cannot prevent this Court from protecting its jurisdiction over the Petitioner's other substantive claims.  Respondent's "extradition" arguments are beside the point.

**B.    Denial of the Motion Would Be Improper Before Discovery**

Finally, there can be no doubt—and Respondents do not deny—that this Court may order discovery in a case such as this one.  Discovery is uniquely appropriate in this case.  Petitioner has been held incommunicado for years without access to family, friends, and counsel.  Furthermore, the facts surrounding Petitioner's potential transfer lie exclusively within Respondents' possession.  Respondents seek to use their exclusive control of the facts as a

17

weapon, by presenting this Court with generalities of supposed procedures while refusing to disclose any details applicable to Petitioner himself.

For example, Respondents' declarations provide no details as to how well, when, or even if, these generalized procedures are followed, and provide nothing by which the Court may gauge the accuracy of the Respondents' assertions. However, the generalized procedures that Respondents outline are not the last word on the subject. It has become increasingly plain that United States security agencies have often been given carte blanche with respect to rendition. As recently reported in the New York Times:

> The Bush Administration's secret program to transfer suspected terrorists to foreign countries for interrogation has been carried out by the Central Intelligence Agency under broad authority that has allowed it to act without case-by-case approval from the White House or the State or Justice Departments, according to current and former government officials. The unusually expansive authority for the C.I.A. to operate independently was provided by the White House under a still-classified directive signed by President Bush within days of the September 11, 2001 attacks at the World Trade Center and the Pentagon, the officials said.. . .
>
> In recent weeks, several former detainees have described being subjected to coercive interrogation techniques and brutal treatment during months spent in detention under the program in Egypt and other countries. The official would not discuss specific cases, but did not dispute that there had been instances in which prisoners were mistreated. The official said none had died . . . .
>
> The official refused to say how many prisoners the government had transferred as part of the program. But former government officials say that since the Sept. 11 attacks, the C.I.A. has flown 100 to 150 suspected terrorists from one foreign country to another, including to Egypt, Syria, Saudi Arabia, Jordan and Pakistan.

Jehl & Johnston, *supra* at p. 11.

A front-page Washington Post article recently noted how "[t]he system the CIA relies on to ensure that the suspected terrorists it transfers to other countries will not be tortured has been ineffective and virtually impossible to monitor." *See* Dana Priest, *CIA's Assurances on Transferred Suspects Doubted,* Wash. Post., Mar. 17, 2005. The article notes how only verbal "assurances" are received from other nations. One C.I.A. official involved with renditions "called the assurances from other countries 'a farce.'" *Id.* Attorney General Alberto Gonzales

was quoted as saying:

> [W]e can't fully control what that country might do.  We obviously expect a
> country to whom we have rendered a detainee to comply with their representations
> to us.  If you're asking me, 'Does a country always comply?' I don't have an
> answer to that.

*Id*.  Of course, there is a certain "beauty" in such answers. As one person interviewed in the
article noted, 'It would be stupid [for the United States] to keep track of them because then you
would know what's going on. . . . It's really more like, 'Don't ask, don't tell.''  *Id.*

Others do tell, however.  A released detainee revealed how he had been tortured in Egypt
for six months after United States officials sent him there—"hung by his arms from hooks,
shocked, nearly drowned and brutally beaten."  *Id*.  One United States official who had visited
foreign prisons where suspects had been rendered stated, "It's widely understood that
interrogation practices that would be illegal in the U.S. are being used."  *Id*.  The article noted
how "[t]he CIA's Inspector General recently launched a review of the rendition system."  *See
also* Briefing Paper, *The United States '"Disappeared": The CIA's Long-Term "Ghost
Detainees*", Human Rights Watch (Oct. 2004).

On the topic of "Don't ask, don't tell," Respondents apparently never informed any judge
of this Court of Respondent Rumsfeld's February 5, 2005, memorandum before it was reported
in the New York Times.  In light of such limited disclosures, it would be inappropriate to give
weight or credence to the admittedly generalized declarations Respondents bring to this Court,
See Resp. Br. Ex. A (Waxman Decl. at ¶ 1) ("The following statements provide a general
overview of the process . . . ."); *id.* Ex. B (Prosper Decl. at ¶ 1) ("The following statements
provide a general overview of the Department of State's role . . . ."), while preventing Petitioner
from engaging in discovery to determine when, or if, those procedures are applied.  Despite
Respondents' discussions of "policy," and comments about how non-torture assurances are
"sought" in every transfer case, *id.* Ex. B (Prosper Decl. at ¶ 6), both of Respondents' declarants
ultimately acknowledge that, at the end of the day, "[d]ecisions on transfer are made on a case-

by-case basis." Resp. Br. Ex. A (Waxman Decl. at ¶ 7). *See also* Resp. Br. Ex. B (Prosper Decl. at ¶ 7) ("Decisions with respect to [the transfer of Guantanamo detainees are made on a case-by-case basis."). And, of course, both declarants speak only of what they know about their own agencies' actions; their comments in no way address the recently-publicized, apparently active role of the CIA in America's rendition process.

Petitioner has established a strong basis for this Court to grant his motion. If this Court is inclined to disagree, it cannot be overlooked that Respondents have sole possession of all the facts needed to successfully challenge a decision to render the Petitioner to the custody of a foreign government, and yet have submitted only generalized, limited declarations. In view of these circumstances, Petitioner requests that, if this Court is inclined to deny his motion on the facts and arguments presented here, the Court first allow Petitioner to engage in the limited discovery necessary to support his requests for relief. At a minimum, that discovery should permit Petitioner to serve discovery requiring Respondents' declarants to provide the factual basis underlying their assertions.

Given Petitioner's uncertain status and the government's apparent plans to render him to the custody of a foreign state, Petitioner also respectfully requests that the Court hold an evidentiary hearing on this motion as expeditiously as possible.

## III.

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner respectfully request that this Court grant his motion. The relief Petitioner requests is necessary to ensure that the Court retains jurisdiction over Petitioner's claims, to allow for Petitioner to meaningfully petition this Court, and to prevent the torture of Petitioner.

Dated:  December 27, 2005.                    Respectfully submitted,


_____
**SHEREEN J. CHARLICK** (Cal. Bar. No. 147533)
Federal Defenders
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467  (tel)
(619) 687-2666  (fax)
e-mail: Shereen_Charlick@fd.org

## <u>CERTIFICATION AND VERIFICATION</u>

Counsel for Petitioner certifies that the foregoing pleading is true and accurate to the best of her information and belief, and that a copy of the foregoing document has been served this day upon Andrew Warden, counsel for Respondents.


Dated: December 27, 2005                          _____

                                                 Shereen J. Charlick