# IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **MOHABAT KHAN,** | ) |
| Guantánamo Bay Naval Station, | ) |
| Guantánamo Bay, Cuba | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Civil Case No. **05-CV-01010 (RJL)** |
| **GEORGE W. BUSH** | ) |
| President of the United States | ) |
| The White House | )   JUDGE RICHARD J. LEON |
| 1600 Pennsylvania Avenue, N.W. | ) |
| Washington, D.C. 20500; | ) |
| | ) |
| **DONALD RUMSFELD** | ) |
| Secretary, United States | ) |
| Department of Defense | ) |
| 1000 Defense Pentagon | ) PETITIONER'S OPPOSITION TO |
| Washington, D.C. 20301; | ) RESPONDENTS' MOTION FOR |
| | ) PROCEDURES, MEMORANDUM |
| **ARMY BRIG. GEN. JAY HOOD** | ) OF POINTS AND AUTHORITIES |
| Commander, Joint Task Force - GTMO | ) IN SUPPORT OF RESPONSE TO |
| JTF-GTMO | ) "JURISDICTIONAL" NOTICE AND |
| APO AE 09360; and | ) REQUEST FOR ENTRY OF |
| | ) PROTECTIVE ORDER |
| **ARMY COL. MIKE BUMGARNER** | ) |
| Commander, Joint Detention | ) |
| Operations Group, JTF - GTMO | ) |
| JTF-GTMO | ) |
| APO AE 09360 | ) |
| Respondents. | ) |

_____

## PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES
### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF:
### RESPONSE TO "JURISDICTIONAL"
### NOTICE & REQUEST FOR ENTRY OF PROTECTIVE ORDER

1

Petitioner, Mohabat Khan, through undersigned counsel, respectfully files this Opposition to Respondents' July 7, 2006 Motion for Procedures Related To Review of Certain Detainee Materials ("Motion for Procedures"). He first addresses the issue of this Court's jurisdiction in Response to the Court's August 8, 2006 Order and Respondent's July 7, 2006 Notice setting forth their position concerning the effect of the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, in light of the decision in *Hamdan v. Rumsfeld*, 548 U.S. ___, 126 S. Ct. 2749 (2006). Because as even Respondents must believe by virtue of their request for action in this case by this Court, there is jurisdiction, Mr. Khan renews his request that the Protective Order be entered in this case. Finally, he opposes the relief sought in the Respondents' Motion for Procedures because Respondents have confiscated materials from Mr. Khan which may be attorney-client materials or materials protected by a work-product privilege.[1] Because Respondents have not permitted entry of the protective order in this case, citing primarily a lack of jurisdiction, undersigned counsel are unable to ascertain whether the seized materials related to preparation of Mr. Khan's defense. Petitioner opposes Respondent's request to review these materials via a "filter team" consisting of its employees, and seeks return of these materials to

---

[1] In light of their refusal to allow attorney-client contact, Respondents may contend that nothing seized from Mr. Khan can be privileged material. However, unlike other detainees, Mr. Khan is an individual who actually drafted a substantive *pro se* habeas petition where he asserted that he was innocent of all terrorist activities and requested his release. Mr. Khan was likely informed by other detainees that the District Courts had appointed counsel to cases like his, where a *pro se* petition was filed. As he did with his *pro se* petition, Mr. Khan may have been drafting his own legal materials and/or drafting correspondence to counsel, awaiting the time when he could meet with his assigned attorneys. Thus, the materials seized may well be either attorney/client privileged communications or work-product privileged matter which could reveal defense strategy. There is also no showing made in Respondents' filing that Mr. Khan's seized materials or conduct otherwise indicates that he is part of some plot to kill himself or otherwise cause unrest at Guantanamo.

Mr. Khan, or alternatively for the Court to review the materials *in camera* to ascertain whether or

not these materials are privileged and/or whether these materials should be returned to Mr. Khan

as they do not demonstrate that he is part of any plot to take his own life.  If Mr. Khan has been

punished or disciplined as a result of Respondents' seizure of materials or if Respondents plan to

continue confiscating Mr. Khan's written materials, he also seeks an evidentiary hearing where

Respondents are required to present evidence linking Mr. Khan to some concerted suicide plot.

## I.

## BACKGROUND

On May 19, 2005, Mr. Khan petitioned pro se for a writ of habeas corpus. Court Record

("CR") 1.  On June 3, 2005, Respondents filed a Motion to Stay Proceedings pending the Court

of Appeals for the District of Columbia's determination of the conflicting decisions in *In re*

*Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) and *Khalid v. Bush*, 355 F.

Supp. 2d 311 (D.D.C. 2005). CR 2.  Another basis for the stay was to attempt to seek and recruit

volunteer counsel for individuals such as Mr. Khan.  CR 2 at 4, n.8.

On July 26, 2005, the Court granted the government's motion to stay these proceedings

but failed to enter the protective order which was deemed appropriate for these cases under *In re*

*Guantanamo Detainee Cases*, 344 F. Supp. 174 (D.D.C. 2004).  As the undersigned have already

represented in the motion seeking entry of the protective order, because the protective order was

entered in other similarly-situated cases, failure to enter it here was likely an oversight.  *See* CR

27, 30 (motion and reply seeking entry of protective order filed on February 21, 2006 and April

11, 2006, respectively).  On October 14, 2005, Chief Judge Hogan appointed Federal Defenders

to represent Mr. Khan. CR 4.  After appointment, undersigned counsel filed various motions,

including an amended petition for a writ of habeas corpus ("Petition"), CR 10 and a Motion for an order to show cause. CR 18.

On December 30, 2005, the President signed into law the DTA "which addresses a broad swath of subjects related to detainees," *See Hamdan*, 126 S. Ct. at 2762-63, including provisions which purport to strip habeas jurisdictions from all "court[s], justice or judge" over Guantanamo detainees currently in military custody or who have been labeled "enemy combatant[s]." DTA §§ 1005(e)(1),(e)(2).

On February 21, 2006, Petitioner filed a Motion seeking entry of the Protective Order advising the Court that the Protective Order had been entered in a number of other Guantánamo *habeas* cases subsequent to the passage of the DTA. CR 27.  Petitioners reiterated their request for entry of the Protective Order.  Respondents opposed the motion, based primarily upon what it perceived as a lack of jurisdiction over this action due to the DTA. CR 28 .  They contended that DTA §1005(e)(1) which provides that no court shall have jurisdiction to consider "an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba" applies to pending *habeas* petitions divesting this Court of jurisdiction over all Guantánamo cases. CR 28.  Petitioner filed a reply.  CR 30.

On June 10, 2006, three detainees at Guantanamo apparently committed suicide.  Motion for Procedures at 3.  These suicides have apparently spurred punitive measures taken against Petitioner, including seizure of various undisclosed written materials from him.[2]

---

[2] Undersigned counsel were informed by Respondent's counsel, Andrew Warden that materials were taken from Mr. Khan.

On June 29, 2006, the United States Supreme Court issued its decision in *Hamdan*,  The Court determined that the DTA did not strip the courts of jurisdiction over petitions for *habeas corpus* provided the petitions were pending at the time the DTA was enacted.  126 S. Ct. at 2769 n. 15.  The Court denied the government's subject matter jurisdiction challenge to federal courts' authority over Mr. Hamdan's habeas petition wherein he challenged the Executive's authority to prosecute and punish him and the procedures employed by the Executive, specifically, the proposed military commissions.  *Id*.; *see also id*. at 2759.  The Court employed principles of statutory interpretation to determine that because section 1005(e)(1) was not expressly made applicable to pending cases in the DTA, it could not be applied retroactively.  *See Hamdan*, 126 S. Ct. at 2764 (drawing a negative inference from the absence of the language dictating retroactive application in section 1005(e)(1) as opposed sections 1005(e)(2) &1005(e)(3)) (citing *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)).

The Court recognized that there may be cases where someone was only challenging the CSRT or the decision of the military commission which should be transferred to the District of Columbia Court of Appeals.  *Id*. at 2770 n.14.  Because Hamdan's habeas petition sought much broader relief, he was not merely "contesting any 'final decision' of a CSRT or military commission, [thus], his action does not fall within the scope of subsection (e)(2) or (e)(3) [which would require transfer]."  *Id*.  Because the Court only relied upon statutory construction to reach this result, it did not address the difficult constitutional and statutory questions posed by an interpretation of the DTA which would suspend the writ of habeas corpus retroactively, nor did it address the doctrine of constitutional doubt which counsels against construing statutes in a manner which would raise such serious constitutional questions.  *See id*. at 2769, n.15.  The

5

Court did note and recognize each of these significant arguments raised by Hamdan.  *Id.*; *see also id.* at 2763-64.

After *Hamdan* was decided, Respondents' counsel advised that they would persist in their refusal to agree to entry of the Protective Order, thus,  Petitioner filed a notice of supplemental authority seeking entry of the protective order.  CR 31.[3]  Respondents previously opposed entry of the protective order claiming that the DTA withdrew jurisdiction from this Court and Mr. Khan has no right to counsel.  Both grounds were addressed and eliminated in *Hamdan*.  *See* 126 S. Ct. at 2769, n.15 (DTA does not apply to habeas petitions -- at least those seeking the broad relief sought here -- pending upon its enactment, thus there is district court jurisdiction over habeas petition); *see id.* at 2786, 2790-91 (at least some protections of Geneva Conventions apply and court-martial rules apply which would include right to counsel).  *See infra*, this Opposition at n.

On July 7, 2006, Respondents filed a Notice, asserting that notwithstanding the statements of the Supreme Court in *Hamdan*, the Court still lacks jurisdiction over this Petition. They also continue "to assert that a stay remains appropriate" while due process issues are pending in the appeals court.  Respondents' July 7, 2006 Notice at 3 n.3.  Inexplicably, on the same date, Respondents filed a Motion For Procedures seeking judicial intervention regarding materials they seized from Mr. Khan.  Respondents' have impounded "certain materials associated with . . . [Mr. Khan]," Motion for Procedures at 1, and searched Mr. Khan's cell, *id.* at

---

[3] As noted previously,  undersigned counsel have received security clearance and the only impediment to visiting Mr. Khan is that no protective order has been entered.  Because undersigned counsel have multiple detainee cases, they wished to try to conserve taxpayer resources by making one trip to see all clients at once.

6, as part of an "NCIS investigation to determine the circumstances and cause of death with respect to ... recent suicides." *Id.* at 4. Furthermore, it appears that the government has subjected detainees such as Mr. Khan to even more punishing prison conditions than usual in response to the suicides. *See, e.g.*, "Hicks says Guantanamo conditions worse after detainee suicides," *Jurist Legal News & Research*, July 7, 2006 (reporting that Guantanamo detainee "told family members that conditions at the detention center have worsened in the wake of three detainee suicides"), attached as Exhibit A; "Calls to Close Guantánamo Grow After Suicides," Assoc. Press, June 11, 2006 (noting that guards "now give bedsheets to detainees only when they go to bed and remove them after they wake up in the morning"), attached as Exhibit B. According to the Associated Press, "[h]uman rights activists and defense attorneys said the deaths signaled the desperation of many of the 460 detainees held on suspicion of links to Al Qaeda and the Taliban." *Id.*[4]

---

[4] Recent credible evidence not only confirms that "conditions at the detention center have worsened," *id.*, but according to a report of the United Nations Economic and Social Council distributed on February 15, 2006 ("02/15/06 U.N. Report"), attached as Exhibit C, the government has subjected detainees to severe suffering:

> On the interviews conducted with former detainees, the Special Rapporteur, concludes that some of the techniques, in particular the use of dogs, exposure to extreme temperatures, sleep deprivation for several consecutive days and prolonged isolation were perceived as causing severe suffering.
> . . . .
> Whereas it is conceivable that in the beginning the conditions of detention put in place were determined for reasons of order and security, they then seem to have been used to "counter resistance" and to cause stress. Moreover, they were closely linked with investigation techniques. There is plentiful evidence indicating that policies aimed at forcing detainees to cooperate such as withholding of clothes or of hygienic products, permanent light in the cells, no talking, cultural and religious harassment, sensory deprivation, intimidation, and the deliberate uncertainty generated by the indeterminate nature of confinement and the denial of access to independent tribunals, were used and led to seriously mental health problems.

02/15/06 U.N. Report at 25-26 (internal formatting and footnotes omitted). The 02/15/06 U.N.

7

Mr. Khan opposes Respondents' Motion for Procedures and seeks return of all materials seized

from him.  That said, having asked this Court to take action in its July 7, 2006 Motion for

Procedures, Respondents cannot be convinced that this Court lacks jurisdiction over this cause --

and for good reason.  According to the Supreme Court's interpretation of the DTA in *Hamdan*

and the broad relief sought by Mr. Khan, this Court has jurisdiction.  *See Hamdan*, 126 S. Ct. at

2769 n.15.  Petitioner's legal analysis of the jurisdictional issue is set forth below.  Assuming the

Court will reach the merits of the Respondents' Motion for Procedures  Because the Court holds

that, at a minimum, Common Article 3 of the Geneva Convention and the rules for courts-martial

apply to Mr. Khan and both would afford him the right to counsel and to meet with counsel, he

renews his prior request for entry of the Protective Order.

## II.

### THIS COURT HAS JURISDICTION

Respondents previously argued that this DTA section 1005(e)(1) which provides that no

court shall have jurisdiction to consider "an application for a writ of habeas corpus filed by or on

behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba" applies to

pending cases divesting this Court of jurisdiction over all Guantánamo *habeas* cases. CR 28.

In *Hamdan,* the Supreme Court rejected this section 1005(e)(1) argument.  After reviewing the

statutory text and legislative history, the Court held that "§1005(e)(1) does not strip federal

---

Report also chronicles the government's excessive use of violence toward detainees, which
"[t]he Special Rapporteur considers . . . amounts to torture," *id.* at 26, and discusses the
"consistent reports about the practice of rendition and forcible return of Guantánamo detainees to
countries where they are at serious risk of torture," *id.* at 26.  Finally, the 02/15/06 U.N. Report
concludes that "[i]nvestigations into allegations of torture . . . were conducted by different parts
of the executive branch, and lacked impartiality."  *Id.* at 27 (internal footnotes omitted).

courts' jurisdiction over cases pending on the date of the DTA's enactment." 126 S. Ct. at 2769 n.15. Because *Hamdan* involved a *habeas* petition that was pending at the time of the enactment of the DTA, the exercise of jurisdiction was appropriate. Similarly, Mr. Khan's *habeas* petition was pending when the DTA was enacted, hence, this Court should exercise jurisdiction over Mr. Khan's claims. *See id.*.

In spite of *Hamdan*'s clear command that the DTA does not "strip federal courts' jurisdiction over cases pending on the date of the DTA's enactment," *id.*, Respondents mistakenly maintain that the DTA divests jurisdiction from this Court. They now assert that jurisdiction is barred by other exclusive review provisions of the DTA, in particular, the provision that vests the District of Columbia Circuit Court of Appeals with exclusive authority to review any final decision of a Combatant Status Review Tribunal ("CSRT") that an alien is properly detained as an enemy combatant, *see* DTA § 1005(e)(2) and DTA § 1005(e)(3) providing for exclusive review in the D.C. Circuit for military tribunal decisions. *See* Respondents' July 7, 2006 Notice. Respondents are wrong. *Hamdan* itself recognized that "[DTA] subsections (e)(2) and (e)(3) grant jurisdiction only over actions 'to determine the validity of any final decision' of a CSRT or commission." 126 S. Ct. at 2768-69. Thus, a petitioner who is "not contesting any 'final decision' of a CSRT or military commission . . . does not fall within the scope of subsection (e)(2) or (e)(3)." *Id.* at 2769. The Court indicated that while a challenge to the final decision of the CSRT would be subject to section1005(e)(2)'s exclusive review requirement, *habeas* actions challenging the legitimacy of all the processes employed by Respondents which have resulted in his detention would not. *See id*. Significantly, the Court noted the possibility of dual proceedings:

>There is nothing absurd about a scheme under which pending habeas
>actions—particularly those, like this one, that challenge the very legitimacy of the
>tribunals whose judgments Congress would like to have reviewed—are preserved, and
>more routine challenges to final decisions rendered by those tribunals are carefully
>channeled to a particular court and through a particular lens of review.

*Id.*[5]

Mr. Khan's habeas corpus petition is not a challenge to the final decision of a CSRT or a military tribunal's determination.  He asserts numerous causes of action, challenging his unlawful detention and conditions of his confinement under the Fifth Amendment and the Eighth Amendment, he asserts common law due process doctrines, and he invokes the Geneva Convention, the Uniform Code of Military Justice and the Alien Tort Statute.  *See* CR 10 at 16-27.  He alleges that the Executive's conduct and policies exceed the bounds of Article II of the Constitution, CR 10 at 23, and he seeks declaratory and injunctive relief in addition to relief from unlawful detention -- *habeas corpus* – the remedy that permits him to demand either release to freedom or legal justification for imprisonment.[6]  In doing so, he denies the legitimacy of the CSRTs and the procedures and processes under which he is presently detained.  For example, their Petitions allege, among other things, that: (1) Petitioners are not properly detained subject to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or Joint Resolution 23, Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept.

---

[5]  *Cf. id.* at 2815 (Scalia, J., dissenting) ("By drawing a negative inference *à la Lindh*, the Court supplants this exclusive-review mechanism with a dual-review mechanism for petitioners who were expeditious enough to file applications challenging the CSRTs or military commissions before December 30, 2005.").

[6]  This is the remedy which the Court has repeatedly recognized applies here.  *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004)(recognizing that habeas was proper vehicle to challenge indefinite detention -- both for aliens and citizens) *Rasul v. Bush*, 542 U.S. 466, 485 (2004)(allowing habeas petitions filed by aliens at Guantanamo).

18, 2001) ("AUMF"); (2) the executive order issued by President Bush, 66 Fed. Reg. 57,833 § 2

(Nov. 13, 2001), was not authorized by Congress and is beyond the scope of the Joint Resolution;

(3) Petitioners have been denied the process due to them under the common law and the Due

Process Clause of the Fifth Amendment, domestic civil and military law, and international law;

(4) the conditions of confinement at Guantánamo violate the Constitution, the regulations of the

United States Military, the Geneva Convention, the International Convention on Civil and

Political Rights, the American Declaration on the Rights and Duties of Man, the 1954

Convention Relating to the Status of Refugees and customary international law; and (5)

Petitioners are at risk of being rendered without lawful procedures to a country that engages in

torture during interrogations and incarceration.   Respondents' attempt to recast Petitioner's

action as nothing more than a challenge to the validity of the CSRT decisions must fail once the

actual habeas petition is reviewed.

Subsequent to *Hamdan,* courts have exercised jurisdiction over the Guantánamo *habeas*

cases.  *See, e.g., Al Darby v. Bush,* Case No. 05-2371 (RCL) (July 3, 2006 Order entering the

Protective Order); *Hamoud v. Bush,* (July 5, 2006, Order concluding that "the [*Hamdan*] Court

made clear that this court retains jurisdiction over this *habeas corpus* petition."[7]

Whether they admit it or not, by seeking relief from this Court, Respondents acknowledge

its jurisdiction to afford such relief.  Respondents cannot both request the assistance of this Court

when it suits their needs but deny the authority of the Court to act on any request for relief filed

---

[7] As Petitioner noted in his Supplemental Authority, even before *Hamdan* was decided, a number of district court judges rejected the assertion that the DTA precluded entry of the protective order.  *See* CR 30 at 5 n.3.

11

by anyone else.[8]  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (principles of judicial

estoppel prevents parties from taking one legal position when it suits their interests and altering

that legal position when their interests change) (citing 18 C.Wright, A. Miller & E. Cooper,

*Federal Practice & Procedure* §4477 p. 782 (1981) ("absent any good explanation, a party

should not be allowed to gain an advantage by litigation on one theory and then seek an

inconsistent advantage by litigation on an incompatible theory").

## III.

## THIS COURT SHOULD DENY RESPONDENTS' MOTION FOR PROCEDURES AND SAFEGUARD MR. KHAN'S RIGHT TO ENGAGE IN ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS

Nearly a month after the fact, Respondents now disclose to this Court that, between June

10 and June 14, 2006, NCIS seized and examined over a half-ton of written communications

between Guantanamo prisoners and their lawyers. Motion for Procedures, Kisthardt Decl. ¶¶ 2-5.

The government's seizure and examination of these materials violates the well-settled principles

of American and international law.  Nevertheless, having belatedly disclosed its illegal seizure

and examination of privileged materials, the government now asks this Court to condone its

actions and permit it to retain the seized materials and examine them even more closely.  Not

only should this Court summarily deny Respondents' request, this Court should find Respondents

in contempt, sanction the government for its illegal conduct, and refer the matter to the Justice

---

[8] Respondents' notation that the Motion for Procedures is filed "without prejudice to respondents' position that the Court lacks jurisdiction," Motion for Procedures at 2 n. 3, is meaningless -- either there is jurisdiction or there is not.  It is not something that can be "waived" by a party's admission.  *See, e.g., United States v. Cotton*, 535 U.S. 625(2002) (subject matter jurisdiction is something that exists by virtue of statute and it cannot be waived under any circumstances).

Department's Office of Professional Responsibility, as urged by the American Bar Association ("ABA"). *See* Letter from Michael S. Greco of the ABA to Arlen Specter and Patrick Leahy, attached as Exhibit D (urging "the [U.S. Senate Committee on the Judiciary] to request that the Inspectors General for the Department of Defense and the Justice Department investigate this matter promptly and make their findings and conclusions public in a report to the Committee).

**A.     The Attorney-Client Privilege Applies.**

It is now settled that prisoners held at Guantanamo, including Mr. Khan, have a right to representation and access to counsel. In 2004, the Supreme Court held that Guantanamo detainees had the right to seek relief in habeas corpus petitions. *Rasul v. Bush*, 542 U.S. 466, 485 (2004). In that same year, the Supreme Court held that a United States-citizen detainee alleged to be an enemy combatant and seeking access to counsel to challenge that classification "unquestionably has the right to access to counsel in connection with ... [habeas corpus] proceedings[.]" *Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004).

In response to these cases, judges of this Court have reached the inevitable conclusion that the right to counsel encompasses and includes the right to freely and safely communicate with counsel in a privileged manner. In *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004), Judge Kollar-Kotelly of this Court recognized that "[t]he privilege that attaches to communication between counsel and client has long held an exceptional place in the legal systems of the United States." Magistrate Judge Kay of this Court "flatly rejected" the government's position that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit" and the government's effort to impose

"significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees." *Adem v. Bush*, 425 F. Supp. 2d 7, 11-12 (D.D.C. 2006).

Were there any doubt that Guantanamo detainees such as Mr. Khan are entitled to the effective access to counsel, in *Hamdan*, the Supreme Court made clear that at least Article 3 of the Geneva Conventions applies to Mr. Khan, including the provision prohibiting "[t]he passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See* Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3318, T.I.A.S. No. 3364, Article 3; *Hamdan,* 126 S. Ct. at 2795. The "civilized peoples" of the United States, at least, afford the judicial guarantee of access to counsel to detainees, including the protections of the attorney-client privilege.[9]

---

[9] It should not be overlooked that, while the focus of *Hamdan* is Article 3 of the Geneva Conventions, there are numerous references to and assumptions that the other articles may apply as well—and the President has conceded as much. As noted in *Hamdan*, "[t]he President has stated that the conflict with the Taliban is a conflict to which the Geneva Conventions apply." 126 S. Ct. at 2795, n.60 (citing White House Memorandum, Humane Treatment of Taliban and al Quaeda Detainees 2 (Feb. 7, 2002), attached as Exhibit E. *See also* 126 S. Ct*.* at 2793 (rejecting court of appeals' conclusion that Hamdan is not entitled to the protections—plural not singular—of the Geneva Conventions without limiting such protections to only Article 3); id.at. 2795, n.61 (discussing Hamdan's contention that Article 5 of the Geneva Conventions confers prisoner-of-war status upon him but refraining from deciding the issue but not because Article 5 does not apply or because only Article 3 applies, but, rather because the military tribunal convened to try Hamdan was illegitimate whether or not he was a "prisoner of war"); *but see id.* at 2795 (not reaching the question of whether the Geneva Conventions in their totality apply, because, at a minimum, Article 3 applies).

This is important because both the Geneva Conventions and the Uniform Code of Military Justice ("UCMJ") relied on so heavily by the Supreme Court in *Hamdan* as a lodestar for the minimum protections available to a Guantanamo detainee charged with a crime provide for a right to counsel. *See* Geneva Convention (III) Relative to the Treatment of Prisoners of

In short, the attorney-client privilege is the meat on the bones of the effective representation to which Mr. Khan is entitled. *See, e.g., Back v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974) ("An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to regress his grievances is particularly important"); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised."). *See also Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (holding that, even for prisoners convicted of *crimes*, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid").

The issue, then, is not whether Mr. Khan is protected by the attorney-client privilege, but instead, whether the government's violation of the privilege was justified.  It was not.

**B.    The Government's Violation of the Attorney-Client Privilege Was Unwarranted.**

Before the government can abrogate the attorney-client privilege, it must make a specific, individualized showing that there is a sufficiently compelling justification for invading the

---

War ("GPW"), Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3318, T.I.A.S. No. 3364, Article 3 (prohibiting "[t]he passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples"); *id*. at Article 98 ("No prisoner of war may be convicted without having had an opportunity to present his defence and the assistance of a qualified advocate or counsel"); *id*. at Article 105 ("The prisoner of war shall be entitled to . . . defence by a qualified advocate or counsel of his own choice . . . "); *see also* 10 U.S.C. § 838(b)(1) ("The accused has the right to be represented in his defense before a special or general court-martial . . . .").  The Geneva Conventions also provides that counsel for the prisoner of war "may, in particular, freely visit the accused and interview him in private."  GPW, Article 105.

privilege.  For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies—that is, that the client whose privilege the government seeks to breach "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.  *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997).[10]

Seizure of legal papers is a particularly egregious violation of the attorney-client privilege because it strikes at the heart of the attorney-client relationship and interferes with a detainee's access to the courts.  *See, e.g., Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) ("The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts . . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest" (internal citations omitted)).[11]  Thus, even when seized documents will be reviewed in

---

[10]  *See also In re Richard Roe, Inc.,* 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that the attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoena Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents that the corporation failed to produce).

[11]  *See also Simmons v. Dickhaut*, 804 F.2d 182, 183-84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); *Carter v. Hutto*, 781 F.2d 1028, 1031-32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

camera by the court—and not by the government, as here—"the judge should require a showing

of a factual basis adequate to support a good faith belief by a reasonable person that . . . *in*

*camera* review of the materials may reveal evidence to establish the claim that the crime-fraud

exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal quotations and

citations omitted).  In this case, the government has made no showing whatsoever "of a factual

basis adequate to support a good faith belief by a reasonable person" that Mr. Khan has misused

his legal papers.  *Id*.  In fact, the government has made no factual showing with respect to Mr.

Khan at all.

As the basis for its wholesale seizure of over a half-ton of privileged materials from

hundreds of prisoners, the government claims that it seized the prisoners' legal papers because

notes found in the cells of the prisoners that allegedly committed suicide suggested that the

prisoners might have used the cloak of the attorney-client privilege to further a suicide plot by the

prisoners, perhaps "encouraged, ordered, or assisted by third parties."  Motion for Procedures,

Harris Decl. ¶ 4.  In particular, "NCIS found what appeared to be handwritten suicide notes on

the deceased detainees persons."  *Id.* ¶ 3.  Additionally, NCIS "discovered a handwritten note

hidden in the mesh wall of one of the deceased detainee's [sic] cell which, when translated, was

found to be related to the suicides."  *Id*.  The back of the note was stamped "Attorney Client

Privilege."  Id.  In other prisoners' cells, the NCIS found additional "notes . . . considered to be

relevant to the investigation . . . , many of them on stationery stamped 'Attorney-Client

Communication,' 'Privileged and Confidential,' and 'Attorney-Detainee Materials[.]'"  *Id*.  After

expanding the scope of its search "to include handwritten materials in all enemy combatant

detainees' cells throughout the Guantanamo detention facility," *id*. ¶ 4, NCIS found a note

containing "instructions on tying knots, *id*. ¶ 5, "an original JTF-GTMO generated email that appeared to contain classified or sensitive information regarding cell locations of detainees as well as details concerning camp operational matters," *id.*, and envelopes marked as privileged containing a document "with a 'Secret' stamp lined out and marked 'Unclassified,' *id*., and a document stamped "FOUO," *id*..

These vague allusions to "evidence," completely unrelated to Mr. Khan, do not establish a "legitimate penological interest" in seizing Mr. Khan's legal documents.  Not only does seizing Mr. Khan's papers interfere with his access to the courts, it chills the giving, receiving, and continued possession of communications from Mr. Khan to his attorneys.  To burden Mr. Khan's access to the courts and counsel in this manner, the government must prove more.

In any event, the government's own descriptions of the documents seized offer little support for the government's position that attorney-client materials are being misused, let alone specific evidence that Mr. Khan has misused such materials.  In fact, the government's description of the documents indicates that many of the documents were documents that the prisoners legitimately could possess, not contraband.  For example, the government alleges that one of the documents was labeled "FOUO" ("For Official Use Only").  As the government well knows, "FOUO" stamps are not classification designations.  "FOUO" is simply an internal Department of Defense designation used to designate whether a particular document may be released to the public under the Freedom of Information Act.  "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ."  Department of Defense Reg. 5200.1: C5.2.7.1.1.3 (emphasis added).  The designation specifically is "not authorized as an anemic form of

classification to protect national security interests," *id*. 5400.7-R:C4.1.1, and in fact "is, by

definition, unclassified," *id.* AP3.2.2.3.2.  Thus, there is nothing illegitimate about a prisoner's

possessing a document with a FOUO designation.

Similarly, the government's allegation that a prisoner's possession of a document with a

crossed-out "SECRET" stamp, marked "Unclassified," is suspect rings hollow.  There is nothing to

suggest that a document marked in this manner is a classified document.[1]  It is more likely that this

is a document that was *once* classified, but then was declassified and marked accordingly.  Because

the Protective Order does not prevent prisoners at Guantanamo from possessing unclassified

documents, there is nothing illegitimate about a prisoner's possessing a document with a crossed-out

"SECRET" stamp.

The remainder of the documents that the government references similarly do not support the

breach of attorney-privilege that the government proposes—and has already engaged in—here.  For

example, the government does not allege that the so-called "knot-tying" document was labeled

"attorney-client material"; nor does the government allege that this document was discovered in a

prisoner's privileged legal folder.  Thus, this document provides no support for the government's

reviewing privileged materials.  Similarly, the prisoners do not appear to have been hiding the

alleged suicide note handwritten on the back of a piece of paper marked "attorney-client privileged."

The government apparently discovered this paper in the mesh of one of the dead prisoners' cells, not

secreted in a privilege folder.  If the deceased prisoner was seeking to keep this document from the

prying eyes of the prison guards by disguising it as a privileged document, why did he place it where

---

[1]  Because the government has not provided counsel with copies of the documents it relies
upon for the instant motion, counsel can only make an educated guess about the nature of the
formerly "SECRET" document.

guards would inevitably discover it?  It is more likely that the prisoner wanted the note to be discovered, and that he drafted it on the only piece of paper readily available to him—a piece of paper that happened to be marked "attorney-client privileged."

Finally, the government does alert counsel and the Court to a single document that (from the government's description of it, anyway) perhaps should not have been in a prisoner's possession. Remarkably, however, the document is an email from the Joint Task Force at Guantanamo—a document that counsel did not provide to the prisoner, because counsel do not have access to such documents.  In any event, no one has stated that Mr. Khan possessed any such document(s).

In short, the government has made no showing that the seizure of Mr. Khan's effects was warranted, let alone the individualized showing that the law requires.  The government's thin and ephemeral "evidence" of wrongdoing simply cannot support the seizures that occurred here, let alone further intrusion into privileged attorney-client communications.

**C.    This Court Should Not Authorize a Defense Department "Filter Team" to Read the Seized Attorney-Client Materials.**

In the unlikely event the government can make an adequate showing "'of a factual basis adequate to support a good faith belief by a reasonable person' . . . that *in camera* review of the materials [seized from Mr. Khan] may reveal evidence to establish" that they are linked to the suicides or that an exception to the privilege applies, *Zolin*, 491 U.S. at 572, the government's proposed "taint" or "filter" team is untenable.  If this Court determines that further review of the seized materials is warranted, that review should be conducted only by the Court or a person appointed by the Court—not by the government's "filter team."  *See, e.g., United States v. Neill*, 952 F. Supp. 834, 841 & n.14 (D.D.C. 1997) (criticizing use of taint team as "unwise," because it

20

"constitutes a *per se* intentional intrusion" on privilege and "at the very least . . . create[s] an appearance of unfairness").

The government suggests a proposed procedure by which a "filter team" comprised of military personnel would review  materials, and then forward them to a "filter litigation team" consisting of federal prosecutors.  Motion for Procedures at 10-11, 22-23.  In the government's view, this is a "fair" process of determining whether it can find useful needles of evidence concerning suicide plots in the 1,100 pound haystack of papers that it indiscriminately has confiscated from the Guantanamo detainees.  Not only does this proposed procedure needlessly trample on Mr. Khan's right to keep privileged materials out of his captors' hands, the proposed procedure also "create[s] an appearance of unfairness" that threatens to undermine Mr. Khan's relationship with his attorneys.  *United States v. Neill*, 952 F. Supp. 834, 841 & n.14 (D.D.C. 1997).

It cannot be overlooked that Mr. Khan has been detained virtually incommunicado for more than three years.  During that time, Mr. Khan has never been charged with a crime.  Nor has he had the opportunity to meet with his court-appointed counsel who were only recently given the security clearances necessary to visit Mr. Khan.  Thus, Mr. Khan's only interactions have been with interrogators and prison guards—in other words, his captors.  Apparently, the government has now confiscated Mr. Khan's effects, including documents containing privileged material Mr. Khan intended to share with counsel.  Under the government's proposed plan, Mr. Khan's captors would retain these sensitive documents, rather than deposit them with a neutral party.  The appearance of impropriety cannot be lost on Mr. Khan.  Many detainees have already begun to suspect that their civilian attorneys are simply government agents in disguise as a result

of statements made to them by interrogators and other government personnel.  *See, e.g.*, Charlie

Savage, *Guantanamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, at A1

attached as Exhibit F.  Absent this Court's affirming the sanctity of the attorney-client privilege,

these seizures will only make Mr. Khan's trust that much harder for counsel to win.

Even the government cannot avoid the fact that courts are reluctant to entrust attorney-

client privileged materials teams of government actors like the "filter team" proposed here.  *See*

Motion for Procedures at 21 n.12.  *See, e.g., Black v. United States*, 172 F.R.D. 511, 516

(S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court

rejected proposed "taint team" and ordered that "a United States district judge or his designee"

would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520-21

(S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged

documents obtained by search warrant).

Significantly, this Circuit recently granted an emergency motion to stay the very sort of

"filter team" review proposed by the government in this case.  In *United States v. Rayburn Office*

*Bldg, Rm. 2113,* No. 06-3105 (D.C. Cir. July 28, 2006), attached as Exhibit G, the D.C. Circuit

enjoined the government from reviewing documents seized from a congressman's office pursuant

to a search warrant and ordered that the congressman himself be allowed to review the seized

documents to determine if any of the documents were privileged.  *Id.*  Potentially privileged

documents would be reviewed in camera by the district court, not by the proposed "filter team."

*Id.*  In that case, unlike this one, the government seized documents pursuant to a search warrant

supported by probable cause.  Nonetheless, the appellate court crafted a review procedure

sensitive to the congressman's privilege, rather than giving the government license to determine

the nature, scope, and legitimacy of the intrusion.  This case demands at least a similar level of

caution, if not much more; *see also In re Grand Jury Subpoenas*, __ F.3d __, 2006 WL 1915386

(6th Cir. July 13, 2006) (Sixth Circuit overruled a district court's decision to permit review of

potentially privileged documents by an independent government "taint team" because the review

posed unacceptable risks to the attorney-client privilege").

      The government may claim that anyone else is ill-equipped to sort through this volume of

material seized—1,100 pounds—and translate the documents if necessary. It may lament the

delay that could be caused by adopting Mr. Khan's proposal that the Court appoint an impartial

party to review the materials, and it will assert the urgency with which this review must occur.  It

should not be lost on the Court, however, that the government created its own delay.  The

government waited almost a month to file its motions.  More importantly, the primary reason any

review—be it by an impartial party appointed by this Court, or a "filter team"—will be lengthy is

because of the indiscriminate means by which the government collected its 1,100 pounds of

"evidence."  Mr. Khan should not be made to further suffer the consequences of the

government's negligent procedures.

      Finally, to the extent that the government seeks support for its position in *United States v.*

*Grant*, 2004 WL 1171258 (S.D.N.Y. May 25, 2004), its reliance is misplaced.  In *Grant*, a large

number of documents, including some potentially privileged materials, were lawfully seized on

the basis of probable cause and a valid search warrant.  In other words, the government had

already determined (with the court's imprimatur) that all the materials authorized to be seized,

including the privileged materials, were connected with some degree of certainty to criminal

conduct.  Here, on the other hand, documents were indiscriminately impounded.  Thus, no such

prior determination—much less the confirmation of a prior determination by a neutral

arbiter—has been made.  Moreover, the *Grant* court only permitted the government "privilege

team" to do an initial review of the seized materials because defendants were guaranteed the

opportunity to object to the use of any document before it was turned over to the government trial

team.  *Id.* at *2.  In contrast, the government's proposal in the instant case does not assure Mr.

Khan's counsel that essential right.  Under the government's proposal, Mr. Khan's counsel could

be bypassed altogether—even in regard to the review of privileged materials directed to counsel.

In short, the procedures the government proposes are unprecedented and unsupportable.

Under these troubling circumstances, this Court should dismiss the government's proposal and

create—if anything—a review procedure that maintains the appearance of fairness, while

intruding as little as possible on Mr. Khan's relationship and communications with his attorneys.

**D.    The Court Should Sanction the Government's Unlawful Conduct And, as an Interim Measure, Order it to Deposit the Seized Attorney-Client Materials With the Court**

The Court should not allow NCIS's confiscation and possible reading of Mr. Khan's

privileged materials to go unpunished.  The government does not claim that there was any

emergency or imminent threat of the materials' destruction necessitating NCIS's unilateral

actions, taken without notice to—let alone permission from—this Court.  NCIS's actions were

deliberate, calculated, and in flat violation of Mr. Khan's rights.  Not only did the government

violate this Court's orders, it waited a month to inform the Court and counsel regarding its

actions.  Under these circumstances, the Court should impose sanctions against the government

for its irresponsible and unlawful conduct.  In addition, the Court should act to mitigate the harm

NCIS's unlawful actions have inflicted by ordering the government to immediately deposit the seized materials with the Court pending the materials' ultimate return to Mr. Khan.

If Respondents believe that there is evidence of some wrongdoing specific to Mr. Khan, he seeks an evidentiary hearing to determine the basis for such allegations where this Court can take evidence and determine: 1) whether the government alleges that Mr. Khan had any involvement whatsoever in the three recent suicides and the extent of Mr. Khan's involvement if any; 2) what precisely the government has seized from Mr. Khan and the extent to which items seized are privileged or otherwise protected from seizure; 3) whether the government's treatment of Mr. Khan has changed—and, in particular, worsened—in view of the three suicides and, if so, whether changed treatment is justified; and 4) the state of Mr. Khan's physical and mental well-being at Guantanamo.

Respondents are asking this Court to take actions supporting NCIS's "investigation to determine the circumstances and cause of death with respect to the recent suicides." Motion for Procedures at 4. Before this Court grants Respondents leave to further impinge on Mr. Khan's rights, this Court first must ensure that the government's prior and proposed actions are lawful and, in particular, that the government has not—and will not—curtail Mr. Khan's rights without authority and reason. As the United States Supreme Court noted in *Reid v. Covert*, 354 U.S. 1, 23-24 (U.S. 1957), "[t]he Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds." It is this Court's job to confine the administrations' might within these "essential bounds." As a non-partisan tribunal charged with upholding the law, not rubber-stamping executive action, this Court must view critically the facts allegedly warranting the steps the government already has taken and the steps the

government now wishes to take.  Without gathering more evidence, a reasoned and just

resolution of these matters is impossible.

## IV.

### THE PROTECTIVE ORDER SHOULD BE ENTERED

In *Rasul v. Bush*, 542 U.S. 466 (2004), the Supreme Court unequivocally held that

"§2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to

the legality of their detention at the Guantanamo Bay Naval Base" *Id*. at 484.  In *Hamdan*, the

Supreme Court reaffirmed this principle -- at least as applied to petitions such as Mr. Khan's

pending on the date the DTA was enacted.  126 S. Ct. at 2769 n.15.  As Respondents have

themselves recognized, Petitioner is not versed in either the language or the laws of this land.

*See* CR 2 at 4, n.8.  The exercise of that right is meaningless if a petitioner is denied the ability to

communicate with his attorneys.  *See Chandler v. Fretag*, 348 U.S. 3, 10 (1954) ("a defendant

must be given a reasonable opportunity to employ and consult with counsel; otherwise, the right

to be heard by counsel would be of little worth"); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 539

(2004) (in context of habeas challenge, mandating that petitioner have access to counsel in order

to ensure meaningful notice and opportunity to respond to allegations surrounding his

detention).[2]

---

[2] *Hamdi*  expressly addressed the rights attendant to the citizen challenging the lawfulness
of his detention and found a citizen entitled to a due process rather than a statutory basis for
allowing his habeas challenge, 542 U.S. at 532-533, while *Rasul* held that aliens detained on land
controlled exclusively by the United States, had a statutory right to bring such a challenge. 542
U.S. at 484.   While *Hamdi's* decision that habeas review was required for citizens was
constitutionally grounded, *see* 542 U.S. at 532-533, the mandate that petitioner be provided
access to counsel could not have been as there is no right to counsel in habeas proceedings.  But
as with Mr. Khan, Mr. Hamdi had appointed counsel and the government denied him access to
appointed counsel who were willing to meet with Mr. Hamdi.. The Supreme Court stated that

Respondents' continued efforts to deny Petitioner access to counsel should be rejected. This Court has the authority to enter the Protective Order, and there is no justification for further delay of the entry of that order.[3] In *Hamdan*, the Supreme Court recognized that at a minimum, the protections contained in Common Article 3 of the Geneva Convention which apply include judgments pronounced by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Geneva Convention*, 1949 Protocol, Art. 3. According to *Hamdan*, the phrase "regularly constituted court" is not defined in the text of the Geneva Conventions but "it must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of the Protocol I to the Geneva conventions of 1949, adopted kn 1977 (Protocol I)." *Hamdan*, 126 S. Ct. at 2797. Article 75 provides that the accused "shall have all necessary rights and means of defence."[4] Geneva Convention Protocol I, Art. 75(4)(a).

Mr. Hamdi "unquestionably has the **right to access to counsel** in connection with the proceedings on remand." *Id*. at 539 (emphasis supplied). Similarly, Mr. Khan, who has appointed counsel, who are willing to meet with him, should not be denied **access** to counsel. *See id*.

[3] Even if Mr. Khan's petition was to be deemed a challenge to a final decision of the CSRT, entry of the Protective Order would not impinge upon the jurisdiction of the D.C. Circuit Court of Appeals. Indeed, entry of an order permitting access to the client would be necessary to counsel's representation of Petitioner in such an appeal. *See* Order filed in *Adem v. Bush*, No. 05-cv-723(RWR)(AK) (D.D.C. Mar. 14, 2006) at n.25 (rejecting the suggestion that issues relating to counsel's access to their clients should be deferred because counsel presumably would continue to represent the detainee in the D.C. Circuit Court of Appeals, thus, access would remain an issue even if the DTA was held to preclude district court *habeas* jurisdiction).

[4] According to Article 75, Mr. Khan is either an "accused" who obtains the "necessary rights and means of defence" and the presumption of innocence or he is just a person detained who "shall be released with the minimum delay possible and in any event as soon as the circumstances justifying the arrest, detention or internment have ceased to exist." Geneva Convention Protocol I, Art. 75(3), (4)(a). Since no efforts have been made to release Khan, presumably, he is an "accused."

In *Hamdan*, the Supreme Court found that the right to cross-examine was such a fundamental judicial guarantee, 126 S. Ct. at 2798 n.67-- the right to counsel which derives from the same constitutional amendment appears no less fundamental -- maybe more so in light our precedents on this subject.  *See Gideon v. Wainwright*, 372 U.S. 335 (1963) (right to counsel is structural); *see also United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2563 (2006) (recent reaffirmance that "counsel is critical to the ability of the adversarial system to produce just results.") (citation omitted).  The Supreme Court went on to define "a regularly-constituted court" as one which, at a minimum, complies with the rules governing courts-martial.  126 S. Ct. at 2797.  The rules governing courts-martial, contained in the Uniform Code of Military Justice recognize the right to defense counsel, UCMJ §827, Art. 27(a)(1) ("defense counsel shall be detailed for each general and special court-martial"); *id*. at Art. 27(c)(1) ("the accused shall be afforded the opportunity to be represented at the trial by counsel...."); *see also* 10 U.S.C. §836(a) (requiring that "the rules that the President promulgates for courts-martial, provost courts and military commissions alike conform to those that govern procedures in Article III courts" so far as the President determines is practicable). The President has nowhere declared that access to counsel is "impracticable."  According to *Hamdi, Rasul* and *Hamdan*, Mr. Khan should not be denied access to his appointed defense counsel.

## V.

## CONCLUSION

In *Hamdan*, the Supreme Court held: "in undertaking to try Hamdan and subject him to criminal punishment, the Executive is bound to comply with the Rule of Law that prevails in this jurisdiction." 126 S. Ct. at 2798. Mr. Khan seeks this same protection from this Court. He respectfully requests that this Court exercise jurisdiction, deny Respondents' Motion for Procedures, return his seized materials and enter the protective order.

Respectfully submitted,


/s/_____
**SHEREEN J. CHARLICK
(CA147533)**
Federal Defenders
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 685-3719

## CERTIFICATE OF SERVICE

I, Shereen J. Charlick, hereby certify that I today caused a true and accurate copy of the

foregoing to be served upon the following persons, by first-class United States mail, in addition

to the service that automatically occurs by virtue of my electronic filing of this document:

The Honorable Alberto Gonzales
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

The Honorable Kenneth L. Wainstein
United States Attorney for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

Terry Marcus Henry, Esq., Senior Trial Attorney
U.S. Department of Justice
P.O. Box 883
20 Massachusetts Ave., NW, Suite 7144
Washington, DC 20044

August 11, 2006

/s/_____
SHEREEN J. CHARLICK
Counsel for Petitioner