# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SLITI v. BUSH** | ) | **Civil Case No. 05-0429 (RJL)** |
| **HAMOODAH v. BUSH** | ) | **Civil Case No. 05-0795 (RJL)** |
| **KHAN v. BUSH** | ) | **Civil Case No. 05-1010 (RJL)** |
| **RIMI v. BUSH** | ) | **Civil Case No. 05-2427 (RJL)** |

## PETITIONERS' CONSOLIDATED MEMORANDUM
## IN CONTINUED SUPPORT OF THEIR
## <u>PETITIONS FOR WRITS OF HABEAS CORPUS</u>

11107971.5

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 2

    A.    Petitioner Hamoodah (05-0795) ............................................................... 2

    B.    Petitioner Rimi (05-2427) ........................................................................ 3

    C.    Petitioner Abdullah (05-0429) ................................................................. 5

    D.    Petitioner Khan (05-1010) ....................................................................... 7

III.    PETITIONERS' HABEAS CLAIMS MUST BE HEARD BECAUSE THERE IS
    REASON TO BELIEVE THAT PETITIONERS REMAIN IN THE CONSTRUCTIVE
    CUSTODY OF THE UNITED STATES ......................................................................... 9

    A.    Standards for Constructive Custody Are Satisfied ................................... 9

    B.    The Imprisoning Sovereign is the Respondents' Agent. .................................... 10

    C.    Petitioners' Liberty Interest Is Constrained and There Are Collateral
    Consequences as a Result of Respondents' Actions. .......................................... 11

    D.    Detention Outside of the United States Does Not Affect Custody Analysis ........ 12

IV.    PETITIONERS' HABEAS CLAIMS MUST BE HEARD BECAUSE PETITIONERS
    ARE SUFFERING COLLATERAL CONSEQUENCES OF THEIR DETENTION IN
    GUANTÁNAMO .................................................................................................. 12

V.    PETITIONERS' HABEAS CLAIMS MUST BE HEARD BECAUSE THEIR
    TRANSFERS WERE MADE IN VIOLATION OF THE CONVENTION AGAINST
    TORTURE AND RELATED STATUTES ..................................................................... 17

VI.    CONCLUSION .................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

<u>Abu Ali v. Ashcroft</u>, 350 F. Supp. 2d 28 (D.D.C. 2004) ................................................. 12

<u>In re Ballay</u>, 482 F.2d 648 (D.C. Cir. 1973) ...................................................................... 15

<u>Boumediene v. Bush</u>, 533 U.S. __ (2008) (slip op. at 66) ................................................ 9

<u>Braden v. 30th Judicial Court of Kentucky</u>, 410 U.S. 484 (1973) .............................. 9, 13

<u>Carafas v. LaVallee</u>, 391 U.S. 234 (1968) ................................................ 9, 10, 14, 15, 16

<u>Chong v. INS</u>, 264 F.3d 378 (3d Cir. 2001) ...................................................................... 14

<u>Hamdi v. Rumsfeld</u>, 542 U.S. 507 (2004) .............................................................2, 4, 5, 7

<u>Jones v. Cunningham</u>, 371 U.S. 236 (1963) ................................................................10, 15

<u>Justin v. Jacobs</u>, 449 F.2d 1017 (D.C. Cir. 1971) ............................................................ 15

<u>Leitao v. Reno</u>, 311 F.3d 453 (1st Cir. 2002) ................................................................... 14

<u>Qassim v. Bush</u>, 466 F.3d 1073 (D.C. Cir. 2006) ......................................................13, 15

<u>Sibron v. New York</u>, 392 U.S. 40 (1968) .......................................................................... 15

<u>Spencer v. Kemna</u>, 523 U.S. 1 (1998) .............................................................................. 14

<u>Steinberg v. Police Court of Albany</u>, 610 F.2d 449 (6th Cir. 1979) ............................ 9, 10

<u>White v. White</u>, 925 F.2d 287 (9th Cir. 1991) .................................................................. 15

<u>Zalawadia v. Ashcroft</u>, 371 F.3d 292 (5th Cir. 2004) .............................................13, 14, 17

<u>Zegarra-Gomez v. INS</u>, 314 F.3d 1124 (9th Cir. 2003) .................................................. 14

<u>Zundel v. Berrong</u>, 106 Fed. Appx. 331 (6th Cir. 2004) ................................................. 14

# FEDERAL STATUTES

28 U.S.C. § 2241 ................................................................................................9, 14, 19

18 U.S.C. § 3181 ..................................................................................................... 11

Foreign Affairs Reform and Restructuring Act of 1998 (FARR Act), div. G, 112
    Stat. 2681-822 ...................................................................................................... 18

# TREATIES

United Nations Convention Against Torture and Other Cruel, Inhuman or
    Degrading Treatment or Punishment, 1465 U.N.T.S. 85, Art. 3, S. Treaty
    Doc. No. 20, 100th Cong., 2d Sess., p. 6 (1988) ...................................................... 18

Petitioners hereby respectfully submit this memorandum to address certain issues identified in the Court's July 30, 2008 Order. In this memorandum, Petitioners explain that their claims, far from being moot, require adjudication before this Court. Petitioners continue to suffer severe collateral consequences that give rise to the right to habeas relief. There is also reason to believe that Petitioners, although transferred, remain in the constructive custody of the United States.

## I.    INTRODUCTION

This Court should adjudicate the above-captioned petitions for writs of habeas corpus. Despite Petitioners' years of detention at Guantánamo Bay Naval Base, Cuba ("Guantánamo Bay"), no habeas court has ever adjudicated their claims.  Unless the claims are heard, Petitioners will remain falsely designated enemy combatants and terrorists.  This designation, and the false allegations that underlie the designation, have led Petitioners' home countries to detain them without cause and have led to other severe collateral consequences. Petitioners also have reason to believe that their detention may have been or may continue to be directed by the United States, and seek discovery on this issue.

Additionally, Petitioners challenge the circumstances of their respective transfers from the United States on the basis that such transfers violated the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the statutes that implement it.

Petitioners request that their claims for habeas corpus be heard before this Court under 28 U.S.C. § 2241.

- 2 -

II.    **FACTUAL AND PROCEDURAL BACKGROUND**

    A.    Petitioner Hamoodah (05-0795)

    Sofian Ebrahim Hamad Hamoodah  (ISN 557) is a Libyan citizen who was living in
Pakistan at the time of his transfer to Guantánamo Bay in 2002. He was not and never had been
an enemy alien, lawful or unlawful belligerent, or combatant of any kind, and had never been
"part of or supporting forces hostile to the United States or coalition partners in Afghanistan and
who engaged in an armed conflict against the United States." Hamdi v. Rumsfeld, 542 U.S. 507,
516 (2004) (internal quotation omitted).

    Petitioner had left his native Libya with his wife and his children in 1992-1993 due to the
religious repression experienced under the Muammar Qaddafi regime. The family lived in Sudan
until 1997, when they moved to Pakistan. In 1999, they moved to Afghanistan where Mr.
Hamoodah worked for a charitable organization that provided relief to the indigent. Petitioner's
son AbuAlAlla lost his hearing due to bomb attacks, and in 2001 the Petitioner and his family
decided to leave Afghanistan due to the danger. After arriving in Pakistan, Petitioner received
news that the Libyan Government would be allowing exiled Libyans to return to Libya.
Petitioner and his family submitted the required documents to the Libyan Embassy in Pakistan,
and they were issued Libyan passports. Prior to leaving Pakistan, Mr. Hamoodah was detained
by Pakistani authorities and eventually transferred to Guantánamo Bay. Petitioner's wife was
unable to learn of her husband's situation until 2002, when the Libyan Red Crescent informed
her that Petitioner was being held in Guantánamo Bay. Mr. Hamoodah disputes the false
allegations made against him that he is a member of al Qaida, that he is part of the Taliban, and
that he is a member of the Libyan Islamic Fighting Group (LIFG).  A Petition For Writ of

Habeas Corpus and Complaint for Declaratory and Injunctive Relief was filed on April 21, 2005.

Petitioner remained in Guantánamo Bay, without charges or a trial, until October 2007.

On October 5, 2007, the Respondents filed a Notice of Transfer indicating that Mr.

Hamoodah had been transferred to Libya. The government transferred Mr. Hamoodah without

removing his enemy combatant status, and he remains in the custody of Libyan security forces,

where he has been denied access to a lawyer. The Libyan regime is well-known by the United

States government for engaging in torture, especially against those viewed to be 'political

opponents' such as members of the LIFG.  U.S. Dep't of State, Country Conditions Reports on

Human Rights Practices, March 11, 2008, available at

http://www.state.gov/g/drl/rls/hrrpt/2007/100601.htm (See Exhibit A); U.S. Dep't of State,

Country Conditions Reports on Human Rights Practices, March 6, 2007, available at

http://www.state.gov/g/drl/rls/hrrpt/2006/78858.htm (See Exhibit B) Human Rights Watch,

Libya:  Rights at Risk, http://hrw.org/english/docs/2008/01/03/libya17674.htm; (See Exhibit C)

Mr. Hamoodah continues to be held in Libya without access to counsel, without charges or a

trial, and under conditions of abuse and torture.

B.    Petitioner Rimi (05-2427)

Muhammad Abdallah Mansur Safrani Al Futuri Rimi (ISN 194), age 39, is a citizen of

Libya.  In 2002, Mr. Rimi was taken into custody by United States armed forces in Afghanistan

and brought to Guantánamo Bay Naval Base, Cuba ("Guantánamo Bay"), where the United

States continued to hold him for the next four years.  Mr. Rimi's detention at Guantánamo was

unlawful, as he was not and never had been an enemy alien, lawful or unlawful belligerent, or

combatant of any kind, and had never been "part of or supporting forces hostile to the United

States or coalition partners in Afghanistan and who engaged in an armed conflict against the

- 4 -

United States." Hamdi v. Rumsfeld, 542 U.S. 507, 516 (2004) (internal quotation omitted).  Mr.
Rimi filed a petition for writ of habeas corpus in this Court on December 19, 2005, challenging
his designation as an enemy combatant under Hamdi v. Rumsfeld, 542 U.S. 507 (2004).  The
government has not filed a factual return in his case.

During his detention in Guantánamo Bay, Mr. Rimi received a Combatant Status Review
Tribunal hearing and two annual Administrative Review Board hearings, and during each of
these he disputed the accuracy of substantial portions of the government's evidence against him.
See Summarized Detainee Statement, ISN 194, 3124, 3127, available at
http://www.dod.mil/pubs/foi/detainees/csrt_arb/Set_46_3096-3129.pdf.  For example, Mr. Rimi
disputed the unfounded allegations that he was a member of al Qaida, that he was a member of
the Taliban, and that he was a member of the Libyan Islamic Fighting Group ("LIFG").  See
Summary of Administrative Review Board Proceedings for ISN 194, 2104, 2113, available at
http://www.dod.mil/pubs/foi/detainees/ csrt_arb/ARB_Transcript_2100-2195.pdf.  Mr. Rimi also
explained his fear of religious persecution in Libya and made a claim for political asylum.  Id. at
2117-18.  During his time in Guantánamo Bay, Mr. Rimi was visited by Libyan agents who
indicated that they would torture and perhaps kill him should he be returned to their custody in
Libya.  Petitioner told U.S. government officials at Guantánamo Bay that he was afraid of being
tortured or killed upon return to Libya. (See Declaration of Clive A. Stafford-Smith, Exhibit D)

On December 20, 2006, the government filed a Notice of Transfer announcing Mr.
Rimi's transfer to Libya.  The government transferred Mr. Rimi without removing his enemy
combatant status and without providing prior notice to counsel.  Reports indicate that at the time
he was transferred to Libya, Mr. Rimi had tuberculosis and wounds on his arms.  See Human
Rights Watch, Libya: Rights at Risk, available at

http://hrw.org/english/docs/2008/01/03/libya17674.htm. (See Exhibit C). United States

government officials have claimed that Mr. Rimi remains in custody of the Libyan government,

without access to counsel and without having been charged with crimes.  Id.  Access to Mr. Rimi

was denied to the non-governmental organization Human Rights Watch in March 2008.  Id.

The designation of Mr. Rimi as an enemy combatant is erroneous and is based on the

false underlying allegations about his membership in LIFG, allegations that leave him open to

greater risk of torture than an ordinary detainee in Libya.

C.      Petitioner Abdullah (05-0429)

Abdullah Bin Omar Al Hajji (ISN 724) is a citizen of Tunisia. Petitioner was not and

never had been an enemy alien, lawful or unlawful belligerent, or combatant of any kind, and

had never been "part of or supporting forces hostile to the United States or coalition partners in

Afghanistan and who engaged in an armed conflict against the United States."  Hamdi v.

Rumsfeld, 542 U.S. 507, 516 (2004) (internal quotation omitted).

Mr. Al Hajji left his native Tunisia in 1989 because of the repression he experienced

because of his religious beliefs.  He, his wife, and his eight children settled in Pakistan in 1991.

He was captured from his home in Peshawar, Pakistan, and was held in Guantánamo Bay for

almost five years.  He received a Combatant Status Review Tribunal hearing and two annual

Administrative Review Board hearings, and during each of these he disputed the accuracy of the

government's evidence against him.

On February 22, 2007, Respondents notified Mr. Al Hajji's counsel that Mr. Al Hajji had

"been approved to leave Guantánamo, subject to the process for making appropriate diplomatic

arrangements for his departure."  Disregarding the strenuous objection of counsel, Respondents

transferred Mr. Al Hajji to Tunisia even as counsel arrived in Guantánamo Bay to meet with Mr.

- 6 -

Al Hajji.  Respondents ignored Tunisia's well known record of violating human rights, the specific threat of torture and abuse facing Mr. Al Hajji, and the fact that Mr. Al Hajji had been tried in absentia for the political crime of opposing the Tunisian government and sentenced to at least 10 years in prison.  See U.S. State Department, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices 2007: Tunisia, March 11, 2008, available at http://www.state.gov/g/drl/rls/hrrpt/2007/100607.htm (See Exhibit E); U.S. State Department, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices 2006: Tunisia, March 6, 2007, http://www.state.gov/g/drl/rls/hrrpt/2006/78864.htm (See Exhibit F); Human Rights Watch, Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations, September 2007, http://hrw.org/reports/2007/tunisia0907/ (See Exhibit G)  Mr. Al Hajji did not know of the trial when it took place and therefore had no opportunity to defend himself.  Indeed, Mr. Al Hajji did not know a prison sentence awaited him in Tunisia until he arrived there; counsel had gone to Guantanamo specifically to inform Mr. Al Hajji of the absentia conviction and discuss with Mr. Al Hajji the necessity of seeking asylum.

Mr. Al Hajji was immediately sent to prison upon his arrival in Tunisia and held incommunicado for several days.  He reported to a visitor that he had been beaten and threatened by the Tunisian authorities and that his Tunisian interrogators had threatened to rape his wife and daughters if he did not confess.  The visitor reported that Mr. Al Hajji appeared to have been drugged because of his extremely slow speech and difficulty concentrating.  Mr. Al Hajji later told his lawyer that he had been denied sleep, food and water for several days.

In November 2007, petitioner faced a re-trial before a military court in Tunisia, attended (but not represented) by his counsel in this petition and officials of the American Embassy in Tunis.  Tunisia is well-known for using evidence gained from torture at such trials, and for

refusing to permit a true defense. No witnesses or documents was presented against Mr. Al
Hajji; the only proffered justification for the charges were a single conclusory report from the
security services from years before, citing two informants who recanted their statements to the
security services, but whose recantations were not allowed into evidence. Despite the absence of
evidence, petitioner was sentenced to seven years in prison and five years of home-based
confinement.

Since Mr. Al Hajji's conviction, he has reported frequent harassment in his cell by
security officials, including the slashing and ripping of his clothes.

Mr. Al Hajji's enemy combatant determination is erroneous, and was not lifted prior to
his transfer. If Mr. Al Hajji had not been held on account of his false enemy combatant
designation, he never would have been returned to Tunisia. He was living his life with his
family in Pakistan, with no intent of setting foot ever again in his repressive home country. The
only reason for his abuse, re-trial and continued detention remains the enemy combatant status
and the false allegations that underlie that designation.

D. Petitioner Khan (05-1010)

Mohabat Khan is a citizen of Afghanistan. Petitioner was not and never had been an
enemy alien, lawful or unlawful belligerent, or combatant of any kind, and had never been "part
of or supporting forces hostile to the United States or coalition partners in Afghanistan and who
engaged in an armed conflict against the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 516
(2004) (internal quotation omitted).

A petition for Writ of Habeas Corpus was filed for Mr. Khan on May 19, 2005 after he
wrote a "postcard petition" to the Court. In that petition, Mr. Khan explains that he was a

- 8 -

juvenile at the time of his apprehension in Afghanistan.  He also tells the Court that he "[has not] done any unlawful activities and [he] was arrested for no reason."  Id.

Federal Defenders of San Diego, Inc. was appointed by the Court on October 14, 2005.  Counsel filed its "Motion for Order Requiring Respondents to Provide Counsel with Advance Notice of Any Removal From Guantanamo" on December 5, 2005.  Mr. Khan's counsel also filed an Amended Petition for Writ of Habeas Corpus on December 12, 2005.  The Court stayed the pending proceedings pending related appeals and for continued Coordination before Federal Defenders of San Diego, Inc. was appointed.

Despite the pending motions, a Notice of Transfer for Mohabat Khan was filed with the Court on October 24, 2006, advising that he had been transferred to Afghanistan.  The notice merely states that "the United States has relinquished custody of [Mr. Khan] and transferred him to the control of the Government of Afghanistan.  Id.  In October 2006 counsel was still awaiting security clearance and permission to visit Mr. Khan at Guantanamo Naval Base.  The government transferred Mr. Khan before counsel had an opportunity to meet with him, without removing his enemy combatant status and without providing any prior notice.

No further information has been provided by the government despite requests from counsel as recently as August 7, 2008.  It is unknown whether Mr. Khan is being held in custody and the government has refused to provide that information.  The government's refusal to provide information about the conditions of his transfer, his custodial status, or his whereabouts serves to prevent the removal of the collateral consequences experienced by Mr. Khan.

III.    **PETITIONERS' HABEAS CLAIMS MUST BE HEARD BECAUSE THERE IS REASON TO BELIEVE THAT PETITIONERS REMAIN IN THE CONSTRUCTIVE CUSTODY OF THE UNITED STATES**

A.    Standards for Constructive Custody Are Satisfied.

Petitioners remain entitled to pursue their petitions for writ of habeas corpus because there is reason to believe that they remain in the constructive custody of the United States after their transfers out of Guantánamo Bay. Petitioners believe that discovery will illustrate that this is the case. Boumediene v. Bush, 533 U.S. __ (2008) (slip op. at 66); Carafas v. LaVallee, 391 U.S. 234 (1968). Petitioners Hamoodah and Rimi remain in the constructive custody of the United States in Libya, Petitioner Abdullah remains held in a Tunisian prison, and the conditions of Petitioner Khan's likely confinement in Afghanistan remain undisclosed.

In the case of Petitioner Rimi, officials of the United States government have visited Rimi in Libya on more than one occasion. The U.S. government endorses Mr. Rimi's detention despite the fact that he has not been charged with any crime in Libya. The only apparent reason Mr. Rimi continues to be detained is that the United States has requested his detention. This arrangement constitutes constructive custody, as described in Steinberg v. Police Court of Albany, 610 F.2d 449, 453 (6th Cir. 1979):

> In order to maintain a habeas corpus action, the petitioner must be "in custody." 28 U.S.C. §§ 2241(c)(3), 2254(a), 2255; Carafas v. LaVallee, 391 U.S. 234, 238, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968). His custody must be the result of the respondent's action from which he seeks habeas corpus relief. Brown v. Wainwright, 447 F.2d 980 (5th Cir. 1971). However, the Supreme Court has given the custody requirement a liberal construction, and it is not necessary that the petitioner be in physical control of the respondent. It is enough that the imprisoning sovereign is the respondent's agent, See Braden v. 30th Judicial Court of Kentucky, 410 U.S. 484, 498-99, 93 S. Ct. 1123, 35 L. Ed. 2d 443 (1973); that his liberty is restrained by the respondent's parole conditions, Jones v. Cunningham, 371 U.S. 236, 83 S. Ct. 373, 9 L. Ed. 2d 285 (1963); or that he can point to some continuing collateral disability which is the result of the respondent's action, Carafas v. LaVallee, 391 U.S. 234, 237-40, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968).

Here, the conditions for constructive custody are met because all three of the disjunctive conditions giving rise to constructive custody are present: (1) the imprisoning sovereign is the Respondent's agent; (2) Petitioners' liberty is restrained by Respondents' parole conditions; or (3) there are continuing collateral disabilities that are the result of Respondents' actions.

B.     The Imprisoning Sovereign is the Respondents' Agent.

There is reason to believe that discovery will show that the imprisoning sovereigns of Libya, Tunisia, and likely Afghanistan, are holding Petitioners at the direct and intentional behest of the Respondents.  Each Petitioner's transfer was arranged by the Respondents, directed by Respondents, and reported to the court by Respondents. Some have been subject to on-site follow-up visits by Respondents.

In some cases, Respondents allowed officials of the foreign governments to visit the Petitioners prior to the transfer, during which time the officials made threats to Petitioners.

Respondents have transferred petitioners despite the fact that the United States has extensive and public knowledge about the torture used on political prisoners by these governments. The petitioners would not be in custody of the foreign governments but for the Respondents' transfer, and the transfers are likely governed by the terms of agreements between Respondents and the Libyan, Tunisian, or Afghan governments. Discovery will provide further details concerning such agreements.

Neither Petitioner Hamoodah nor Petitioner Rimi has ever been charged with any crime by their Libyan captors. The charges for which they are held appear to be the allegations leveled against them by Respondents during the Petitioners' respective Combatant Status Review Tribunal proceedings at which their enemy combatant designation was first affixed.

Petitioner Abdullah was transferred to Tunisia by Respondents. The 'charges' for which he is held from stem from the political crime of opposing the government, allegations included in

- 11 -

the justification for deeming him an enemy combatant. Respondents fully observed this

purported 're-trial' and did not lodge any objections with the court.

Petitioner Khan's location and confinement remain undisclosed by Respondent despite

numerous requests.

The United States has publicly documented the use of torture in Libya, Tunisia, and

Afghanistan and has refused to enter extradition treaties with these nations. 18 U.S.C. § 3181.

Although extradition policies are not operable when, as here, no charges have ever been brought

against the petitioners by the foreign governments (with the exception of the crime of "opposing

the Tunisian government" leveled against Petitioner Abdullah, which is expressly exempted from

extradition eligibility because such an offense is "of a political nature," 18 U.S.C. § 3181(b)(2)),

they are relevant to establish that it would have been in violation of U.S. law for Petitioners to

have transferred the petitioners to the foreign governments at their request. Therefore, the

detention must have been directed at the order of the Respondents, and, as Petitioners believe

discovery will show, was predicated on their continued detention.

C.    Petitioners' Liberty Interest Is Constrained and There Are Collateral
      Consequences as a Result of Respondents' Actions.

The continued confinement of the Petitioners is the clearest infringement on a liberty

interest that could be established. Respondents transferred Petitioners to these foreign prisons,

despite the prisons' well-known practice of torturing political prisoners, after making unfounded

allegations that the Petitioners supported groups opposing these governments. Petitioner Rimi

has been threatened with beatings and torture at the hands of his guards, and Petitioner Abdullah

appears to have been beaten, threatened, and drugged.

Petitioners believe that discovery will demonstrate that these foreign prisons are holding

Petitioners at the direct and intentional behest of the Respondents, but the collateral disabilities

- 12 -

extend beyond detention. The collateral disabilities include the enemy combatant designation, which was never adjudicated and is predicated on false allegations of associations with terrorist groups, and the political opposition allegations, which, if unchallenged, will surely lead to continued detention, harassment, economic disability, and other impairments as a result of reputational damages experienced by all petitioners and discussed further below.

> D.    Detention Outside of the United States Does Not Affect Custody Analysis.

Whether a habeas petitioner is detained in the actual custody of officials of the United States or of foreign governments at the behest of the United States does not affect the analysis of constructive custody. Judge Bates of this court has ruled recently and decisively that constructive detention outside the United States satisfies the constructive custody requirements:

> In summary, then, given the accepted breadth of the habeas statute, the imperative to construe the "in custody" requirement expansively in favor of the petitioner and without regard for formalisms, the absence of any language in the text that carves out an exception where the physical custodian is a foreign body, the many circumstances in which habeas jurisdiction has been found where the individual was not in the immediate possession of the respondent, and the decisions in which habeas jurisdiction was found when the executive or some other government official was working through the intermediary of a State (Braden), a private individual (Jung Ah Lung) or a private corporation (Stokes), the Court cannot find any basis in the habeas statute for denying jurisdiction merely because the executive is allegedly working through the intermediary of a foreign ally.

Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 49 (D.D.C. 2004) (emphasis added).

Because Petitioners' detention will be shown to constitute constructive custody by the United States, the writ of habeas corpus is the only means by which to challenge their detention and other claims and should be allowed.

## IV.    PETITIONERS' HABEAS CLAIMS MUST BE HEARD BECAUSE PETITIONERS ARE SUFFERING COLLATERAL CONSEQUENCES OF THEIR DETENTION IN GUANTÁNAMO

Petitioners are entitled to the petition for habeas corpus relief notwithstanding the fact that the United States transferred them from Guantánamo. Jurisdiction in a habeas corpus

- 13 -

petition attaches at the time of filing and is not defeated by the release of a petitioner where, as here, he continues to suffer collateral consequences of unlawful detention. This principle applies in the executive detention context. Zalawadia v. Ashcroft, 371 F.3d 292, 298 (5th Cir. 2004) (holding that deportation of a habeas petitioner challenging his immigration removal order does not render habeas petition moot because the 5-year statutory bar on reentry constitutes a sufficient "collateral consequence" of the order); Zegarra-Gomez v. INS, 314 F.3d 1124, 1127 (9th Cir. 2003) (same, 20-year statutory bar); Leitao v. Reno, 311 F.3d 453, 456 (1st Cir. 2002) (same, 10-year statutory bar); Chong v. INS, 264 F.3d 378, 385 (3d Cir. 2001) (same); cf. Spencer v. Kemna, 523 U.S. 1, 7 (1998) (a habeas petitioner need only satisfy the "in custody" requirement of 28 U.S.C. § 2254 at the time of filing); Zalawadia, 371 F.3d at 297 (deportation of an alien habeas petitioner does not deprive court of jurisdiction over the suit); see also Zundel v. Berrong, 106 Fed. Appx. 331, 334-35 (6th Cir. 2004) ("While the mootness of Zundel's requests for preliminary relief preclude us from reviewing the district court's disposition of those claims, his requests for permanent relief—namely, a writ of habeas corpus vacating his deportation order and damages for alleged constitutional violations—do not suffer from the same problem. These claims require consideration by the district court in the first instance.") (citations omitted). In Qassim v. Bush, 466 F.3d 1073, 1076 (D.C. Cir. 2006), the Court of Appeals for District of Columbia Circuit noted that the collateral consequences doctrine enables a released Guantánamo habeas petitioner to have his claim heard. In Qassim v. Bush, 466 F.3d 1073 (D.C. Cir. 2006), the Court of Appeals held that the collateral consequences, if established, could have provided grounds for released Guantánamo habeas corpus petitioners of Uighur ethnicity to continue their claims for the writ.[1] Qassim, 466 F.3d 1073, 1077 (D.C. Cir. 2006).

---

[1]The Court of Appeals for the District of Columbia  found that the Uighurs were not suffering collateral
*(Footnote continued on next page)*

Individuals suffering collateral consequences as a result of convictions should be granted judicial review of the merits of their claims that the convictions were illegal. <u>Carafas</u>, 391 U.S. at 239 (1968). Similarly, Petitioners should be granted judicial review of their enemy combatant designation which continues to cause them to suffer collateral harm.

Here, Petitioners face the potentially fatal collateral consequence of being subject to indefinite detention by the Qaddafi regime, the Tunisian regime, or detention in Afghanistan. Facing torture or death in a jail of a country known for torture more than satisfies the collateral consequences doctrine, especially as compared to the collateral consequences which sufficed to sustain jurisdiction in other cases. Collateral consequences have been found to exist in the restrictions on liberty represented by parole, the requirement to register an address and make periodic reports to a parole officer, and a requirement to observe restrictions on travel (<u>Jones v. Cunningham</u>, 371 U.S. 236, 241-43 (1963)); restrictions from serving as a labor union official, voting, and jury service (<u>Carafas</u>, 391 U.S. at 237); voting restrictions, jury service disqualification, special driver's license examinations, and limited access to a gun license resulting from commitment as a sex offender (<u>White v. White</u>, 925 F.2d 287, 290 (9th Cir. 1991)).

The discussion in <u>Qassim</u> of the collateral consequences doctrine outside of a challenge to a criminal conviction is consistent with the decision of the Court of Appeals for the District of Columbia Circuit in <u>Justin v. Jacobs</u>, 449 F.2d 1017 (D.C. Cir. 1971). There, the court permitted a petitioner who had been committed to a mental health facility as a "sexual psychopath" to continue his challenge to that determination even after his release from the facility. In that case,

---

*(Footnote continued from previous page)*
consequences, however, this decision was based on their designation as "no longer enemy combatants (NLEC's)" prior to their release. In contrast to the Uighur's eventual exoneration, the 'enemy combatant' designation has not been removed from the petitioners in this case.

as with the enemy combatant label here, the designation connoted activity for which he could have been prosecuted and he faced a "burden of a reputation for mental instability and dangerousness." 449 F.2d at 1020 n.8. A similar result was reached in In re Ballay, 482 F.2d 648, 651-52 (D.C. Cir. 1973), a case involving the question of mootness on appeal after a civilly committed person was discharged from a mental hospital. The court observed in Ballay that "a multitude of legal disabilities radiate[d] from the label 'mentally incompetent'" and that "such an adjudication, while not always crippling, is certainly always an ominous presence in any interaction between an individual and the legal system."

Petitioners' releases from Guantánamo did not remove the "enemy combatant" designation, a designation which exposes Petitioners to the stigma of being labeled falsely a terrorist – "the worst of the worst" – which jeopardizes their employability, freedom to travel, and which, in the case of Libya and Tunisia, their freedom from torture and, potentially, their lives.[2]

The enemy combatant designation establishes a *prima facie* collateral consequence sufficient to establish that this case is not moot. See Carafas, 391 U.S. at 239-40; Sibron v. New York, 392 U.S. 40, 55 (1968) (actual collateral consequences need not be proven where the mere possibility that such consequences may exist is sufficient to preserve a live controversy).

---

[2]    The government's public statements have assured maximum stigmatization of Guantánamo detainees. *See*, *e.g.*, Department of Defense News Briefing – Gen. Richard B. Myers, Chairman, Joint Chiefs of Staff (Jan. 11, 2002), *available at* http://www.defenselink.mil/transcripts/2002/t01282002_t0128asd.html (prisoners are "the worst of the worst"); *Rumsfeld: Captives Will Not be POWs*, USA TODAY, Jan. 28, 2002, at A1 (quoting Secretary Rumsfeld: "[The prisoners are] among the most dangerous, best-trained vicious killers on the face of the Earth."); Department of Defense News Briefing – Secretary Rumsfeld and Gen. Myers (Jan. 28, 2002) ("These are people that would gnaw through hydraulic lines in the back of a C-17 to bring it down, so these are very, very dangerous people, and that's how they're being treated.") *available at* http://www.defenselink.mil/transcripts/2002/t01112002_ t0111sd.html; Department of Defense News Briefing – ASD PA Clarke and Rear Adm. Stufflebeem (Jan. 28, 2002) *available at* http://www.defenselink.mil/transcripts/ 2002/t01282002_t0128asd.html (Rear Admiral John D. Stufflebeem: "These are the worst of the worst, and if let out on the street, they will go back to the proclivity of trying to kill Americans and others. So that is well established.").

However, here, petitioners are suffering far more than just the harmful effects of the "enemy combatant" designation.  Because the Respondents have, without substantial evidence, accused petitioners Rimi and Hamoodah of participating as members of the Libyan Islamic Fighting Group ("LIFG"), a group that opposes the regime of Libyan President Muammar Qaddafi, they are more likely to be victims of torture, as the United States has publicly disclosed the widespread use of torture against "political opponents" in Libya. U.S. Dep't of State, Country Conditions Reports on Human Rights Practices, March 2008, available at http://www.state.gov/g/drl/rls/hrrpt/2007/100601.htm (See Exhibit C). Of Libya's treatment of its political prisoners, the United States Department of State reports: "The reported methods of torture and abuse included chaining prisoners to a wall for hours; clubbing; applying electric shock; applying corkscrews to the back; pouring lemon juice in open wounds; breaking fingers and allowing the joints to heal without medical care; suffocating with plastic bags; depriving detainees of sleep, food, and water; hanging by the wrists; suspending from a pole inserted between the knees and elbows; burning with cigarettes; threatening with dog attacks; and beatings on the soles of the feet." Id.

Conditions of Petitioner Khan's transfer were never ascertained, despite numerous requests to the government, but may likely present concerns similar to those presented by the case of this fellow Petitioners, given the history of detainees in Afghanistan.[3] However continued detention is not required to establish collateral consequences. Zalawadia v. Ashcroft, 371 F.3d 292, 298 (5th Cir. 2004) ("Moreover, as we have explained, although Zalawadia has been released from detention, he still faces concrete collateral consequences arising out of that illegal order. Accordingly, Zalawadia is entitled to appropriate habeas relief quite aside from how a

---

[3] See Human Rights Watch,  U.S. Operated Secret 'Dark Prison' in Kabul, http://hrw.org/english/docs/2005/12/19/afghan12319_txt.htm (See Exhibit H).

particular government regulation may apply to him now."). The collateral consequences experienced by Mr. Khan because of his false designation require adjudication of his writ.

Petitioners seek the Court's leave to conduct discovery. In the alternative, Petitioners seek an order of this court requiring that Respondents disclose the information they possesses concerning the confinement status of Petitioners.

## V. PETITIONERS' HABEAS CLAIMS MUST BE HEARD BECAUSE THEIR TRANSFERS WERE MADE IN VIOLATION OF THE CONVENTION AGAINST TORTURE AND RELATED STATUTES

The transfer of petitioners to the governments with records of known torture practices created – and continues to create – the likelihood they will be subjected to torture. For these reasons, Petitioners also seek an adjudication and determination on the lawfulness of their transfers. Because Petitioners' transfers could well mean torture, execution and/or prolonged arbitrary detention, it is likely that the transfer itself was unlawful. See United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, Art. 3, S. Treaty Doc. No. 20, 100th Cong., 2d Sess., p. 6 (1988) ("1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture. 2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."); see also, Foreign Affairs Reform and Restructuring Act of 1998 (FARR Act), div. G, 112 Stat. 2681-822 ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is

physically present in the United States"). By transferring these individuals without first removing the enemy combatant label and adjudicating the underlying allegations, these transferees were known to be at great risk for torture at the hands of these regimes. Transfers under these conditions violate the Convention Against Torture.

## VI.  CONCLUSION

For the above-stated reasons, petitioners seek to present their claims for habeas corpus before this Court. Because no factual returns were ever filed in these cases, petitioners request that the government produce factual returns so that they can be traversed in accordance with the requirements of 28 U.S.C. § 2241. Petitioners request orders from this Court requiring the government to file such returns, based on the evidence available in any CSRT and ARB hearing transcripts.

Additionally, Petitioners seek the Court's authority to obtain discovery concerning: their confinements, the 'charges' against them, the Respondents' agreements with the governments to which the petitioners have been transferred and their treatment by the foreign governments, and any information gathered by Respondents about Petitioners since their transfers.

A classified supplemental memorandum is being filed concurrently in support of this motion.

Consistent with this Court's ruling from the bench on July 10, 2008, Petitioners request a conference on this motion.

Dated:      August 12, 2008                    Respectfully submitted,

/s/ Brian M. Childs
W. Scott O'Connell
Brian M. Childs
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000 (tel)
(617) 345-1300 (fax)
bchilds@nixonpeabody.com
*Counsel for Petitioner Rimi*

/s/ Kevin G. Boris
Kevin G. Boris
Louis A. Ruprecht
RUPRECHT, HART, & WEEKS LLP
306 Main Street
Millburn, NJ 07041
(973) 379-2400 (tel)
(973) 379-2446 (fax)
kboris@rhwlawfirm.com
*Counsel for Petitioner Hamoodah*

/s/ Stephen Demick
Shereen J. Charlick
Stephen Demick
FEDERAL DEFENDERS
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467 (tel)
(619) 687-2666 (fax)
Shereen_Charlick@fd.org
*Counsel for Petitioner Khan*

/s/ Zachary Katznelson
Zachary Katznelson
Cori Crider
REPRIEVE
P.O. Box 52742
22 Tudor Street
London, UK EC4Y 0AY
011 44 207 353 4640 (tel)
011 44 207 353 4641 (fax)
zachary@reprieve.org.uk
*Counsel for Petitioner Abdullah*

*Of Counsel*
Shayana D. Kadidal (D.C. Bar No. 454248)
Gitanjali S. Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439 (tel)
(212) 614-6499 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served via the e-filing system on the following counsel of record for respondents:

Terry Henry
Andrew I. Warden
US DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7226
Washington, DC 20529-000 1

/s/ Brian M. Childs
Brian M. Childs

Dated: August 12, 2008

11107971.5