# EXHIBIT A

# Libya

Country Reports on Human Rights Practices - 2007
Released by the Bureau of Democracy, Human Rights, and Labor
March 11, 2008

The Great Socialist People's Libyan Arab Jamahiriya is an authoritarian regime with a population of approximately six million, ruled by Colonel Mu'ammar al-Qadhafi since 1969. The country's governing principles are derived predominantly from Colonel al-Qadhafi's Green Book ideology. In theory citizens rule the country through a pyramid of popular congresses, communes, and committees, as laid out in the 1969 Constitutional Proclamation and the 1977 Declaration on the Establishment of the Authority of the People. However, in practice al-Qadhafi and his inner circle monopolized political power. In March 2006, Secretary of the General People's Committee (GPC) al-Baghdadi al-Mahmoudi (prime minister-equivalent) and the remaining delegates of the 760-member General People's Congress began a three-year term. The civilian authorities generally maintained effective control of the security forces.

The government's human rights record remained poor. Citizens did not have the right to change their government. Reported torture, arbitrary arrest, and incommunicado detention remained problems. The government restricted civil liberties and freedoms of speech, press, assembly, and association. The government did not fully protect the rights of migrants, asylum seekers, and refugees. Other problems included poor prison conditions; impunity for government officials; lengthy political detention; denial of fair public trial; infringement of privacy rights; restrictions of freedom of religion; corruption and lack of transparency; societal discrimination against women, ethnic minorities, and foreign workers; trafficking in persons; and restriction of labor rights.

On July 24, the government allowed six foreign health workers, detained since 1999 and accused of intentionally infecting 426 children with HIV in 1999, to depart the country.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports that the government or its agents committed arbitrary or unlawful killings.

According to a September 2006 Human Rights Watch (HRW) report, witnesses interviewed in 2005 claimed that abuse by detention center guards led to the deaths of three detainees.

There were no developments in the case of the 2005 killing of Daif Al Ghazal, a prominent opposition journalist and anticorruption activist.

b. Disappearance

On February 16, security services arrested Abdulrahman al-Qutiwi and Juma'a Boufayed. Twelve individuals detained with al-Qutiwi and Boufayed subsequently appeared in court to face criminal charges; however, according to opposition groups, al-Qutiwi and Boufayed have not been seen since their February 16 arrest. At year's end the location of both men remained unknown.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices, but security personnel routinely tortured prisoners during interrogations or as

punishment. Reports of torture were difficult to corroborate in many cases since often detainees were held incommunicado.

The reported methods of torture and abuse included chaining prisoners to a wall for hours; clubbing; applying electric shock; applying corkscrews to the back; pouring lemon juice in open wounds; breaking fingers and allowing the joints to heal without medical care; suffocating with plastic bags; depriving detainees of sleep, food, and water; hanging by the wrists; suspending from a pole inserted between the knees and elbows; burning with cigarettes; threatening with dog attacks; and beatings on the soles of the feet.

From their arrest in 1999 until their departure on July 24, six foreign medical personnel charged with deliberately infecting children in a Benghazi hospital with the HIV virus repeatedly testified that they had been tortured with electric shocks and beatings to extract confessions.

In an August 1 interview, one of the medics offered a detailed account of these incidents, which included beatings, electric shocks, and injections with what police officers claimed was the HIV virus. According to the medic, security services first arrested him on January 29, 1999, forced him to wear a hood, and detained him without clothes in a 12 x 12 foot cell for 10 months. For several days he was detained in a room with three dogs, which police officers ordered to attack him as they attempted to extract a confession. Police also bent his knees against his chest, tied his hands and feet around his legs, threaded an iron bar through the rope and spun him around the bar "like a roasted chicken." For months, police forced him to sleep with his hands tied behind his back, hanging from the wall.

In the August 1 interview, the medic went on to allege that police officers forced the medics to strip and applied electric shocks to their bodies. He stated that the female medics were sexually abused. One female medic attempted to commit suicide by cutting her wrists with broken glass.

In June 2005 a court acquitted 10 security officials accused of torture by the medics. Two security officials subsequently filed a civil suit against the medics accusing them of slander. On May 27, a court acquitted the medics on the civil count.

In an August 8 interview with Al Jazeera, Saif al-Islam al- Qadhafi, a son of the Libyan leader and director of the semi-official Qadhafi Development Foundation (QDF), admitted that Libyan security services tortured the medics. According to Saif al-Islam, "yes, they [the medics] were tortured with electrodes and threats to target their families." He also criticized police officers' "manipulation" of the investigation.

During the year, there were reports that security services intentionally committed sane persons to psychiatric facilities to obstruct political activities deemed threatening to the regime.

Prison and Detention Center Conditions

According to diplomatic missions and international organizations, prison and detention center conditions ranged from poor to adequate. Pretrial detainees, who reportedly accounted for more than half of the prison population, were held in the same facilities as convicts. Prison officials frequently held pretrial detainees for long periods.

Security forces reportedly subjected prisoners and detainees to cruel, inhuman, or degrading conditions and denied them adequate medical care.

In October 2006, according to press accounts, clashes between prisoners and guards at the Abu Salim prison killed one prisoner, Hafed Mansour Al-Zwai, and injured 17. Opposition groups published articles on October 4, the first anniversary of the clashes, criticizing the government for failing to investigate.

On November 7, a group of Libyan activists abroad met to demand a government investigation into the 1996 Abu Salim prison riot, in which a large but unknown number of prisoners died. The group alleged that security services killed 1,200 political prisoners in the riot. In 2005 the authorities established a committee to investigate the incident. According to HRW, the government did not provide information on the timing of the investigation and has not responded to subsequent HRW requests for details on the investigation's progress. Similarly, Amnesty International (AI) did not receive a reply from the government to its formal request for information. AI officials reported that they continued to receive inquiries from family members of prisoners possibly involved in the 1996 incident. Since 2001according to the Swiss-based Libyan Human Rights Solidarity (LHRS) opposition group, government officials notified 112 families of the 350 families in contact with the group that a family member died in the incident, but officials did not provide a body or explain the cause of death. The remaining 238 families have not received confirmation from the government on the status of their family members.

According to LHRS, Muhammad Bosadra, a prisoner who reportedly negotiated with guards during the incident, was held

incommunicado since 2005, when government officials moved him from Abu Salim to an unknown facility.

As in previous years, international organizations, including the United Nations High Commissioner for Refugees (UNHCR) and International Organization for Migration (IOM), had access to prisons and detention facilities. UNHCR staff was reportedly allowed to conduct private interviews at government-operated detention facilities. International observers reported a gradual improvement in migrant detention conditions since 2005, in particular in medical services.

In 2005, after a 15-year absence, HRW visited the country and was provided access to police stations, five prisons, and prisoners under government observation. According to HRW, prison conditions appeared generally adequate, but overcrowding and abuse by security forces as punishment were problems. According to HRW, witnesses reported that physical abuse by guards led to the deaths of three detainees; one interviewee stated that he saw what he believed to be rape, while three witnesses reported that security officials threatened women detainees with sexual violence.

In March 2005 the government also allowed the humanitarian organization Physicians for Human Rights (PHR) representatives to examine a limited number of detention facilities.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention; however, the government did not observe these prohibitions. As in previous years, there were reports that security forces arbitrarily arrested and detained citizens during the year.

On February 16, security forces arrested several regime critics, including Idris Muhammad Boufayed, al-Mahdi al-Hameed, and their families, to disrupt a peaceful demonstration calling for greater political openness planned for the following day. Security forces previously arrested Boufayed, a businessman who returned to Libya in September 2006 after 16 years abroad, in November 2006.

Twelve individuals were arrested on February 16 in connection with the aborted demonstration and were charged with trying to overthrow the government, weapons possession, and communication with a foreign government, for which they may face the death penalty. According to press accounts, on October 30, the twelve began a hunger strike to protest their lengthy pretrial detention. On November 17, an opposition Web site published a report that security services at times detained the 12 in pairs in underground cells smaller than four cubic meters.

According to press accounts, after canceling an August 4 hearing without explanation, a state security court held an initial hearing on November 20. During the hearing, Boufayed made a statement attesting to "mistreatment" while in detention. At year's end the 12 remained in incommunicado detention.

On October 14, security services detained a regime critic, Fouad Nassar al-Mahmoudi, at Tripoli International Airport upon his return from a long stay in the United Kingdom. According to press accounts, al-Mahmoudi returned after obtaining assurances from the Libyan People's Bureau in London. At year's end al-Mahmoudi remained in incommunicado detention.

In April 2006, authorities reportedly released Kamel Mas'ud al-Kilani, whom police arrested, took to an unknown destination, and detained for 10 months, according to Libya Watch for Human Rights. Authorities arrested al-Kilani despite government assurances of safety upon his 2005 return to the country, but the government did not bring charges against him. At year's end authorities had not yet returned his passport.

There were no developments in the case of Mahmoud Muhammad Boushima, a government critic resident in the United Kingdom since 1981 whom police arrested during a July 2005 trip to the country, according to an AI report.

Role of Police and Security Apparatus

The country maintains an extensive security apparatus that includes police and military units, multiple intelligence services, local revolutionary committees, people's committees, and "purification" committees. The result is a multilayered, pervasive surveillance system that monitors and controls the activities of individuals. The legal basis of security service authority is unclear; citizens have no obvious recourse if they believe security services have exceeded their authority. Frequently cited laws are the 1971 and 1972 "Protection of the Revolution" laws, which criminalize activities based on political principles inconsistent with revolutionary ideology. Although the law prohibits arbitrary arrest and detention, in practice security services can detain individuals without formal charges and hold them indefinitely without court convictions.

Security forces committed serious human rights abuses with impunity, including the lengthy extralegal detentions of

Boufayed, al-Hameed, and Boushima. In addition, security services regularly enjoyed impunity from criminal acts committed while performing their duties.

Arrest and Detention

The law stipulates that detainees can be held after arrest for up to eight days for investigation; in practice security services can hold detainees indefinitely. While the law requires that detainees be informed of the charges against them, it was not enforced in practice. The law states that, in order to renew a detention order, detainees must be brought before a judicial authority at regular intervals of 30 days; in practice security services detained persons for indefinite periods without a court order.

By law bail must be set for pretrial detainees and detainees must have access to counsel. Public defenders must be appointed for those who cannot afford a private attorney. Detainees reportedly did not receive information on their rights to legal representation during interrogation.

Incommunicado detention was a problem. The government held many political detainees incommunicado for unlimited periods in unofficial detention centers controlled by branches of the security services. The government reportedly held political detainees, including fewer than 100 associated with banned Islamic groups, in prisons throughout the country, but mainly in the Ayn Zara, Jadida, and Abu Salim prisons in Tripoli. Some human rights organizations estimated there were approximately 2,000 political detainees, many held for years without trial. Hundreds of other detainees may have been held for periods too brief to permit confirmation by outside observers.

According to a 2006 HRW report, migrants and refugees in detention centers complained consistently of not being informed of the reason for their arrest, of lengthy periods of pretrial detention, and of restricted access to a lawyer.

Women and girls suspected of violating moral codes reportedly were detained indefinitely in "social rehabilitation" homes.

Amnesty

On August 31, as part of its annual Revolution Day commemoration, the government reportedly pardoned 2,091 prisoners serving sentences related to civil or minor criminal matters. The government regularly pardons prisoners during the September holiday.

e. Denial of Fair Public Trial

The law provides for an independent judiciary; however, it was not independent in practice. The law stipulates that every person has the right to resort to the courts; however, security forces had the authority to pass sentences without trial, particularly in cases involving political opposition. The legal basis for security force authority is unclear. Some nongovernmental organizations (NGOs) cited the 1971 and 1972 "Protection of the Revolution" laws. Security services intimidated, harassed, and detained individuals without formal charges and held them indefinitely without court convictions, particularly in cases involving political opposition. The government used summary judicial proceedings to suppress domestic dissent. Al-Qadhafi may, at his discretion, interfere in the administration of justice by altering court judgments, replacing judges, or manipulating the appeal system. The judiciary failed to incorporate international standards for fair trials, detention, and imprisonment.

The judicial system is composed of four tiers: the summary courts, the courts of first instance, the three courts of appeal, and the Supreme Court. The summary courts hear cases involving misdemeanors. The decisions of this court may be appealed to the courts of first instance. These courts are composed of chambers of three judges and have the authority to adjudicate in all civil, criminal, and commercial cases. Jurors of the court of first instance apply Shari'a (Islamic law) in family law cases. Cases from the courts of first instance may be appealed to the three courts of appeal, which are composed of panels of three judges. The Shari'a court of appeals hears cases from the lower Shari'a court.

The final court of appeal is the Supreme Court, composed of five separate chambers of five judges. The court has chambers for civil and commercial, criminal, administrative, constitutional, and Shari'a cases. The GPC elects the presiding president and other members of the supreme court.

The Higher Judicial Council, an extrajudicial body that reviews Supreme Court decisions for political implications, has the authority to overturn supreme court verdicts or grant amnesty in cases involving capital punishment.

The Supreme Council for Judicial Authority is the administrative authority of the judiciary that handles appointments,

transfers, and disciplinary matters.

On August 19, the Supreme Council for Judicial Authority established a state security court of appeals responsible for hearing national security cases. The court's portfolio includes cases stemming from three laws: Law 80 of the 1975 Penal Code stipulating the death penalty for offenses against the security of the state, Law 71 of 1972 which classifies as "treason" all independent political activity, and a revolutionary council decision from 1969 which prohibits all forms of peaceful political opposition. Opposition groups raised concerns that defendants in cases before the state security court may be denied access to an attorney and that cases are conducted in secret.

Trial Procedures

The law provides for the presumption of innocence, informing defendants of the charges against them, and the right to legal counsel. In practice defendants often were not informed of the charges against them and usually had little contact, if any, with their lawyers. Defense lawyers automatically were appointed, even if the defendant declined representation.

On two occasions, in 2004 and 2006, a court sentenced to death six foreign health workers accused of deliberately infecting 426 children with HIV-tainted blood in 1999. The sentences reportedly were based on confessions that the accused made under torture. International observers reported serious concerns about the lack of investigation into allegations of torture and delays in bringing the case to a conclusion. In 2005 the Supreme Court accepted the appeal of the medics and ordered a retrial by the criminal court, which began in May 2006 and concluded with a second guilty verdict in December 2006.

During the second criminal trial, authorities denied the defendants and their lawyers the right to call witnesses or present evidence while giving wide latitude to the prosecution. Defendants and their lawyers had limited access to government-held evidence. Following the December 2006 guilty verdict, the medics again appealed to the Supreme Court, which held its first hearing on the defendants' appeal on June 20. On July 11, the Supreme Court upheld the lower court's conviction and reinstated several lesser charges to the indictment, including alcohol consumption and currency violations. On July 17, the Higher Judicial Council intervened and commuted the death penalty to life imprisonment after the victims' families expressed satisfaction with a compensation arrangement, which included a payment of one million dollars for each infected child, substantial foreign investments in the local health infrastructure, and European promises to provide medical care abroad for some affected children.

On July 24, the government allowed the medics to depart to serve their remaining prison terms in Bulgaria, where authorities pardoned the six medics upon arrival.

In an August 8 interview with Al Jazeera, Saif al-Islam al-Qadhafi said, "Regarding the Bulgarian nurses, I am convinced there was negligence and poor medical services, but that there was no premeditation" on the part of the Libyan authorities. He noted the medics' case was "manipulated" by "police officers who conducted the investigation." In addition, he accused foreign countries of using the medics' case to "blackmail" Libya: "the Europeans and the Americans... began to say [Libya] should release the Bulgarian nurses now against [Libyan] law and that they do not care about [Libyan] courts... consequently, this is a kind of blackmail."

Political Prisoners and Detainees

A large but unknown number of persons were detained and imprisoned during the year either for engaging in peaceful political activity or for belonging to an illegal political organization. The law bans any group activity based on any political ideology inconsistent with the principles of the 1969 revolution.

Among the many political prisoners and detainees was political activist and al-Qadhafi critic Fathi al-Jahmi, who remained in incommunicado detention. During the year, there were no developments in his case which began in 2002 when security forces detained al-Jahmi after he called publicly for democratic reforms and released him in March 2004. The government again detained him two weeks later after al-Jahmi gave several foreign-press interviews calling for reforms. In May 2005 HRW visited al-Jahmi, who stated that he faced three charges: attempting to overthrow the government, slandering al-Qadhafi, and communicating with a foreign official without permission. According to HRW, the government contended it arrested al-Jahmi for telephoning foreign officials and "providing them with information with the purpose of making their countries hate the Great Jamahiriya" and for conspiring to serve the interests of a foreign country. Al-Jahmi's lawyer reportedly believed these charges could carry the death penalty.

According to HRW, as of May 2006, the government had not brought formal charges against al-Jahmi and claimed the case was still under investigation. In 2005 PHR visited al-Jahmi in 2005 and reported that he suffered from diabetes, hypertension, and coronary artery disease. According to NGO reports, al-Jahmi has had no contact with his family since

approximately September 2006.

On approximately February 16, the government briefly re-arrested journalist Abd al-Razia al-Mansuri in connection with an abortive peaceful demonstration calling for greater political openness planned for February 17. Al-Mansuri was released within days and gave an interview to an opposition Web site in late February confirming his release. In 2005, al-Mansuri, an active contributor to dissident Web sites, was arrested and charged ten months later with illegal possession of a handgun. Security services released al-Mansuri in 2006.

At year's end, Abdel Nasser Younis Meftah al-Rabassi reportedly remained in prison without visitation privileges. He was sentenced in 2003 for posting an article on an Arab Web site criticizing the corruption in the Qadhafi government. According to human rights activists and AI, he did not have access to adequate medical care and was unable to hire his own attorney.

Civil Judicial Procedures and Remedies

There was no independent judiciary in civil matters and citizens did not have access to courts to seek damages for, or cessation of, human rights violations. Security services intimidated, harassed, and detained individuals outside of the legal system and without judicial oversight. In practice individuals did not have the right to seek redress for security service actions in civil court. Neither judicial nor administrative remedies were generally available for alleged wrongs.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions; however, the government did not respect these prohibitions. The security agencies often disregarded the legal requirement to obtain warrants before entering a private home. They routinely monitored telephone calls and Internet usage, including e-mail communication with foreign countries.

The security agencies and the revolutionary committees oversaw an extensive network of informants engaged in surveillance for the government. The government threatened to seize and destroy property belonging to "enemies of the people" or those who "cooperate" with foreign powers. Exiled government opponents reported that family members were harassed and threatened with detention.

Collective punishment was inflicted on the relatives of individuals, particularly those of certain convicted oppositionists. Punishments by law include denial of access to utilities (water, electricity, and telephone), fuels, food supplies, and official documents; denial of participation in local assemblies; and termination of new economic projects and state subsidies. During the year security services reportedly set fire to the property of relatives of a political activist arrested for calling for a multiparty system.

There were no reports of application of the "purge law" that provides for the confiscation of private assets above a nominal amount. The law describes wealth in excess of such unspecified amounts as "the fruits of exploitation or corruption."

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech "within the limits of public interest and principles of the Revolution"; however, in practice the government severely limited the freedoms of speech and of the press, particularly criticism of government officials or policy. The government tolerated some difference of opinion in people's committee meetings and at the GPC. On August 20, Saif al-Islam al-Qadhafi called for greater openness within the people's congress system but cautioned that all political speech must stay within four "red lines": Islam, national security, territorial integrity, and al-Qadhafi's primacy in the political sphere.

The government prohibited all unofficial political activities. By law many forms of speech or expression may be interpreted as illegal. The wide reach of security services and broad networks of informants resulted in pervasive self-censorship.

On February 16, the government arrested dissident writer Jamal al-Hajj in connection with a peaceful demonstration calling for greater political freedom. Al-Hajj remained in detention at year's end.

In March 2006 the government released Abd al-Raziq al-Mansuri, who was arrested in 2005 after publishing articles critical of the government and society on a foreign Web site.

In 2005 unidentified individuals abducted and killed journalist and outspoken government critic Daif al-Ghazal. Authorities found his body and later detained two men in connection with an ongoing investigation. No additional information about the investigation was available at year's end.

The government owned and controlled virtually all print and broadcast media. The official news agency, JANA, was the designated conduit for official views. Government-controlled media neither published nor broadcast opinions inconsistent with official policy. During the year, the quasi-official 1/9 Media Group, a Qadhafi Development Foundation (QDF) subsidiary, launched a satellite television station, a radio station, and two independent newspapers. Local revolutionary committees published several small newspapers.

No foreign publications were available. In July 2006 the 1/9 Media Group began distributing foreign publications for the first time domestically. In February QDF began distributing foreign Arabic-language publications through select news outlets. On approximately March 20, the QDF discontinued the distribution of all foreign publications. While the publications law in theory restricts publishing rights to public entities, in practice, private companies were able to publish.

Satellite television was widely available; however, at times, the government blocked foreign programming.

Internet Freedom

A sole government-owned service provider offered Internet access. The number of Internet users was small but growing. According to the UN Development Program (UNDP), as of 2004 approximately 4 percent of citizens regularly used the Internet. The government occasionally blocked certain Internet sites, chiefly political opposition Web sites, and reportedly monitored Internet communications.

Academic Freedom and Cultural Events

The government severely restricted academic freedom. Professors and teachers who discussed politically sensitive topics faced the risk of government reprisal. Foreigners were frequently denied access to schools and university campuses.

The government must approve all cultural events in advance. Any group or individual seeking to organize a cultural event required a government sponsor. The government at times denied permission for musical performances and denied visa applications for foreign musical performers to visit the country.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law stipulates that "individuals may meet peacefully, and no police personnel are entitled to attend their meetings; moreover, they are not obliged to notify the police of such gatherings." The law also provides for the right to hold public meetings in accordance with the regulations set by the law. However, the government severely restricted these rights in practice and permitted public assembly only with its express approval and only in support of its positions.

Freedom of Association

The government restricted the right of association to institutions affiliated with the government. The government did not allow the formation of groups based on political ideology inconsistent with the 1969 revolution. Political activity deemed treasonous by the government carries the death penalty.

c. Freedom of Religion

While there is no explicit law guaranteeing religious freedom, the government generally respected the right to freely observe one's religion in practice. Islam is the equivalent of a state religion and thoroughly integrated into everyday political and social life.

The government regulated mosques, religious schools, and clerics to ensure all views were in line with the state-approved form of Islam. The government strongly opposed militant forms of Islam, which it viewed as a threat to the regime.

The World Islamic Call Society (WICS), an international educational institution headquartered in Tripoli, operated a state-run university providing Muslims outside the Arab world with a broad education in literature, history, science, and religion.

WICS also organized vocational training programs, offered students exposure to international academic speakers, and maintained relations with local non-Muslim religious groups, including Christian churches.

The government was tolerant of other religious groups but prohibited the proselytizing of Muslims. Christian churches operated openly and were accepted by the authorities; however, the government imposed a limit of one church per denomination per city. There were no official places of worship for some minority religions such as Hinduism, Buddhism, and the Baha'i Faith.

A noncitizen female who marries a Muslim citizen is not required to convert to Islam; however, a noncitizen male must convert to Islam in order to marry a Muslim woman. The government supported the position that all citizens were Muslim. Marriages between non-Muslims citizens were unacceptable.

Societal Abuses and Discrimination

There were no reports of societal violence, harassment, or discrimination against members of religious groups.

Although no current statistics were available, the country's Jewish population was extremely small and possibly nonexistent. There was no known Jewish community.

The government renovated a former Jewish school in Tripoli, to serve as a city archive. There was no functioning synagogue.

Discussions between the government and representatives of the former Jewish community regarding possible compensation for Jewish communal property confiscated by the government after 1948 were ongoing since 2004.

During the year al-Qadhafi made statements denigrating Christians and Jews and urged the practice of Islam. Echoing a statement in April 2006 that all persons are required to be Muslims, al-Qadhafi noted in a March 31 speech in Agadez, Niger, that "Christianity is not a faith for people in Africa, Asia, Europe, and the Americas." Speaking during an annual commemoration of the Prophet Muhammad's birth, al-Qadhafi declared that those who did not practice Islam were "losers" and that it was a mistake for Christians to say Jesus was crucified. Following comments in April 2006 that Jews should conform to Islamic practices by making an annual pilgrimage to Mecca, al-Qadhafi stated in a March 27 interview that "Jews will go extinct because everyone hates them."

A January 31 editorial published in *Ash-Shams*, a government-backed daily newspaper with a small circulation, by Abdullah Rashid claimed that the Holocaust was a myth. In his view, the "presumed" Holocaust was devised to justify the need for a "Zionist occupation state," to give them an "excuse" and a "kind of privilege," and to gain "political and financial support." According to Rashid, "Jews are a tyrannous and rogue people" who "are persecuting the Arabs in the same manner as they did to Christ."

For a more detailed discussion, see the *2007 International Religious Freedom Report*.

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law stipulates that "each citizen, during the time of peace, may move freely, choose the place where he or she wishes to live, and may return to the country and leave whenever he or she chooses." The government generally did not restrict the freedom of movement within the country; however, freedom to travel outside the country was at times restricted by the arbitrary seizure or non-issuance of passports. Authorities routinely held the passports of foreigners married to citizens upon their entry into the country.

The law neither allows, nor did the government impose, forced exile as a punishment. The government continued to encourage dissidents resident abroad to return and publicly promised their safety; however, there were numerous reports that the government detained dissidents returning from exile despite promises to the contrary. The government reportedly interrogated students returning from study abroad and at times discouraged students from studying abroad claiming they would be recruited to work as foreign agents against Libya.

Protection of Refugees

The laws do not provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention relating to the Status of Refugees and its 1967 protocol, and the government has not established a system for providing protection to refugees. The government did not grant refugee status or asylum. The government is a party to the former Organization

of African Unity's Convention Governing the Specific Aspects of Refugee Problems in Africa.

In practice, the government provided some protection against refoulement, the return of persons to a country where there is reason to believe they feared persecution.

Despite the absence of a formal memorandum of understanding, the government generally cooperated with the Office of the U.N. High Commission for Refugees (UNHCR) and, as in previous years, did not obstruct UNHCR's work assisting refugees and asylum seekers. UNHCR had regular access to government officials and facilities.

The law prohibits the extradition of political refugees. While the government did not target refugees for forcible deportation, the government forcibly deported foreigners regularly without proper screening to ensure that deportations did not include legitimate refugees or asylum seekers. According to international organizations working in the country, the government increasingly differentiated between legitimate refugees and asylum seekers and other economic migrants; however, most citizens failed to distinguish legitimate refugees and asylum seekers from the large migrant population.

During the year, approximately 12,000 refugees were registered with the UNHCR, although UNHCR estimated there were closer to 30,000 refugees in the country. Of the total refugee population, roughly 3,500 were in regular contact with the UNHCR mission in Tripoli. During the year, UNHCR reported an increase in the number of refugee applications, which contributed to an eight-month waiting period for asylum seekers to receive an appointment with the organization. The majority of refugees are Palestinians, Iraqis, and Somalis, followed by smaller numbers from Sudan and Eritrea.

The government stipulates that any foreigner who enters the country illegally shall be deported. The government maintained detention camps to hold noncitizens pending deportation and did not routinely inform diplomatic representatives when their nationals were detained. Persons in detention camps reportedly were abused. According to government figures, officials repatriated approximately 145,000 foreigners between 2003 and 2005.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The country does not have a constitution, and citizens do not have the right to change their government. The country's governing principles stem from al-Qadhafi's Green Book, which combines Islamic ideals with elements of socialism and pan-Arabism. The Green Book states that direct popular rule is the basis of the political system and that citizens play a role in popular congresses; however, in practice al-Qadhafi and his close associates monopolized government decision-making.

On August 20, Saif a-Islam al-Qadhafi repeated calls for some political openness and a new "social contract" between the Libyan people and their government. He warned that four "red lines"--Islam, national security, territorial integrity, and Muammar al-Qadhafi--will constrain any future political reforms.

Elections and Political Parties

The government prohibits the creation of and subsequent membership in political parties. The 1977 Declaration on the Establishment of the Authority of the People dictates how citizens exercise their political rights. The government is structured in a pyramid of committees, communes, and congresses, each layer of which is involved in the selection of the next highest level. Citizens participate through numerous organizations, including vocational, production, professional, and crafts congresses. Voting for leaders of the local congresses is mandatory for all citizens over the age of 18.

The elected secretaries of these various congresses and committees select the members of the highest legislative organization, the GPC, which is composed of 760 members serving three-year terms.

In theory revolutionary committees, composed primarily of youth, guard against political dissent and ensure that citizens adhere to sanctioned ideology. These committees approve candidates for the GPC. In practice revolutionary committees played an unclear role in enforcing official ideology, appearing at times either increasingly marginalized or at other times still active in political life.

Elections occur every three years when the people's congresses, the local bodies comprised of all citizens, choose their leadership committees. The last renewal of people's congresses took place in March 2006. The election process continues through the hierarchy of people's congresses, until the nation-wide General People's Congress chooses the General People's Committee, which manages the daily affairs of the government.

According to the 2007 UNDP report, women held 4.7 percent of the 760 seats in the General People's Committee. No

reliable information existed on the representation of minorities in the government.

Government Corruption and Transparency

Laws stipulating criminal penalties for official corruption are unclear and inconsistently applied. The World Bank's Worldwide Governance Indicators reflected a severe corruption problem. Officials sometimes engaged in corrupt practices with impunity. Government corruption was perceived to be a severe problem, which coupled with favoritism based on family ties, contributed to government inefficiency.

In a series of speeches in 2006, al-Qadhafi called for all senior government officials to declare their earnings and assets or risk unspecified punitive action by the state; at year's end, no clear deadline had been set for officials to comply. The Administration Monitoring Board is the government agency responsible for oversight of official activities and the prevention of corrupt practices.

The law does not provide for public access to government information, and the government did not provide access in practice to citizens or foreign media.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Numerous charitable associations approved by the government operate in the country; however, the government prohibited the establishment of independent human rights organizations. Individuals wishing to carry out human rights work were forced to operate abroad due to restrictive laws that imposed imprisonment for forming or joining international organizations without government authorization.

Associations engaging in unauthorized political activity were illegal. The government body known as the Libyan Arab Human Rights Committee did not release any public reports. The Libyan Society for Human Rights, operating under the sponsorship of the semiofficial QDF, followed government policy priorities rather than operating as an independent entity.

Section 5 Discrimination, Societal Abuses, and Trafficking in

Persons

The law prohibits discrimination based on race, sex, religion, disability, or social status; however, the government did not enforce these prohibitions effectively, particularly with regard to women and minorities.

Women

The 1969 Constitutional Proclamation granted women total equality; however, traditional attitudes and practices continued to be used as reasons for discrimination against women. Shari'a governs inheritance, divorce, and the right to own property.

The law prohibits domestic violence, but there was no reliable information on the penalties for punishment. There was little detailed information regarding the extent of violence against women. Domestic abuse was rarely discussed publicly.

The law prohibits rape. The convicted rapist must marry the victim, with her agreement, or serve a prison term of up to 25 years.

The law does not distinguish between rape and spousal rape. According to testimony by government officials before the UN, spousal rape occurred and was resolved by "social solutions."

The law prohibits prostitution; however, the authorities tolerated it.

The law does not prohibit female genital mutilation (FGM), which is foreign to the culture and society; however, there were reports that FGM occurred in remote areas of the country within African migrant communities.

Women and girls suspected of violating moral codes reportedly were detained indefinitely in "social rehabilitation" homes, which provided social services, including education and healthcare. Many detained in these facilities had been raped and then ostracized by their families. The government also stated that a woman was free to leave the homes when she

reached "legal age" (18 years old), consented to marriage, or was taken into the custody of a male relative. According to HRW the government routinely violated women and girls' human rights in "social rehabilitation" homes, including violations of due process, freedom of movement, personal dignity, and privacy.

The law criminalizes sexual harassment; however, there were no reports on how this law was enforced in practice.

The Department of Social Affairs under the GPC secretariat collects data and oversees the integration of women into all spheres of public life. Women did not hold any cabinet-level offices in the government. The General Union of Women's Associations, established by the government as a network of nongovernmental organizations, addresses women's employment needs. According to a 2005 International Labor Organization report, 32 percent of Libyan women over the age of 15 were economically active; however, traditional restrictions continue to discourage some women from playing an active role in the workplace.

In general the emancipation of women was a generational phenomenon. Educational differences between men and women have narrowed; however, a significant proportion of rural women did not attend school and were inclined to instill in their children such traditional beliefs as women's subservient role in society.

Children

The government generally protected children's rights and welfare.

The government subsidized primary, secondary, and university education, and primary education was compulsory until the age of 15. In July the government amended the law to impose high fees on noncitizens enrolled in primary and secondary schools, prompting many foreigners to leave the country. According to a 2003 UNDP report, 96 percent of school-age children attended primary school and most reached at least a sixth-grade level. 53 percent of girls and 71 percent of boys attended secondary school.

The government subsidized medical care and improved the welfare of children; however, general economic mismanagement led to a low standard in medical services. Boys and girls enjoyed equal access to medical care.

The law prohibits child abuse, and that prohibition was respected in practice.

Trafficking in Persons

The law does not specifically prohibit trafficking in persons; however, there were reports that persons were trafficked to the country, some en route to final destinations in Europe.

The country was both a transit point for trafficked persons en route to Europe as well as a destination country for victims from sub-Saharan Africa and South Asia. An estimated 1 to 2 percent of Libya's 1.5 to 2 million foreigner residents may be trafficking victims. Individuals may be trafficked both for purposes of forced labor and commercial sexual exploitation.

The law does not expressly criminalize trafficking for purposes of sexual exploitation or involuntary servitude, and the government provided no information on prosecutions related to trafficking offenses. Unlike in previous years where there were no prosecutions for trafficking, the government brought a civil case against an individual who attempted to deceive 20 Indian nationals into involuntary servitude during the year. No additional information was available about the case at year's end.

There were no reports of any government participation in, or facilitation of, trafficking in persons.

As in previous years, the government did not provide adequate protection to victims of trafficking. The government failed to adequately screen vulnerable populations to identify trafficking victims. Victims were susceptible to punishment for unlawful acts committed as a result of being trafficked, including unlawful presence in the country, working without a valid work permit, and engaging in prostitution. Trafficking victims, intermingled with economic migrants, may have been deported without receiving medical, psychological, or legal aid.

During the year the government took some steps to prevent trafficking in persons by establishing a task force to combat passport and document fraud used to traffic individuals across the country's porous southern border. In addition, the government established an interagency committee, consisting of representatives from the Ministry of Foreign Affairs, Ministry of Justice, and Ministry of the Interior, to share information with other governments on trafficking and to coordinate antitrafficking programs in the country. The government also supported a series of training workshops for members of the

law enforcement community and select government-sponsored charity associations to raise awareness of trafficking.

Persons with Disabilities

The law provides the rights of persons with disabilities and provides for monetary and other types of social care. There were a number of government-approved societies that care for persons with disabilities. Access to employment, education, health care, and other state services were generally protected.

National/Racial/Ethnic Minorities

Arabic-speaking Muslims of mixed Arab-Amazigh (Berber) ancestry constituted 97 percent of citizens. The principal minorities were Amazighs and sub-Saharan Africans.

Unlike in previous years, the government took some steps to alleviate discrimination against the country's Berber minorities. During the year the government abolished a law prohibiting the use of Amazigh and Tuareg names. In August the government convened the first Amazigh Congress to discuss education and social integration of the country's Berber communities and allowed individuals to display Amazigh-language signs written at government-sponsored events. Unlike in previous years, GPC Secretary al-Baghdadi al-Mahmoudi and Saif al-Islam al-Qadhafi made high-profile visits to Berber regions.

Other Societal Abuses and Discrimination

There were no reports of societal violence or discrimination based on sexual orientation or against persons living with HIV/AIDS.

Section 6 Worker Rights

a. The Right of Association

The law prohibits meaningful, independent association; however, the law allows workers to join the government-organized National Trade Unions' Federation. The Federation played an active role in the International Confederation of Arab Trade Unions, the Organization of African Trade Union Unity, and the World Federation of Trade Unions. The government prohibited foreign workers from joining the Federation.

b. The Right to Organize and Bargain Collectively

The law circumscribes unions' conduct of their activities. For example, the government must approve all collective agreements made between unions and employers to ensure that they were in line with the country's economic rights. The law does not provide workers with the right to strike, and there were no reports of strikes during the year. No information was available on any additional mechanisms designed to protect workers' rights.

A free trade zone in Misrata officially opened in 2004, but at year's end it was not operating.

c. Prohibition of Forced or Compulsory Labor

The law prohibits any form of forced or compulsory labor, including by children, and there were no reports that such practices occurred.

d. Prohibition of Child Labor and Minimum Age for Employment

The law forbids children under the age of 18 from employment, unless it is a form of apprenticeship. There was no information available on the prevalence of child labor.

No information was available concerning whether the law limits working hours or sets occupational health and safety restrictions for children. The General People's Committee for Manpower, Employment and Training is responsible for preventing child labor.

e. Acceptable Conditions of Work

The labor law defines the rights and duties of workers, including matters of compensation, pension rights, minimum rest periods, and working hours. In 2006 the government shortened the legal work week from 48 to 40 hours. The law stipulates the minimum wage, standard working hours, night shift regulations, dismissal procedures, and training requirements. Employment laws generally favor the employee. The law does not specifically prohibit excessive compulsory overtime.

Wages are forbidden by the Green Book and paid in the form of "entitlements," which frequently were in arrears. While some public sector wages, including professors, have seen wage increases in recent years, a wage freeze imposed more than a decade ago continues to depress earnings. In July 2006 the World Bank reported that the government enforced the minimum wage of $68 (85 dinars) per month. Although there was no information available regarding whether the average wage was sufficient to provide a worker and family with a decent standard of living, the government heavily subsidized rent, utilities, and food staples.

Labor inspectors were assigned to inspect places of work for compliance with government-defined health and safety standards, and the law grants workers the right to court hearings regarding these standards. Certain industries, such as the petroleum sector, attempted to maintain standards set by foreign companies. There was no information regarding whether workers could remove themselves from an unhealthy or unsafe work situation without jeopardizing their employment.

Foreign workers reportedly constituted 1.6 million of the 3.2 million workforce; however, the labor law does not accord foreign workers equal treatment. Foreign workers were permitted to reside in the country only for the duration of their work contracts, and they could not send more than half of their earnings to their home countries. They were subjected to arbitrary pressures, such as changes in work rules and contracts, and had little option other than to accept such changes or depart the country. Many foreign workers were deported arbitrarily for not having newly required work permits for unskilled jobs they already held.

 BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.