# EXHIBIT E

Case 1:05-cv-01010-RJL    Document 63-6    Filed 08/12/2008    Page 1 of 20



# Tunisia

Country Reports on Human Rights Practices - 2007
Released by the Bureau of Democracy, Human Rights, and Labor
March 11, 2008

Tunisia is a constitutional republic with a population of approximately 10 million, dominated by a single political party, the Democratic Constitutional Rally (RCD). Zine El Abidine Ben Ali has been the president since 1987. In the 2004 presidential election, President Ben Ali ran against three opposition candidates and was declared the winner with approximately 94 percent of the popular vote. Official turnout was higher than 90 percent, although observers regarded these figures as substantially inflated. In concurrent parliamentary elections, the RCD gained 152 of the 189 seats. The 2005 indirect elections for the Chamber of Advisors, one of two legislative bodies, resulted in a heavily pro-RCD body. The civilian authorities generally maintained effective control of the security forces.

There were significant limitations on citizens' right to change their government. Local and international nongovernmental organizations (NGOs) reported that security forces tortured and physically abused prisoners and detainees and arbitrarily arrested and detained individuals. Security forces acted with impunity sanctioned by high-ranking officials. Lengthy pretrial and incommunicado detention remained serious problems. The government infringed on citizens' privacy rights and continued to impose severe restrictions on freedoms of speech, press, assembly, and association. The government remained intolerant of public criticism and used intimidation, criminal investigations, the court system, arbitrary arrests, residential restrictions, and travel controls to discourage criticism by human rights and opposition activists. Corruption was a problem.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings.

In March 2006, according to the World Organization Against Torture (OMCT), Bechir Rahali, chief of police of Cite Ennour, El Ouradia IV, Tunis, reportedly killed Tarek Ayari by hitting him on the head with the handle of a pickaxe as he fled a police raid. Ayari was left on the scene without assistance and later died from his injuries. Authorities did not conduct any further investigation, and no known charges were filed.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices; however, according to human rights organizations, security forces tortured detainees to elicit confessions and discourage resistance. Reported abuses included sexual abuse; sleep deprivation; electric shock; submersion of the head in water; beatings with hands, sticks, and police batons; suspension, sometimes manacled, from cell doors and rods resulting in loss of consciousness; and cigarette burns. According to Amnesty International (AI) and Human Rights Watch (HRW), police and prison officials on occasion used sexual assault and threats of sexual assault against prisoners' wives and daughters to extract information, intimidate, and punish.

Charges of torture in specific cases were difficult to prove, and authorities generally did not take steps to investigate

allegations or punish perpetrators. Authorities often allegedly denied victims of torture access to medical care until evidence of abuse disappeared. The government maintained that it investigated all complaints of torture and mistreatment filed with the prosecutor's office and noted that alleged victims sometimes accused police of torture without filing a complaint, a prerequisite for an investigation. However, according to defense attorneys and local and international human rights groups, police routinely refused to register complaints. In addition, judges dismissed complaints without investigation and accepted as evidence confessions allegedly extracted through torture. The government can open an administrative investigation of allegations of torture or mistreatment of prisoners without a formal complaint; however, in those cases the results were not made public or available to the lawyers of affected prisoners.

Consistent with an effort to extract information or coerce confessions, reports of torture were more frequently associated with the initial phases of interrogation/investigation and in pretrial detention centers more than prisons. Human rights activists, citing prisoner accounts, identified facilities at the Ministry of Interior (MOI) as the most common location for torture. Political prisoners, Islamists, and persons detained on terrorism-related charges allegedly received harsher treatment than other prisoners and detainees.

Several domestic and international NGOs reported multiple torture cases throughout the year.

According to the National Council for Liberties in Tunisia (CNLT), between December 2006 and January 22, authorities blindfolded, bound, and beat with electric cables Mohamed Amine Jaziri while he was in police custody. At year's end there were no further developments.

On April 6, according to the International Association for the Support of Political Prisoners (AISPP), prison officials hit on the head and body Oualid Layouni, who had been detained at Mornaguia Prison since January 16. Officials reportedly confined Layouni to a small space without natural light or aeration and subjected him to sleep deprivation.

According to a November 2 AI press release, on October 16, guards tortured Ousama Abbadi, Mohammed Amine Jaziri, Ramzi el Aifi, Oualid Layouni, and Mahdi Ben Elhaj Ali, who were in pretrial detention at Mornaguia Prison on terrorism-related charges. Guards reportedly restrained, punched, and kicked the men. Ousama Abbadi's injuries resulted in internal bleeding in his right eye and an open wound on his leg.

The November 2 AI release also stated that authorities stripped individuals detained in Mornaguia Prison and dragged them through a corridor. One prisoner was reported to have been raped with a staff.

On December 30, the Tunis Court of First Instance sentenced 30 Tunisians on terrorism related charges. The sentences ranged from death to five years in prison. According to press reports, many of the defendants denied the charges against them and stated that they only signed confessions after being tortured by security forces.

There were no developments in the June 2006 case of Aymen Ben Belgacem Dridi. The Tunisian Human Rights League (LTDH) Section in Bizerte reported that authorities detained Dridi on terrorism-related charges and reportedly beat, kicked, and subjected him to falka (beatings on the soles of the feet) in the Borj er-Roumi prison.

Police assaulted human rights and opposition activists throughout the year.

The opposition Arabic weekly *al-Mowqif* reported that on June 13, police attacked labor union leaders in Kasserine during a protest. Police reportedly injured regional union leader Khaled Barhoumi, who was treated for a fractured skull.

On August 24, according to Reporters Without Borders (RSF), 10 plainclothes police officers assaulted journalist Aymen Rezgui as he was leaving a press conference of the opposition Progressive Democratic Party (PDP). Rezgui's hand was reportedly injured, and all his notes and equipment confiscated.

In May 2006, according to multiple witnesses and human rights groups, police assaulted lawyers staging a three-week sit-in to protest a new law that created a training institute for lawyers. Police allegedly attacked several lawyers during the sit-in, including Ayachi Hammami, Abderraouf Ayadi, and Abderrazak Kilani, all of whom were hospitalized, according to a communique released by CNLT.

Prison and Detention Center Conditions

Prison conditions generally did not meet international standards. Overcrowding and limited medical care posed a significant threat to prisoners' health. During the year there were credible reports that injured or sick prisoners were denied prompt access to medical care. The government permits the International Committee of the Red Cross (ICRC) access to

prisons, but not other independent human rights observers.

According to human rights organizations, prison conditions in the country continued to fall short of minimum adequate standards. Hygiene was extremely poor, and prisoners rarely had access to showers and washing facilities. Sources reported that 40 to 50 prisoners were typically confined to a single 194-square-foot cell, and up to 140 prisoners shared a 323-square-foot cell. Most prisoners were forced to share beds or sleep on the floor. Current and former prisoners reported that lack of basic facilities forced inmates to share a single water and toilet facility with more than 100 cellmates, creating serious sanitation problems. Contagious diseases, particularly scabies, were widespread, and prisoners did not have access to adequate medical care. Additional discriminatory and arbitrary measures such as restrictions on family visits worsened the conditions of detention, particularly when prisoners sought redress for grievances about treatment and conditions.

As the result of a 2005 HRW report describing the government practice of holding political prisoners in prolonged solitary confinement, the government in 2005 stated it had eliminated this practice. However, HRW reported that the government continued to keep some political prisoners, most of whom were outlawed Islamist party An-Nahdha leaders, in small-group isolation.

According to prisoner and detainee testimony, prison conditions for women were generally better than those for men. Conditions for detainees and convicts were reportedly the same.

The CNLT reported that other inmates were instructed to stay away from political prisoners and were punished severely for making contact with them.

The ICRC continued to visit detainees in prisons and detention facilities in the country. Per ICRC standard modalities, its observations and recommendations were shared on a confidential and bilateral basis with the authorities. The government did not permit media to inspect or monitor prison conditions.

In November 2006 the government expanded the mandate of the governmental Higher Commission on Human Rights and Civil Liberties (HCHR) to allow prison visits without prior notification and inspections of MOI and Ministry of Justice (MOJ) facilities. The HCHR's reports are not made public.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but the government did not observe these prohibitions.

The AISPP reported that authorities arrested hundreds of persons since 2003 for visiting terrorism-related Web sites and detained them without proper legal procedures or sufficient evidence of commission of a crime.

According to AI and domestic human rights organizations, police arrested scores of people beginning in late December 2006 following security operations to disrupt an armed cell that was plotting to carry out terrorist attacks. Families made inquiries about the individuals, but authorities allegedly provided no information. AI expressed concern that authorities held the arrested in incommunicado detention at the State Security Department of the MOI, where they would be at risk of torture and other ill-treatment. According to press reports, police charged and convicted 30 suspects with plotting against state security, but the number of those in pretrial detention was unknown.

On May 24, according to RSF, police detained founding AISPP member Lassaad Jouhri for approximately 12 hours, questioning him on his plans to accompany international NGOs Human Rights First (HRF) and Frontline to El Kef prison.

*Role of the Police and Security Apparatus*

The MOI controls several law enforcement organizations including: the police, who have primary responsibility within the major cities; the National Guard, which has responsibility in smaller cities and the countryside; and state security forces, which monitor groups and individuals the government considers to be a threat, such as opposition parties and leaders, the media, Islamists, and human rights activists.

In general law enforcement groups were disciplined, organized, and effective; however, incidents of petty corruption and police brutality took place. Law enforcement organizations operated with impunity sanctioned by high-ranking officials. Police attacked dissidents and oppositionists.

The MOI's Higher Institute of Internal Security Forces and Customs has oversight of law enforcement officers in the

ministries of interior and customs. The organization's stated mission was to reinforce human rights and improve law enforcement; however, no information was available about its operations, and no information was available about any punishment of police and prison guards.

Arrest and Detention

The law provides that the police must have a warrant to arrest a suspect, unless the crime committed is a felony or is in progress; however, arbitrary arrests and detentions occurred. The penal code permits detention for up to six days prior to arraignment, during which time the government may hold suspects incommunicado. This requirement, however, was not always observed. For example, a report published during the year by the CNLT documented 24 cases in which the organization claimed that the six-day prearraignment detention was exceeded. Arresting officers are required to inform detainees of their rights, immediately inform detainees' families of the arrest, and make a complete record of the times and dates of such notifications, but those rules were sometimes ignored. Detainees were allowed access to family members when they were not being held incommunicado, although the government did not always facilitate the efforts of family members to identify the whereabouts of their detained relatives.

Detainees have the right to know the grounds of their arrest before questioning and may request a medical examination. They do not have a right to legal representation during the prearraignment detention. Attorneys, human rights monitors, and former detainees maintained that authorities illegally extended detainment by falsifying arrest dates. Police reportedly extorted money from families of innocent detainees in exchange for dropping charges against them.

The law permits the release of accused persons on bail, and detainees have the right to be represented by counsel during arraignment. The government provides legal representation for indigents. At arraignment the examining magistrate may decide to release the accused or remand him to pretrial detention.

In cases involving crimes for which the sentence may exceed five years or that involve national security, pretrial detention may last an initial period of six months and may be extended by court order for two additional four-month periods. For crimes in which the sentence may not exceed five years, the court may extend the initial six-month pretrial detention by an additional three months only. During this pretrial stage, the court conducts an investigation, hears arguments, and accepts evidence and motions from both parties. Complaints of prolonged pretrial detention were common.

Amnesty

Judges and the government exercised their authority to release prisoners or suspend their sentences, often on conditional parole.

On July 24, President Ben Ali released 21 prisoners in advance of the July 25 national holiday commemorating the establishment of the republic. The released prisoners included Mohammed Abbou, an attorney sentenced to prison after posting an article on the Internet critical of prisons and President Ben Ali. The other released prisoners were affiliated with the banned Islamist party An-Nahdha.

On October 5, according to the unregistered NGO Liberty and Equality, authorities released 27 prisoners from Borj Er Roumi and Mornaguia prisons. Authorities had sentenced two, Aymen Mejri and Anouar Hannachi, making them subject to administrative supervision for five years. The other 25 were in pretrial detention and therefore not subject to administrative supervision after release.

On November 7, according to press reports, President Ben Ali pardoned seven prisoners on the occasion of the 20th anniversary of his assumption of the presidency: Karim Harouni, Ali Chniter, Lotfi Senoussi, Mohamed Salah Tsouma, Sakher Fatmi, Abdellatif Bouhjila, and Ramzi Bettibi.

e. Denial of Fair Public Trial

The law provides for an independent judiciary; however, the executive branch and the president strongly influenced judicial procedures, particularly in political cases. The executive branch exercised indirect authority over the judiciary through the appointment, assignment, tenure, and transfer of judges, rendering the system susceptible to pressure. The president headed the Supreme Council of Judges, composed primarily of presidential appointees.

The law provides citizens legal recourse to an administrative tribunal to address grievances against government ministries, although officials rarely respected the tribunal's nonbinding decisions. The government permitted observers from diplomatic missions and foreign journalists to monitor trials. Observers may be allowed to attend sessions of military tribunals at the court's discretion.

At year's end the training institute for lawyers that President Ben Ali signed into law in 2006 had not become operational. The Tunisian Bar Association opposed the creation of the institute, arguing that its creation--and government control of those who would attend the institute--would undermine judicial independence by giving the government control of those admitted to the bar. The Bar Association asked authorities to be involved in the management of the school. In May 2006 police assaulted Bar Association members during a sit-in to protest the law.

The civil court system is a three-tiered hierarchy. At the first level, there are 51 district courts, in which a single judge hears each case. At the second level are 24 courts of first instance, which serve as the appellate courts for the district courts but also have original jurisdiction for more serious cases. The Court of Cassation (or Supreme Court) serves as the final court of appeals. The Supreme Court considers only arguments pertaining to points of law. The organization of the criminal court system is similar to that of the civil court system. In most cases the presiding judge or a panel of judges dominates a trial, and attorneys have little opportunity to participate substantively.

Military courts fall under the Ministry of Defense. Military tribunals have the authority to try cases involving military personnel and civilians accused of national security crimes. Defendants may appeal the military tribunal's verdict to the civilian Supreme Court. According to AI, during the year the military court handed down sentences of up to 10 years to at least 15 civilians.

There is also an administrative tribunal, which hears administrative cases between citizens and the government.

Trial Procedures

The law extends the same trial procedure rights to all citizens, and it provides for the right to a fair trial; however, according to international and domestic NGOs, this did not always occur in practice.

Trials in the regular courts of first instance and in the courts of appeal are open to the public. By law the accused has the right to be present at trial, to be represented by counsel, and to question witnesses; however, judges did not always observe these rights in practice. The law permits the trial in absentia of fugitives from the law. Both the accused and the prosecutor may appeal decisions of the lower courts.

The law provides that defendants are presumed innocent until proven guilty; however, that presumption was sometimes ignored in practice, especially in politically sensitive cases. Defendants may request a different judge if they believe the assigned one is not impartial; however, judges are not required to recuse themselves.

Lengthy trial delays remained a problem. Defendants do not have the right to a speedy trial, nor is there any time limit on cases. Defense lawyers claimed that judges sometimes refused to let them call witnesses on their clients' behalf or to question key government witnesses. Defense lawyers contended that the courts often failed to grant adequate notice of trial dates or allow time to prepare their cases. There were reports that judges restricted access to evidence and court records and in some cases required all the lawyers working on a case to examine documents together on a single date in judges' chambers, without allowing them to copy relevant documents.

Lawyers and human rights organizations reported that courts routinely failed to investigate allegations of torture and mistreatment, accepted as evidence confessions extracted through torture. These groups also reported that the summary nature of court sessions sometimes prevented reasoned deliberation and that erratic court schedules and procedures deterred observers of political trials.

Although family and inheritance law is codified, civil law judges were known to apply Shari'a (Islamic law) in family cases if the two systems conflicted. Some families avoided the application of Shari'a inheritance rules by executing sales contracts between parents and children to ensure that daughters received shares of property equal to that of sons.

Political Prisoners and Detainees

The government denied that it held any political prisoners, and the number of such prisoners, if any, remained unknown. Human rights organizations alleged that the government had arrested and imprisoned approximately 2,000 persons since 2005 without sufficient evidence that they had committed or planned to commit terrorist acts. Human rights activists and lawyers alleged that many of these detainees were tortured in MOI facilities and forced to sign confessions.

The AISPP claimed 24 political prisoners remained from the caseload of Islamists arrested in the late 1980s and early 1990s. Few of the prisoners were convicted for acts of violence. Most of those identified by international human rights groups as political prisoners or prisoners of conscience were arrested for violating laws that prohibit membership in illegal organizations and spreading false information aimed at undermining public order. Many were arrested for disseminating

information produced by organizations such as An-Nahdha. Former political prisoners stated that their identity papers were marked in a way that resulted in their receiving harsher treatment.

The ICRC and the HCHR had access to visit prisons and detention facilities.

Civil Judicial Procedures and Remedies

While a court system existed through which a human rights complaint could be made, the judiciary was not independent and impartial in cases involving human rights violations when the government was involved. Administrative remedies were available through the Office of the Ombudsman at the Presidency and administrative court. However, decisions taken by these institutions were not binding and were often ignored by other government departments and agencies.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions "except in exceptional cases defined by law;" however, the government generally did not respect these prohibitions in practice. Police sometimes ignored the requirement to have a warrant before conducting searches if authorities considered state security to be involved. Domestic NGOs and civil society activists reported that members of the security forces entered their offices when they were not present and searched without a warrant.

Authorities may invoke state security to justify telephone surveillance. According to numerous reports by NGOs, the news media, and diplomatic representatives, the government intercepted faxes and e-mails. The law does not explicitly authorize these activities, but the government stated that the code of criminal procedure implicitly gives investigating magistrates such authority. Opposition political activists experienced frequent and sometimes extended interruptions of service to home and business telephones, faxes, and the Internet. Human rights activists accused the government of using the postal code, with its broad and undefined prohibition against mail that threatens the public order, to interfere with their correspondence and interrupt the delivery of foreign publications. Security forces routinely monitored the activities, telephone, and Internet exchanges of opposition, Islamist, and human rights activists, as well as journalists, and also placed some under surveillance.

Human rights activists claimed that the government punished family members of Islamist activists by denying jobs, educational opportunities, business licenses, and travel due to their relatives' activism. Police subjected relatives also to surveillance and questioning.

Human rights activists reported that the government made it difficult for released detainees suspected of An-Nahdha membership to find employment. Other released political prisoners found it hard to get MOI statements that they had no criminal records, and even when not imprisoned, political activists and Islamists had their identification cards confiscated, which created problems in receiving healthcare, signing a lease, buying or driving a car, and accessing bank accounts and pensions. Police may demand identity cards at any time and may detain those unable to produce their cards until police establish their identity. AISPP member Lasaad Johri has not had an identity card since 1999.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The constitution provides for limited freedom of speech and of the press; however, the government generally did not respect these rights in practice. The government restricted press freedom and intimidated journalists, editors, and publishers into practicing self-censorship. Security forces closely monitored both foreign and domestic press activity.

Under the law, print media need not be licensed but are rigidly controlled by the authorization to the printer. Print media must request a copyright registration from the MOI, which then delivers a receipt valid for one year, which constitutes the official permit to publish. The Press Code requires that the receipt be issued before printing, effectively prohibiting any unlicensed publications. The code also requires the publisher to inform the MOI of any change of printer. Printers and publishers violating these rules are subject to substantial, per copy, personal fines under the Press Code.

Broadcast media are controlled by the granting or denial of a frequency by the Tunisian Frequencies Agency, a part of the Ministry of Communications Technologies. These licenses, or acceptance of the application, are tightly restricted.

The law prohibits citizens from discussing national politics on foreign radio or television channels during the two weeks prior to national elections.

Security forces often questioned citizens seen talking with foreign visitors or residents, particularly visiting international human rights monitors and journalists. The government attempted to prevent private meetings with foreign diplomats and to influence public meetings by surrounding meeting places with scores of plainclothes policemen. For example, on 2006 World Press Freedom Day, plainclothes policemen lined the street leading to the headquarters of the government offices of Tunisian Radio and Television to block a planned demonstration supporting press freedom.

The government stated that there were 950 foreign publications and newspapers distributed in the country and that 90 percent of domestic newspapers were "privately owned and editorially independent." However, two of the eight mainstream dailies were government owned, two were owned by the ruling party, and two, although nominally private, took editorial direction from senior government officials. All media were subject to significant governmental pressure over subject matter.

There were seven opposition party newspapers with small circulations. Five of them received government subsidies under a law providing government financing to papers representing opposition parties with seats in parliament. Two, *al-Mowqif* and *Mouwatinoun*, did not receive the subsidy since their parties are not represented in parliament. On January 10, the opposition Democratic Forum for Labor and Liberties (FDTL) began publication of *Mouwatinoun*.

While the government permitted public criticism in opposition newspapers, it impeded similar criticism in the mainstream press. Individuals and certain groups faced reprisal for statements critical of the government. For example, on March 9, authorities sentenced in absentia journalist and press freedom advocate Mohamed Fourati to 14 months in prison for membership in the unauthorized An-Nahdha party. Fourati previously helped edit the opposition newspaper *al-Mowqif* and authored several articles critical of the government. The court originally found Fourati not guilty, but after the prosecutor appealed the verdict twice, including to the Supreme Court, the court of appeals handed down a guilty verdict. Fourati was living abroad at the time of his conviction.

On August 2, 16, and 28, journalist Omar Mestiri made court appearances before authorities dropped defamation charges against him. Attorney Mohamed Baccar sued Mestiri after he wrote an article questioning the circumstances under which Baccar's license to practice law was reinstated (it had been previously revoked for fraud). Activists opined that the charges were politically motivated; Mestiri authored two articles regarding governmental corruption shortly before Baccar filed charges.

In October 2006 authorities charged opposition political leader Moncef Marzouki with "threatening to disturb the public order," following appearances on Al-Jazeera earlier in October in which he criticized the government and called for civil disobedience. Marzouki departed the country before his case was heard by the court. At year's end there were no further developments.

There were no reports of journalists being arrested solely because of their journalistic work; however, the government detained and interrogated some journalists active in opposition activities.

According to press reports on November 30, authorities arrested two reporters working for the private television station al-Hiwar, where they were covering a labor union meeting. Authorities released them after two hours of interrogation.

On April 9, according to the Committee to Protect Journalists, 15 police officers surrounded and violently pushed reporter Lotfi Hajji outside an opposition PDP meeting. On June 29, according to the local International Campaign for Human Rights, police hit Hajji and journalist Aymen Rezki when they attempted to attend a seminar on freedom of expression organized by the PDP and the FDTL. According to RSF, in three separate incidents between September 20 and 27, authorities forcibly prevented Hajji from entering PDP offices to report on a hunger strike.

On June 6, authorities added 26 months to the internal exile of journalist Abdullah Zouari, who once worked for *Al-Fajr*, the weekly newspaper of the An-Nahdha party. Zouari has remained under administrative control and in internal exile since 2004. According to RSF, no explanation was given for the extension.

On December 4, a district court in Sfax sentenced journalist Slim Boukhdir to a one-year prison sentence and a $4.11 (five dinars) fine for "aggression against a public employee," "violation of public morality standards," and "refusal to present identity papers to police." On November 26, police arrested Boukhdir while he was on his way to the Khaznadar police station to complete paperwork for his passport, for which he staged a 15-day hunger strike earlier in November. On December 4, he was sentenced to one year in prison on charges of insulting a police officer, using foul language, and not presenting his national ID card to security officials. Human rights and press freedom organizations condemned the arrest and sentence as politically motivated. According to an RSF December 4 press release, "Tunisian journalists are often jailed on grounds unrelated to their work so that the authorities cannot be accused of censorship." The government reportedly continued to refuse Boukhdir a press card. In 2005 Arabic-language daily *Ash-Shourouq* stopped publishing his articles and froze his salary in February 2006. In April and May 2006 he was one of two *Ash-Shourouq* journalists who

went on a hunger strike to protest their treatment by *Ash-Shourouq* management.

In January 2006 the president signed a law abolishing "depot legal," which required the government to approve all printed material prior to publication or distribution. Lifting of this requirement ended formal, overt censorship of local newspapers and magazines but did not end self-censorship and obvious government interference, such as the 2006 simultaneous appearance in multiple Arabic-language newspapers of similar editorials criticizing civil society activists who frequent foreign embassies.

On November 7, President Ben Ali announced that responsibility for prior review for foreign publications and books would be moved from the MOJ to the MOI. Prior to this announcement, all books and foreign publications continued to be subject to restrictions, including government refusal to allow printing or distribution. The MOI required book fair publishing representatives to deposit in advance publication titles. In the book fair that took place between April 27 and May 5, many titles were not accepted for display.

The government routinely seized and prevented distribution of domestic newspapers when it found articles or photos contrary to government policies. For example, on March 24, authorities reportedly bought all copies of the opposition weekly *al-Mowqif* because it carried a photo of Tunisian and Israeli parliamentary members participating in the Euro-Mediterranean parliamentary council meeting in Tunis. Similarly, authorities suppressed the June 22 edition of *al-Mowqif* because the issue carried an article about a labor union protest in Kasserine on June 13 and included a photo of regional leader of the General Union of Tunisian Workers (UGTT), Khaled Barhoumi, reportedly injured by the police.

The law stipulates that the publication, introduction, and circulation of foreign works may be restricted. Authorities restricted the timely purchase of foreign publications that included articles deemed critical of the country or that the government determined could prompt a security threat.

According to a February 27 RSF report, the government banned the February 23 edition of the French daily *Le Monde* and the February 8 and 21 editions of the French weekly *Le Nouvel Observateur* because of articles critical of President Ben Ali. RSF reported that the government censored a total of three issues of *Le Monde* in February, one of which contained an interview with Tunisian Human Rights League president Mokhtar Trifi.

Government regulations required foreign correspondents to obtain written approval before video recording in public. The government controlled the satellite transmissions of local correspondents reporting for foreign television stations by refusing to license correspondents and insisting all correspondents use government-owned facilities for satellite uplinks.

The law authorizes sentences up to five years in prison for offensive statements against the president and up to three years for defamation of constitutional bodies, including the Chamber of Deputies, Chamber of Advisors, constitutional councils, the administration, government members, or deputies.

According to many journalists and nonjournalist sources, senior government officials routinely called news directors and editors to inform them which issues they were forbidden to cover or publish and to direct editorial content and news coverage. The Tunisian Agency for External Communications enforced this policy and other informal censorship mechanisms by favoring certain publications for placement of government advertising. In addition, private companies were unwilling to advertise in newspapers no longer receiving government advertisements to avoid the appearance of siding with a media organization being punished by the government.

Directors and owners of existing private media, as well as journalists at the government and ruling party-owned press, practiced a high degree of self-censorship. Journalists in the mainstream press regularly refrained from investigative reporting on national issues. Only the small opposition press reported regularly on controversial national issues.

The government often pressured newspapers to carry the government wire service's version of an event, even when their own journalists were present. According to a November 5 RSF press release, the government instructed reporters for private media outlets to cover only information from the government news agency, Tunis Afrique Press. According to the May 2006 Tunisian Journalists Union report, authorities told journalists not to report a post office employees' January 2006 strike and an April 2006 high school teachers' strike. Some government-owned newspapers accused the union of incitement and a lack of patriotism.

CNLT produced the online newspaper-magazine *Kalima* without a license, but it was only accessible from outside the country. MOI continued to prevent CNLT from registering the publication. International human rights NGOs alleged that the government refused registration of *Kalima* due to its commentary critical of the government.

Internet Freedom

According to the government, no content is blocked or censored, except for obscene material or content threatening public order, defined as "incitement to hate, violence, terrorism, and all forms of discrimination and bigoted behavior that violate the integrity and dignity of the human person, or are prejudicial to children and adolescents." However, the government blocked access to a number of Internet sites. The government blocked nearly all sites belonging to domestic human rights, opposition, and Islamist groups. Some foreign Web sites remained blocked intermittently, including those of AI, RSF, and HRW (Tunisia page). Opposition news sites and Internet discussion sites were also blocked.

According to the 2006 OpenNet Initiative (ONI) country profile, there are approximately one million Internet users in the country. ONI testing indicated that the government pervasively blocked Web sites of political opposition groups, opposition news, human rights groups, pornography, and some sites allegedly critical of the Koran and Islam. According to ONI, the government blocked sites using a commercial software program loaded onto government-controlled servers to block sites consistently on the country's 12 Internet service providers (ISPs).

Two 1997 decrees cover in part Internet and telecommunications services. All ISPs must obtain a license from the Ministry of Communications Technologies. The Commission on Telecommunications Services, including representatives from the Ministries of Defense and Interior, as well as officials holding posts related to communications, information, and computer sciences, reviews each application.

According to a 2005 HRW report on online censorship, each ISP must designate a director to assume responsibility for the content of the Web sites it is requested to host. Internet users and those who maintain Web sites and servers are also responsible for infractions of the law. Each ISP must submit, monthly, a list of its subscribers to the quasi-governmental Tunisian Internet Agency (ATI). If an ISP stops services, it must immediately furnish the ATI with a complete set of its archives. The director of the ISP must maintain constant oversight of the content on the servers to insure that no information contrary to "public order and good morals" remains on the system.

On July 24, Mohamed Abbou received a presidential pardon releasing him from prison in advance of the July 25 national holiday. In 2005 a court found Abbou, a lawyer, guilty of publishing statements online "likely to disturb the public order" in which he condemned torture in the country's prisons and compared the fate of Iraqi prisoners in Abu Ghraib to that of citizen prisoners.

Academic Freedom and Cultural Events

The government limited academic freedom and fostered a culture of self-censorship in universities. The government closely monitored administrators, teachers, and students to identify any political activity. Police on university campuses, both uniformed and in plainclothes, discouraged students from openly expressing dissent.

In October 2006 authorities fined Abdelhamid Sghaier, a postgraduate student, for demonstrating for the right of female students at a Tunis university to wear the hijab. Sghaier went on a 20-day hunger strike to protest the court's decision and to demand the renewal of his passport. The government allegedly refused to issue him a new passport for six months due to his political activities.

Authorities subjected academic publications to government approval before publication, and university libraries did not purchase foreign books or subscribe to foreign magazines deemed critical of the government. Close government control over academic research funds prevented university administrators from authorizing or applying for grants on research topics that they believed the government would find objectionable. Professors avoided teaching classes on subjects considered sensitive, such as legal courses on political systems or classes on civil liberties. University professors often avoided discussion of subjects deemed sensitive enough to interest the government, and faculty members reported that they were hesitant to gather outside the classroom. Faculty members had to request Ministry of Higher Education approval to hold conferences, including by submitting conference topics and invitee lists.

b. Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, but the government severely restricted this right in practice.

Freedom of Assembly

The law requires groups wishing to hold a public meeting, rally, or march to obtain a permit from the MOI no later than three days before the proposed event and to submit a list of participants. Authorities routinely approved permits for groups supporting the government and generally refused permission for dissenting groups. As in previous years, NGO leaders reported difficulty in renting space to hold large meetings, maintaining that police pressured venue managers to prevent them from renting space. Hotel managers and businesses denied any specific ban on renting space to opposition groups;

however, they acknowledged cooperating with the MOI and accommodating its requests when possible.

On August 27, the PDP held a press conference to protest the last-minute reservation cancellation at the hotel where it had planned to host a summer university targeted at youth. Hotel management cited ongoing work at the hotel facilities. Activists asserted that the government pressured hotel management to cancel the reservation to prevent the PDP from holding the planned event.

On September 20, PDP Secretary General Maya Jribi and former secretary general Nejib Chebbi began a hunger strike to protest what they deemed to be the politically motivated eviction from their Tunis headquarters and near-simultaneous evictions from many of their branch offices. The hunger strike lasted more than a month before the PDP reached an agreement with the landlord following the presidency's intervention.

The government consistently blocked meetings by the Tunisian Human Rights League (LTDH), whether in its headquarters in Tunis or in regional offices. On November 9, police reportedly blocked a LTDH meeting organized by members of its steering committee. On June 10, police reportedly blocked the Kairouan regional chapter of the LTDH from accessing the UGTT regional office, where the LTDH hoped to commemorate its 30th anniversary.

The government used police and other state security forces to monitor, control, and sometimes break up demonstrations. In general demonstrators and security forces did not resort to violence; however, there were some exceptions, such as scuffles ensuing from demonstrators' attempts to cross police lines barring access to a demonstration site or demonstrators not dispersing when ordered by police.

In July 2006 the government refused to allow several demonstrations to take place. Opposition groups, human rights NGOs, the Tunisian labor union and students petitioned for permission for multiple demonstrations to protest Israeli actions in Lebanon. Police in Sfax, Gabes, and Kairouan reportedly used violence in breaking up unauthorized demonstrations held in protest against the conflict between Israel and Lebanon in July 2006. Only one demonstration, sanctioned and led by the government, took place.

Freedom of Association

The law provides for freedom of association; however, the government generally did not respect this right in practice. The law requires that new NGOs apply for registration with the government. If the government does not reject the application within 90 days, the NGO is automatically registered. The government routinely blocked registration of new independent NGOs by refusing to provide receipts for their applications. Without such a receipt, NGOs were unable to counter the government's assertions that they had not applied to register and therefore were not allowed to operate. In such cases NGOs could be shut down, their property seized, and their members prosecuted for "membership in an illegal organization."

There were reports that significant numbers of RCD members attempted to join independent NGOs with the apparent intent of limiting NGOs' independence by gaining control through elections or disrupting operations. In some cases RCD members used NGO bylaws, while in other cases they exploited a provision of the law on associations that requires "organizations of a general character" to grant membership to all who apply.

On February 17, a court again ruled that the LTDH could not hold its national congress because of a suit filed by seven members of the LTDH allegedly loyal to the RCD.

In 2005 the government evicted Association of Tunisian Judges (AMT) leadership reportedly because the then-president released a communique detailing judicial reform initiatives and alleging improprieties in the trial of Mohammed Abbou. In September 2006 new AMT leadership loyal to the RCD implemented a regulation reducing the number of members serving on the executive board and excluding regional members. This move came shortly after the government transferred several AMT board members from Tunis to regional cities, including the former AMT president, in an apparent attempt to stifle the organization's independence.

c. Freedom of Religion

The law provides for freedom of religion on the condition that it does not disturb public order; however, the government placed some restrictions on the exercise of this right and allegedly committed some abuses.

Islam is the state religion, and the law stipulates that the president must be a Muslim.

The government recognizes all Christian and Jewish religious organizations established before independence in 1956. Although it permitted other Christian denominations to operate, the government formally recognized only the Roman Catholic Church. The government regarded the Baha'i Faith as a heretical sect of Islam and permitted its adherents to practice their faith only in private.

While it was not illegal to change religions, government officials occasionally discriminated against converts from Islam to another religion using bureaucratic means to discourage conversion. For example, Muslims who convert to another religion faced social ostracism. Customary law based on Shari'a forbids Muslim women from marrying outside their religion. The government required non-Muslim men to convert to Islam before marrying a Muslim woman. The government did not allow married couples to register their children with non-Muslim names.

The government prohibits efforts to proselytize Muslims. While authorities did not deport foreigners suspected of proselytizing, the government did not renew the visas of suspected missionaries. As in the past year, there were no reports of official action against persons suspected of proselytizing.

The government required Islamic religious education in public schools. The religious curriculum for secondary school students also included histories of Judaism and Christianity.

The government did not permit the establishment of political parties based on religion, and it used this prohibition to continue to refuse to register the Islamist An-Nahdha party and to prosecute suspected An-Nahdha members for "membership in an illegal organization." The government continued to maintain tight surveillance over Islamists and monitored activity in mosques.

The law provides that only persons appointed by the government may lead activities in mosques, and the government paid the salaries of imams. The government required that mosques remain closed except during prayers and other authorized religious ceremonies, such as marriages or funerals. According to human rights lawyers, the government continued to question individuals observed praying frequently in mosques. Authorities instructed imams to espouse governmental social and economic programs during prayer times in mosques.

The government sought to suppress certain outward signs of citizens' religious practice. For example, authorities characterized the hijab as a "garment of foreign origin having a sectarian connotation" and sought to restrict its use in public institutions. In September 2006, according to news reports, the police intensified efforts to apply circular "decrees" Number 81 of September 1981 and Number 102 of October 1986 prohibiting sectarian dress (including the hijab) in official buildings, schools, and universities. During the year some women were stopped in public places, detained, and told to remove their hijab. During an October 2006 meeting of the government-loyal NGO National Union of Tunisian Women (UNFT), senior UNFT officials demanded that all women in the audience remove their veils, on occasion tugging at their veils and verbally abusing them in order to do so. In several cases school officials took disciplinary action to punish and deter hijab use by attempting to have women sign written oaths renouncing its use. In December 2006 a lower court ruled that the circular 102 of October 1986 was unconstitutional, but the ruling is not binding on the ministry.

There were reports that police sometimes detained and harassed men with what were termed "Islamic" beards, compelling them to shave. These reports increased in frequency after security operations against alleged Islamist terrorists in December 2006 and January 2007. According to international NGOs and domestic human rights organizations, following these security operations, police arrested more than one thousand young men on terrorism charges. Human rights groups asserted that that some of these arrests may have been targeted at some individuals because of their Islamic appearance, frequent attendance at mosques, or other actions related to their practice of Islam.

The government subjected religious publications to the same restrictions on freedom of speech and the press as secular publications. Christian groups could distribute religious documents only in English and not in public. Only sanctioned Muslim religious groups could distribute religious documents. In the government's view, distribution by other groups constituted an illegal "threat to public order." The government determined which citizens could make the hajj due to country quotas from the Saudi Arabian government on how many nationals from each country could participate.

Societal Abuses and Discrimination

Christians and Jews living in the country, including foreigners, constituted less than 1 percent of the population. According to church leaders, the practicing Christian population was approximately 2,000 and included a few hundred native-born citizens converted to Christianity. The Jewish population numbered approximately 1,100, with 900 in Djerba and the remainder in Tunis.

The government permitted nonproselytizing Jews and Christians to worship as they wished, and it allowed Jewish

communities to operate private religious schools. Some Christians reported government harassment in the form of surveillance and interrogation. There were reports of Christian citizens being detained by police and government security officials and questioned about their conversion to Christianity. In 2006 there were reports that passport renewals were inexplicably delayed for some Christians, although passports were subsequently issued.

Jewish community leaders reported that the government actively protected synagogues, particularly during Jewish holidays, and allowed the Jewish community freedom of worship and paid the salary of the grand rabbi. The government partially subsidized restoration and maintenance costs for some synagogues. The Provisional Committee of the Jewish community met weekly and performed religious activities and charity work, although the government had not granted it permanent registration. Jewish children on the island of Djerba were permitted to divide their academic day between public secular schools and private religious schools.

Cartoons in some mainstream newspapers used derogatory images of historically stereotypical Jews to portray the state of Israel and Israeli interests. These cartoons were drawn by cartoonists outside of the country and reprinted locally.

In March 2006, according to press reports and eyewitnesses, approximately 100 students shouted anti-Israel and anti-Jewish slogans during a demonstration at Manouba University near Tunis at a ceremony to mark the donation of books from the library of the late Tunisian Jewish historian Paul Sebag. After the incident the Manouba Student Union, mainstream journalists, and the Tunisian Human Rights League strongly denounced the demonstration's anti-Jewish character.

The government promoted antibias and tolerance education through a series of lectures regarding religious tolerance.

For a more detailed discussion, see the *2007 International Religious Freedom Report*.

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected these rights in practice; however, it refused to issue, renew, amend, or accept passports of some dissidents, Islamists, and their relatives. The government also may impose a five-year period of "administrative controls" at sentencing on certain former prisoners that constituted a type of internal exile.

The law authorizes the courts to cancel passports and contains broad provisions that both permit passport seizure on national security grounds and deny citizens the right either to present their case against seizure or to appeal the judges' decision. The MOI is required to submit to the courts requests to seize or withhold a citizen's passport through the public prosecutor; however, the ministry routinely bypassed the public prosecutor with impunity.

According to the constitution, no citizen can be exiled from the country nor prevented from returning.

Many citizens, particularly journalists, reported difficulty applying for or renewing their passports and accused the government of blocking their applications solely on the basis of political opposition. Some Christian converts also reported unexplained delays in passport issuance or renewal. Former An-Nahdha leader Mohamed Sedki Labidi has been deprived of his passport for the last 11 years without a court decision.

Administrative control measures, which take effect upon a convict's release from prison, are similar to parole restrictions, except that they may be applied to prisoners even after they have completed their sentences. The government requires those individuals to stay "in the area of their residence," which is determined by the government and may be anywhere in the country. They also may be required to report to a police station frequently each day at times determined only the previous evening. At the police station, they may be forced to wait hours before they are allowed to sign in, making normal employment impossible. Numerous Islamists released from prison in recent years have been subjected to such punishment.

According to international and domestic NGOs, prisoners released on July 24 to commemorate the July 25 national holiday were subject to government harassment and restrictions on personal movement. According to RSF, on August 24, the government refused Mohammed Abbou, one of the 21 released prisoners, permission to travel outside the country. On November 11, Abbou was also prevented from traveling abroad for a human rights conference.

By law administrative control measures may only be imposed at sentencing; however, a former high school teacher, Nouri Chniti, claimed that, although his sentence did not include administrative control, he has been subject to extrajudicial administrative control measures since 1991 when he received a suspended sentence for membership in An-Nahdha. Some political opponents in self-imposed exile abroad were prevented from obtaining or renewing their passports to return

to the country. In 2005 a group of citizens abroad who had been refused passports formed an organization, "Tunisians Without Passports," and released communiques calling on the government to allow all citizens to receive passports.

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol. The government generally cooperated with the office of the UN High Commissioner for Refugees and other humanitarian organizations in assisting refugees and asylum seekers, primarily from sub-Saharan Africa. The government has not established a system for providing protection to refugees or foreign nationals who may not qualify as refugees under the 1951 Convention and 1967 protocol but who still need some form of international protection. In practice the government did not provide protection against refoulement, the return of persons to a country where they there is reason to believe they feared persecution.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

There were significant limitations on citizens' right to change their government. The law provides that citizens shall directly elect the president and members of the Chamber of Deputies for five-year terms, but irregularities routinely called into question the legitimacy of elections. The ruling party has maintained power continuously since the country's independence in 1956. It dominated the cabinet, the legislature, and regional and local governments.

Elections and Political Participation

In the 2004 national elections, President Ben Ali faced three candidates and officially received 94.9 percent of the popular vote to secure a fourth term. The third opposition candidate, Mohamed Halouani of the Et-Tajdid party, cited government restrictions and other irregularities to explain why he received less than 1 percent of the official vote count. According to official election returns, more than 90 percent of registered voters went to the polls; however, independent NGOs estimated that the actual turnout was closer to 30 percent.

Irregularities characterized the polling. A coalition of three local independent NGOs--the LTDH, CNLT, and Tunisian Association of Democratic Women (ATFD)--cited as serious problems the opposition's lack of media access during the campaign and media bias in favor of the ruling party. Opposition candidates and other observers also cited voter intimidation as well as restrictions on disseminating campaign materials and organizing campaign events.

The 2004 Electoral Code significantly limits the number of individuals eligible to run for president. A candidate must be Muslim and must receive the endorsement of 30 sitting deputies or municipal council presidents to be eligible to run. By law 20 percent of the seats in the Chamber of Deputies are reserved for opposition party candidates. The ruling party's domination of state institutions and political activity precluded any credible and competitive electoral challenges.

In 2005 the National Election Observatory, formed by the government in 2004 to monitor all stages of the 2004 elections, issued its report, concluding that the electoral process in general proceeded fairly and according to law. The report contained references to opposition and NGO criticism of the election, including the nondistribution of voting cards to opposition party members, the ruling party's media advantage, the lack of transparency of the actual balloting, and secret ballot counts. While the report refuted the claims, it also listed 12 specific recommendations to address problems. Independent human rights activists complained that the real purpose of the observatory was to deflect criticism of the lack of independent or international observers.

In 2005 the government conducted elections for some of the 126 seats in the Chamber of Advisors, a second parliamentary chamber created by a 2002 constitutional amendment. The voters consisted of 4,555 officials, including municipal counselors, deputies, and mayors, plus the 189 members of the Chamber of Deputies. Only 305 of the 4,555 voters belonged to opposition parties. The constitutional amendment creating the chamber specified that its seats must be allocated among various regional and professional organizations, including 14 seats for the UGTT, which refused to name candidates, citing a lack of independence and democracy in the candidate selection process. The president directly appointed 41 candidates. The elected members of the chamber were mostly members or supporters of the ruling RCD party.

The president appoints the prime minister, the cabinet, and the 24 governors. The government and the party are closely integrated; current and former senior government officials constitute the top ranks of the RCD. The president of the country is also the president of the party, and the party's vice president and secretary general each hold the rank of minister. All members of the RCD politburo hold ministerial rank based on their current or former government service.

RCD membership conferred tangible advantages. For example, there were widespread reports that RCD members and

their families were much more likely to receive educational and housing benefits, small business permits, and waivers on zoning restrictions.

To reduce the advantages wielded by the ruling party, the Electoral Code reserves 20 percent of seats in the Chamber of Deputies (37 of 189) for the seven officially recognized opposition parties and distributes them on a proportional basis to those parties that won at least one directly elected district seat. In the 2004 elections, five of the opposition parties gained seats under that provision. The RCD held the remaining 152 seats.

In March 2006 authorities authorized the establishment of the Green Party for Progress (PVP), the first new political party created since 2002. The government refused to recognize the environmentally based political party, Green Tunisia Party, despite its long-pending application.

The government partially funded legal opposition parties. The government raised the public subsidy for operational costs of opposition parties to $61,500 (75,000 dinars) per year. Opposition parties represented in the chamber also received an additional payment of $6,150 (7,500 dinars) per deputy. Opposition parties represented in the chamber who also publish newspapers received additional funding. On November 22, President Ben Ali signed a law giving political parties that publish daily or weekly newspapers $196,930 (240,000 dinars) in annual government funding for these publications. The government raised the allowance for political parties with monthly publications to $50,000 (60,000 dinars). Opposition party PDP newspaper *al-Mowqif* did not receive a subsidy since the PDP was not represented in the legislature.

By law the government prohibits the establishment of political parties on the basis of religion, language, race, or gender.

There were 50 women in the 301-seat legislature, two women in the 25-seat cabinet, and five women among the 18 secretaries of state (regarded as junior cabinet members). Following municipal elections in 2005, more than one-fourth of municipal council members elected were women. Three women served as presidents of chambers on the Supreme Court, and two women served on the 15-member Higher Council of the Magistracy.

Government Corruption and Transparency

According to the World Bank's Worldwide Governance Indicators, government corruption was a problem. Thirteen articles of the penal code address corruption, and the government routinely prosecuted such cases.

On May 31, a Tunis court sentenced two civil service employees involved in a corruption case to four years in prison. One of the employees, a Tunis airport employee, received $1,234 (1,500 dinars) for helping the other employee travel from Tunis to Marseilles with a false passport.

On November 21, police arrested an employee of the state-owned National Pedagogical Center (National Educational Center) on charges of corruption and misappropriation of foreign currency. At year's end the Court of Tunis had not handed down a verdict.

In July 2006 a newspaper reported that the National Guard arrested a regional tax control officer and prosecuted him on corruption charges after he allegedly took bribes from merchants. Authorities did not sentence the officer, who was not named, but held him in detention.

The Higher Institute of Security Forces and Customs is tasked not only with "reinforcing human rights and improving law enforcement" but also reducing corruption. There were no public reports of the organization's activities during the year. No laws to provide government documents to citizens exist. Public officials are not subject to financial disclosure laws.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Ministry of Justice and Human Rights has the lead on government policy regarding human rights issues, although other ministries also had human rights offices. The ministry did not release any public reports of cases or investigations. A government-appointed and -funded body, the Higher Commission on Human Rights and Fundamental Liberties, received, addressed, and occasionally resolved human rights complaints in regard to prison conditions, requests for amnesty from families of prisoners, and other issues. The commission submitted confidential reports directly to the president. The government maintained several news sites that included sections on human rights, but the sites were not identified as government-sponsored. However, the government continued to block access to the sites of domestic and some international human rights organizations.

The government actively discouraged investigations of human rights abuses by domestic and international groups, who generally were able to investigate and publish their findings, but with difficulty. The government sought to monitor and control the activities of some foreign NGOs within the country. There were approximately one dozen domestic human rights NGOs, although only half were authorized. Some NGOs loyal to the government received government funding. The government met with registered domestic human rights NGOs and on occasion responded to their inquiries; however, it also harassed, targeted, and prosecuted some individuals.

On December 7, according to HRW, police detained AISPP cofounder and steering committee member Samir Ben Amor. According to HRW, before release police told him to cease his activities with the AISPP. The government has refused to register the association since its creation in 2002.

Citing a court ruling that stated the LTDH could not hold its National Congress, the government blocked its meetings and events throughout the year. The LTDH traditionally was one of the most active independent advocacy organizations, with 41 branches throughout the country, although the blockage of LTDH activities by the government limited its operational effectiveness. The organization received and investigated complaints and protested abuses, although the government rarely responded to LTDH communiques. The government continued to block an EU grant to the LTDH, citing a law on NGO financing that includes broad prohibitions on funding of NGOs without government approval. In October 2006 the government sent an official communication to all diplomatic missions in Tunis stating that the LTDH was subject to a 2001 court decision that "forbids all activity of the LTDH." However, the LTDH has conducted widespread activity since 2001.

Since 1998 the government has refused to authorize the CNLT's registration as an NGO. The CNLT issued statements sharply criticizing the government's human rights practices. Government officials have accused CNLT members of violating the pro forma submission requirements by publishing communiqués without prior government approval.

On May 18, the World Association of Newspapers reported that between 30 and 60 plainclothes policemen blocked the entrance to the offices of the online newspaper *Kalima*. The barricade began shortly after *Kalima's* representatives met with members of the international NGOs Frontline International and Human Rights First and continued for more than six weeks.

On June 15, police reportedly questioned the president of the Tunisian chapter of AI about the launch of a coalition against the death penalty, which had been announced the day before. The police reportedly characterized the effort as "illegal."

In April 2006 the International Freedom of Expression Exchange–Tunisia Monitoring Group (IFEX-TMG), a coalition of international human rights and freedom of expression NGOs, conducted fact-finding missions. The IFEX-TMG reported heavy police surveillance of their activities and government interference with their mission. Police prevented translators and private citizens traveling with the group from attending some meetings.

In May 2006 Yves Steiner, a visiting member of the Executive Committee of the Swiss chapter of AI, was arrested and expelled from the country. According to AI, Steiner had delivered a speech in May 2006 to members of AI's local chapter in which he condemned growing human rights abuses in the country, notably restrictions on freedom of expression and freedom of association. According to international media, a government source said that Steiner had posed a threat to public order.

There were credible reports that police prevented some family members of prisoners from visiting ICRC offices and monitored, occasionally harassing, families that visited ICRC offices.

Section 5 Discrimination, Societal Abuse, and Trafficking in Persons

The law provides that all citizens are equal before the law, and the government generally respected this provision, although in inheritance and family law, biased gender-based provisions in the civil code adversely affected women.

Women

The penal code specifically prohibits rape, including spousal rape, and the government enforced the laws vigorously, giving significant press coverage to rape cases; however, there were no reports of prosecution for spousal rape. The penalty for rape with the use of violence or threat with a weapon is death. For all other rape cases, the penalty is life imprisonment.

Laws against domestic violence provide for fines and imprisonment for assaults committed by a spouse or family member that are double those for the same crimes committed by an unrelated individual, but enforcement was lax, as police and the courts generally regarded domestic violence as an internal family problem. Violence against women and spousal

abuse occurred, but there were no statistics to measure its extent. The UNFT, a government-sponsored organization that ran a center to assist women and children in difficulty, sponsored national educational campaigns for women.

The penal code prohibits prostitution, and few were convicted of violating this law. There were government-sanctioned brothels, although under the penal code there is a penalty for prostitution of up to two years in prison. The law applies to both women and men and their accomplices. There were no reported cases of trafficking or forced prostitution involving women.

Sexual harassment was a problem, although there were no comprehensive data to measure its extent. Civil society groups criticized as too vague and susceptible to abuse the law making sexual harassment a criminal offense.

Women enjoy the same legal status as men, and the government advanced those rights in the areas of divorce and property ownership. The law explicitly requires equal pay for equal work, and although there were no statistics comparing the average earnings of men and women, anecdotal evidence indicated that women and men performing the same work received the same wages. A slight majority of university students were women.

In January a law went into effect allowing some female employees in the public sector to work part-time while still receiving two-thirds of their original salary. The government stated that the law was motivated by a desire to allow women to balance family and professional life. Women's rights activists, including the ATFD, stated that treating women and men differently under the law was a major setback to women's rights in the workplace.

Women served in high levels of the government as cabinet ministers and secretaries of state, and President Ben Ali appointed the country's first female governor in 2004. Women constituted approximately 37 percent of the civil service and 24 percent of jurists. However, women continued to face societal and economic discrimination.

Codified civil law is based on the Napoleonic code, although judges often used Shari'a as a basis for customary law in family and inheritance. Most property acquired during marriage, including property acquired solely by the wife, was held in the name of the husband. Married couples may choose between joint or separate property systems when signing marriage contracts. Customary law based on Shari'a prohibits women from marrying outside their religion. Application of Shari'a inheritance law continued to discriminate against women, and there was a double standard based on gender and religion: non-Muslim women and Muslim men who are married may not inherit from each other. The government considers all children from those marriages to be Muslim and forbids those children from inheriting from their mothers. Female citizens can transmit citizenship to children regardless of the father's citizenship.

The Ministry for Women's Affairs, Family, Children, and Senior Citizens sponsored several national media campaigns to promote awareness of women's rights. The government supported and funded the UNFT; the Center for Research, Documentation, and Information on Women; and women's professional associations. Several NGOs focused on women's advocacy and research in women's issues, and a number of attorneys represented women in domestic cases.

Children

The government demonstrated a strong commitment to free and universal public education, which is compulsory from age six to 16 years. According to the UN Children's Fund, 95 percent of boys and 93 percent of girls were in primary school, and approximately 73 percent of boys and 76 percent of girls were in secondary school. The government reported the rate of school attendance at approximately 99 percent. During the year female students graduated from secondary school at a higher rate than males. There were schools for religious groups.

Male and female students received equal access to medical care. The government sponsored an immunization program targeting preschool-age children and reported vaccinating more than 95 percent of children.

Convictions for abandonment and assault on minors carried severe penalties. There was no societal pattern of child abuse.

Child labor and child prostitution were not significant problems. The Ministry of Women's Affairs, Family, Children, and Senior Citizens and the Ministry of Youth, Sports, and Physical Training are responsible for the rights of children. Each had secretaries of state responsible for safeguarding the rights of children.

Trafficking in Persons

The law does not prohibit all forms of trafficking, but the penal code prohibits forced prostitution. There were no reports that

persons were trafficked to, from, or within the country.

In 2004 the legislature approved amendments to the 1975 law on passports and travel documents to include punishments for anyone who "guides, arranges, facilitates, assists, acts as an intermediary or organizes the surreptitious entry or exit, even without remuneration, of an individual to or from Tunisia by land, sea, or air." The law includes provisions for sentencing those convicted to prison terms of three to 20 years and fines of $65,650 to $82,050 (80,000 to 100,000 dinars). The amendments supplement Tunisian ratification of the UN Protocol to Prevent, Suppress, and Punish Trafficking in Persons. Traffickers may be prosecuted under laws prohibiting forced labor, prostitution, participation in armed conflict, displacement. Any other form of servitude is illegal.

The Ministry of Interior and Local Development and the Ministry of Social Affairs, Solidarity, and Tunisians Abroad were the agencies responsible for antitrafficking efforts. There were no specific government campaigns to prevent trafficking, although the government worked closely with its European neighbors to interdict smuggling, some of which may include trafficking. The government did not, however, have measures to identify trafficking victims from those persons smuggled voluntarily.

Persons with Disabilities

The law prohibits discrimination against persons with physical or mental disabilities and mandates at least 1 percent of public and private sector jobs be reserved for persons with disabilities; however, leaders of NGOs dedicated to persons with disabilities reported that this law was not widely enforced, and many employers were unaware of its existence. There was little discrimination against persons with disabilities in employment, education, access to health care, or in the provision of other state services. All public buildings constructed since 1991 must be accessible to persons with physical disabilities, and this was enforced. The government issued special cards to persons with disabilities for benefits such as unrestricted parking, priority medical services, preferential seating on public transportation, and consumer discounts. The government provided tax incentives to companies to encourage the hiring of persons with physical disabilities, and the government strongly supported NGOs working on behalf of persons with disabilities.

Several active NGOs provided educational, vocational, and recreational assistance to children and young adults with mental disabilities. The government and international organizations funded several programs. The Ministry of Social Affairs, Solidarity, and Tunisians Abroad was charged with protecting the rights of persons with disabilities.

Section 6 Worker Rights

a. The Right of Association

The law provides workers the right to organize and form unions, and the government generally respected this right in practice. The UGTT was the country's only labor federation. The Tunisian Journalists Syndicate is an unauthorized, independent trade union. Approximately 30 percent of the work force belonged to the UGTT, including civil servants and employees of state-owned enterprises, and a considerably larger proportion of the work force was covered by union contracts. A union may be dissolved only by court order.

The UGTT and its member unions were legally independent of the government and the ruling party; however, they operated under regulations that limited their freedom of action. The UGTT included persons associated with all political tendencies. UGTT funding came from modest union dues, revenue from an insurance company and a UGTT-owned hotel, and a percentage of annual contributions into the National Social Security Fund. The government provided the UGTT with land for its new headquarters and support for its construction. Central UGTT leadership generally cooperated with the government regarding its economic reform program. The UGTT board showed independence regarding economic and social issues and support of greater democracy. In 2005 the UGTT refused to submit a list of candidates for 14 UGTT-designated seats for elections to the newly created Chamber of Advisors, citing a lack of independence and democracy in the selection process and an unfair distribution of seats. The UGTT supported the LTDH and agreed to let LTDH regional chapters use UGTT facilities for conferences and meetings.

The law prohibits antiunion discrimination by employers, although the UGTT claimed that there was antiunion activity among private sector employers, such as firing union activists and using of temporary workers to avoid unionization. In certain industries, such as textiles, hotels, and construction, temporary workers accounted for a strong majority of the work force. The labor code protects temporary workers, but enforcement was more difficult than for permanent workers. A committee chaired by an officer from the Labor Division of the Office of the Inspector General approved all worker dismissals. The committee was composed of representatives from the Ministry of Social Affairs, Solidarity, and Tunisians Abroad, the UGTT, and the company dismissing the worker.

b.  The Right to Organize and Bargain Collectively

The law protects the right to organize and bargain collectively, and the government protected this right in practice. Wages and working conditions are set in triennial negotiations between the UGTT member unions, the government, and employers. Numerous collective bargaining agreements set standards for industries in the private sector and covered 80 percent of the total private sector workforce.

Unions, including those representing civil servants, have the right to strike, provided that they give 10 days' advance notice to the UGTT, and it grants approval. The International Trade Union Conference characterized the requirement for prior UGTT approval of strikes as a violation of worker rights, but such advance approval rarely was sought in practice. The law prohibited retribution against strikers, and the government generally respected this provision. Labor disputes were settled through conciliation panels in which labor and management were represented equally. Tripartite regional arbitration commissions settle industrial disputes when conciliation fails.

Export-processing zones were subject to labor laws.

c.  Prohibition of Forced or Compulsory Labor

The law prohibits forced and compulsory labor, including by children, and there were no reports that such practices occurred. However, some parents of teenage girls placed their daughters as domestic servants and collected their wages.

d.  Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children under 18 in jobs that present serious threats to their health, security, and morality, and the UGTT and the National Social Security Fund conducted inspection tours of factories and industrial sites to ensure compliance.

The law prohibits the employment of children under the age of 16 years, which is consistent with the age for completing educational requirements, and inspectors of the Ministry of Social Affairs, Solidarity, and Tunisians Abroad examined the records of employees to verify that employers complied with the minimum age law. However, there were no reports of sanctions against offending employers. Child labor also existed in the informal sector disguised as apprenticeship, particularly in the handicraft industry.

The minimum age for light work in the nonindustrial and agricultural sectors during nonschool hours was 13 years. Workers between the ages of 14 and 18 must have 12 hours of rest per day, which must include the hours between 10 p.m. and 6 a.m. In nonagricultural sectors children between the ages of 14 and 16 years may work no more than two hours per day. The total time that children spend in school and work may not exceed seven hours per day. Nonetheless, young children sometimes performed agricultural work in rural areas and worked as vendors in towns, primarily during their summer vacation from school.

e.  Acceptable Conditions of Work

The labor code provides for a range of administratively determined minimum wages. In August the government raised the industrial minimum wage to $200 (240 dinars) per month for a 48-hour workweek and to $173 (208 dinars) per month for a 40-hour workweek. The agricultural daily minimum wage was $6.53 (7.84 dinars) per day for specialized agricultural workers and $6.89 (8.27 dinars) per day for qualified agricultural workers. With the addition of transportation and family allowances, the minimum wage provided a decent standard of living for a worker and family, although that income was only enough to cover essential costs. More than 500,000 workers were employed in the informal sector, which was not covered by labor laws.

Regional labor inspectors enforced standards related to hourly wage regulations. They inspected most firms approximately once every two years. The government often had difficulty enforcing the minimum wage law, particularly in nonunionized sectors of the economy. The labor code sets a standard 48-hour workweek for most sectors and requires one 24-hour rest period per week.

Special government regulations governed employment in hazardous occupations like mining, petroleum engineering, and construction, and the Ministry of Social Affairs, Solidarity, and Tunisians Abroad had responsibility for enforcing health and safety standards in the workplace. Working conditions and standards generally were better in export-oriented firms than in those firms producing exclusively for the domestic market. Workers were free to remove themselves from dangerous situations without jeopardizing their employment, and they could take legal action against employers who retaliated against them for exercising this right.

BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.