**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SLITI v. BUSH | ) | Civil Action No. 05-0429 (RJL) |
| HAMOODAH v. BUSH | ) | Civil Action No. 05-0795 (RJL) |
| KHAN v. BUSH | ) | Civil Action No. 05-1010 (RJL) |
| RIMI v. BUSH | ) | Civil Action No. 05-2427 (RJL) |

**RESPONSE TO PETITIONERS' CONSOLIDATED MEMORANDUM
IN CONTINUED SUPPORT OF THEIR PETITIONS FOR WRITS OF HABEAS
CORPUS FILED PURSUANT TO THE COURT'S ORDER OF JULY 30, 2008
REGARDING TRANSFERRED PETITIONERS**

**INTRODUCTION**

Pursuant to this Court's Order of July 30, 2008, respondents submit this response to petitioners' August 12, 2008 brief [1:05-cv-2427, dkt. no. 26,], regarding former Guantanamo Bay detainees, Mohammad Rimi, Mohabat Khan, Sofian Ebrahim Hamad Hamoodah, and Abdullah Bin Omar Al Hajji, who were transferred to their home countries in 2006 or 2007 ["transferred petitioners"]. In their brief filed on August 12, 2008 [1:05-cv-2427, dkt. no. 25], respondents showed that the habeas petitions of these petitioners are moot, now that they have been transferred out of Guantanamo and do not suffer the type of collateral consequences cognizable in a habeas action. Despite the transferred petitioners' allegations of detention, prosecution, imprisonment, or even torture by their home countries, they offer no competent evidence showing that their alleged injury can be redressed by a favorable judicial decision here. To the contrary, all of the alleged consequences are dependent upon the actions of a non-party sovereign authority beyond the control of this Court.

The petitioners now say that "there is reason to believe that they remain in the

constructive custody of the United States," and seek discovery on that issue. *See* Pet. Mem. at 9. As discussed below, the declarations of Ambassador Clint Williamson and Deputy Assistant Secretary of Defense for Detainee Affairs Sandra L. Hodgkinson (attached to Respondents' Status Report filed on July 14, 2008, 1:05-cv-2427, dkt. no. 22), establish that the United States has relinquished all legal and physical custody of all Guantanamo detainees transferred to a foreign government. While the United States seeks appropriate humanitarian and security assurances from the foreign government prior to relinquishing custody and control, once transferred the detainee's continued detention, prosecution, or release is a matter within the sole discretion of that sovereign.

The transferred petitioners' own allegations do not suggest otherwise; three of them allege that they are imprisoned by their home countries *because of political crimes against those governments*, while counsel for the fourth petitioner does not know his client's status but raises the possibility of continued detention. A fishing expedition based on speculation that the detentions (or possible detention) of the transferred petitioners might be at the behest of the United States is entirely unwarranted. Moreover, any order granting the requested discovery would violate the separation of powers and constitute a serious intrusion into sensitive matters of foreign relations – an intrusion clearly prohibited by the Supreme Court in its recent decision in *Munaf v. Geren*, 128 S. Ct. 2207 (2008).

**ARGUMENT**

**I.    THE UNITED STATES DOES NOT HAVE CONSTRUCTIVE CUSTODY OF THE TRANSFERRED PETITIONERS**

"[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *cf.* 28 U.S.C. § 2241(c) (federal habeas statute confers jurisdiction on the district courts if a petitioner is "in custody under or by the color of the authority of the United States").[1] There is no dispute that the transferred petitioners are not in the physical custody of the United States. Two of the petitioners allege that they are in the custody of the Government of Libya, one is alleged to be imprisoned by the Government of Tunisia, and the fourth petitioner's counsel raises the possibility that his client currently may be detained by the Government of Afghanistan. Nevertheless, the transferred petitioners assert that they may be in the constructive custody of the United States and seek discovery to determine whether that is so. Habeas jurisdiction, however, cannot rest on so thin a basis.

"A [habeas petitioner] is in the constructive custody of the United States when he is in the actual, physical custody of some person or entity who cannot be deemed the United States, but is being held under the authority of the United States or on its behalf." *Mohammed v. Harvey*, 456 F. Supp. 2d 115, 122 (D.D.C. 2006). Clearly, the United States has no authority

---

[1] *Boumediene v. Bush* made explicit that its decision "[did] not hold" that the habeas proceedings for enemy combatant determinations must duplicate typical statutory proceedings under § 2241 in all respects. 128 S. Ct. at 2229, 2267, 2274. To the contrary, it is only the core, constitutionally-required elements of habeas that remain after Congress's repeal of *statutory* habeas for Guantanamo detainees. *See id.* at 2278 (Souter, J., concurring) ("Subsequent legislation eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all.").

over the sovereign governments of Libya, Tunisia, or Afghnistan. Nor are these foreign sovereigns' alleged detentions of the transferred petitioners at the behest of the United States. As fully explained in the declarations of Ambassador Clint Williamson and Deputy Assistant Secretary of Defense for Detainee Affairs Sandra L. Hodgkinson, the United States has no interest in detaining enemy combatants longer than it is necessary, and since 2002, it has transferred approximately 500 Guantanamo detainees to their governments of nationality (or in some instances to another country). *See* Williamson Decl. ¶ 2; Hodgkinson Decl. ¶¶ 3-4.

Unless a detainee is to be transferred for release, the United States engages in a diplomatic dialogue with the receiving government prior to the transfer to ascertain what measures that government is likely to take, consistent with its laws, to ensure that the detainee will not pose a continuing threat to the United States or its allies. *See* Hodgkinson Decl. ¶ 5; Williamson Decl. ¶ 6. The United States also seeks appropriate transfer assurances from the receiving government, including appropriate assurances of humane treatment.[2] *See* Hodgkinson Decl. ¶ 6; Williamson Decl. ¶ 6. As explained in the Hodgkinson declaration, however, "[i]n all cases of transfer, the detainee is transferred entirely to the custody and control of the other

---

[2] It is the policy of the United States, consistent with the approach taken by the United States in implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, not to repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured. Hodgkinson Decl. ¶ 6; Williamson Decl. ¶ 8. As explained by Ambassador Williamson, in making that determination, the State Department considers the totality of relevant factors relating to the individual and the government in question. *See id.* For example, when evaluating the adequacy of any assurance, the State Department considers the identity, position, or other information concerning the official relaying the assurances, and political or legal developments in the foreign country concerned. *See id.* The State Department may also make a judgment regarding the foreign government's incentives and capacities to fulfill its assurances, including the importance to the government concerned of maintaining good relations and cooperation with the United States. *See id.*

government, and once transferred, is no longer in the custody and control of the United States." Hodgkinson Decl. ¶ 5. In other words, the implementation and enforcement of any specific security measure – whether it be travel restrictions, detention, investigation, or prosecution – is committed to that foreign sovereign's exclusive discretion and is not within the control of the United States. If the individual is detained at all, the detention is "by the foreign government pursuant to its own laws and not on behalf of the United States." *Id.*

The petitioners were transferred pursuant to the process described above, and if they are currently detained by their home countries, that is a matter within the sole discretion of those foreign authorities. The United States retains no control over such detentions, and the petitioners' allegations suggest no more than that their current status is the result of the laws and processes that exist in their own countries. For example, petitioner Abdullah alleges that even while he was detained at Guantanamo, he was tried and convicted in absentia by a Tunisian court for the political crime of opposing the Tunisian government. Pet. Mem. at 6-7. He further alleges that after his return to Tunisia, he received a retrial, and was convicted and sentenced to seven years of imprisonment and five years of home-based confinement. *Id.* Not only is it axiomatic that an American court does not provide collateral review of convictions in a foreign tribunal, *see Munaf*, 128 S. Ct. at 2224, but it is simply not credible – and not established by petitioners – that petitioner Abdullah, who is serving his Tunisian sentence, remains in the constructive custody of the United States.

Similarly, petitioners Rimi and Hamoodah allege that they are in the custody of the Libyan security forces because they have been accused of being members of the Libyan Islamic Fighting Group, a group petitioners characterize as opposed to the regime of Libyan President

Muammar Qaddafi.  Pet. Mem. at 3, 16.  Petitioner Hamoodah also alleges that he was in exile from Libya even before his detention at Guantanamo, while petitioner Rimi alleges that he had tried to seek political asylum while he was still at Guantanamo.[3]  *Id.* at 2, 4.  Again, far from suggesting constructive custody on the part of the United States, these allegations suggest only that the Government of Libyan is exercising its indisputable sovereign right to prosecute its own citizens for alleged violations of its domestic laws.

Although petitioners argue that they would not be in the custody of their home countries but for respondents' transfer, Pet. Mem. at 10, that is not the type of harm redressable by habeas.  The Supreme Court recently said in unmistakable terms that "habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them."  *Munaf*, 128 S. Ct. at 2223.  That is true even when the United States has physical control over the habeas petitioner and when the petitioner is a U.S. citizen.  *See id.*  Here, of course, the transferred petitioners are not even in the physical custody of the United States nor are they U.S. citizens.  *See* Pet. Mem. at 2-3, 5, 7.

Petitioners allege that they are in the United States' constructive custody because U.S. government officials allegedly have visited petitioners Rimi and Hamoodah after their return to Libya.  Specifically, petitioners cite a report of Human Rights Watch, a non-government organization, stating that the Department of State had informed the organization that its officials had visited petitioners Rimi and Hamoodah on several occasions in 2007.  *See* Pet. Mem. at 10;

---

[3] As for petitioner Khan, his counsel apparently does not know his status after his return to Afghanistan but speculates that Khan might be in the custody of the Government of Afghanistan.  Counsel does not indicate that they have made any attempt to find their client beyond requesting respondents to obtain the information for them.

Ex. C to Pet. Mem. Any State Department visits by no means establish that the United States has constructive custody over the petitioners. Ambassador Williamson explains in his declaration that in appropriate cases, the State Department may seek the foreign government's assurance of access by host government entities, non-government organizations, or the United States government to monitor the condition of an individual returned to that country. *See* Williamson Decl. ¶ 8. In instances in which the United States transfers an individual subject to assurances, it would pursue any credible report and take appropriate diplomatic action if it had reason to believe that those assurances would not be, or had not been, honored. *Id.* Where specific concerns about an individual's treatment cannot be resolved satisfactorily, the State Department would recommend against future transfers to that country. *Id.*

To the extent the United States is granted access to individuals who have been repatriated to their home countries for any purpose, that does not mean that the United States has control over those individuals, much less the foreign authorities who may be detaining them. As stated by Deputy Assistant Secretary of Defense for Detainee Affairs Sandra Hodgkinson, "*[i]n all cases of transfer*, the detainee is transferred entirely to the custody and control of the other government, and once transferred, is no longer in the custody and control of the United States." Hodgkinson Decl. ¶ 5 (emphasis added).

Petitioners argue that discovery into the United States' arrangements with the governments of Libya, Tunisia, and Afghanistan regarding their transfers may reveal whether these foreign sovereigns are detaining them at the behest of the United States. Pet. Mem. at 10. Petitioners cite *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) (J. Bates), as the lone support for their extraordinary request to conduct a fishing expedition into sensitive areas of

foreign relations. *Abu Ali*, however, is inapposite.

In *Abu Ali*, the Court was prepared to permit limited jurisdictional discovery in a habeas case to determine whether the United States was using a foreign government, the Kingdom of Saudi Arabia, to detain a U.S. citizen in a collusive effort to avoid the jurisdiction of the United States courts. The petitioner there provided evidence for his allegations that he was detained by the Saudis at the behest of the United States officials, that the United States was keeping him in Saudi Arabia to avoid constitutional scrutiny by American courts, and that the Saudis would immediately release him to United States officials upon a request by the U.S. Government. *See id.* 67-68. Specifically, petitioners submitted affidavits relating conversations with several named United States officials, verbatim copies of cables and e-mails that had been shown to them, and described in detail other evidence regarding Abu Ali's detention, conversations with Abu Ali and Saudi officials, and information received from their political representatives. *Id.* The Government moved to dismiss the case but chose not to put forth a factual rebuttal at that time. *See id.* at 67 ("This evidence stands unrebutted, as respondents have chosen not to engage petitioners on their factual contentions."). The Court denied the motion and ordered limited jurisdictional discovery to determine the constructive custody issue.[4]

No jurisdictional discovery is warranted here even if *Abu Ali* were precedent – binding or not – for this case. To begin with, the respondents in *Abu Ali* had chosen not to present a factual

---

[4] The court in *Abu Ali* subsequently dismissed the case as moot because the petitioner was released from Saudi custody and returned to the United States, where he faced criminal prosecution. *Abu Ali v. Gonzales*, 387 F. Supp. 2d 16, 17 (D.D.C. 2005). These facts rendered the case moot, the court held, because they indicated a "fundamental change in the nature of [petitioner's] detention" and because the petitioner had obtained the release from Saudi custody and repatriation that he had sought, and thus was "beyond the reach of [the] Court's habeas jurisdiction." *Id*. at 18-19.

8

rebuttal, and thus the "court was obligated to accept petitioners' allegations of collusion between the United States and [the foreign government at issue] as true." *Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 197 n.9 (D.D.C. 2005). And, as the court noted, "[i]t is well-established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.'" *Abu Ali*, 350 F. Supp. 2d at 54 (quoting *Alabama Great S. R. Co. v. Thompson*, 200 U.S. 208, 218 (1906)). Here, in contrast, not only do the allegations fall short of establishing constructive custody, but even so, the respondents have, in fact, presented contrary rebuttal evidence in the form of sworn declarations of Ambassador Clint Williamson and Deputy Assistant Secretary of Defense for Detainee Affairs Sandra L. Hodgkinson that establish the complete relinquishment of United States custody in the circumstances of transfers of Guantanamo detainees. *See* Hodgkinson Decl. ¶ 5; *see also* Williamson, Decl. ¶¶ 2-3.

*Abu Ali* does not help the petitioners for another reason. The circumstance that "the detainee in *Abu Ali* was a United States citizen, [was] a fact that featured prominently in the reasoning of that case." *Al-Anazi*, 370 F. Supp. 2d at 197 n.9; *see also Abu Ali*, 350 F. Supp. 2d at 55 ("The differences between the *rights of citizens* and the rights of aliens are considerable in this [habeas] context") (emphasis added); *id.* ("this is an exceptional situation that demands particular attention to the *rights of the citizen*") (emphasis added); *id.* at 59 (each of the "weighty principles: the act of state, separation of powers, and political questions doctrines" is "an important consideration. . . . None, however, extinguishes the fundamental right of *a citizen* to challenge his detention colorably alleged to be at the behest of the executive.") (emphasis added). The transferred petitioners are not U.S. citizens. *See* Pet. Mem. at 2-3, 5, 7. Therefore,

9

*Abu Ali* is of no help to them.

Furthermore, *Munaf* makes clear that habeas does not extend to interfere with a foreign sovereign's right to prosecute an individual, even a U.S. citizen, for unlawful insurgency directed against that sovereign within its borders. *See* 128 S Ct. at 2225. And that result does not change even when the individual claims that he may be mistreated in the hands of the foreign sovereign. As the Supreme Court recognized, such concerns are best resolved "by the political branches, not the judiciary" because "the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." *Id.* at 2225-2226. "[T]he other branches possess significant diplomatic tools and leverages the judiciary lacks." *Id.* (internal quoting marks and citation omitted). The Executive's assessment of a foreign sovereign's legal system and assurances from that sovereign are determinations that "[t]he Judiciary is not suited to second-guess" because they are "determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." *Id.*

If such a result obtains in the case of a U.S. citizen, this weighty principle of separation of powers applies with even greater force to counsel against granting discovery because the petitioners here are aliens in the custody of their own countries for allegedly having committed political crimes against those sovereigns. Even as to petitioner Khan, who does not allege that he is in fact in the custody of the Government of Afghanistan, the Court is asked to compel the Government to unilaterally disclose sensitive diplomatic discussions between the United States and foreign sovereigns to which the United States has repatriated their citizens. Such an

intrusion could significantly compromise the Government's ability to interact effectively in the field of foreign relations.  *See* Williamson Decl. ¶¶ 9-12.  As fully explained in the declaration of Ambassador Williamson, the United States' ability to seek and obtain assurances from a foreign government depends in part on its ability to treat its dealings with the foreign government with discretion.  *See id.* ¶ 9.  The delicate diplomatic exchange that is often required in these contexts cannot occur effectively except in a confidential setting.  *See id.* ¶ 10.  As Ambassador Williamson further explained, "the judicial review of the diplomatic dialogue between the U.S. Government and other governments concerning the terms of transfer, or of the ultimate decision to effect a transfer to a given country, risks undermining the ability of the United States Government to speak with one voice on Guantanamo transfer issues."  *Id.* ¶ 12.  Similarly, Deputy Assistant Secretary of Defense for Detainee Affairs Sandra Hodgkinson explained that requiring the United States to disclose information about negotiations outside of appropriate executive branch agencies regarding transfers "could adversely affect the relationship of the United States with other countries and impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts, including with respect to our joint efforts in the war on terrorism."  Hodgkinson Decl. ¶ 8.

Finally, the requested discovery presumably would also inquire into foreign sovereigns' detentions of petitioners under their laws, when such inquiries are beyond the purview of this Court.  *See Worldwide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-65 (D.C. Cir. 2002) ("The act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory.") (internal quotation marks and citation omitted).  *Cf. Munaf*, 128 S Ct. at 2226.

(recognizing that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into the workings of foreign countries' justice systems). Accordingly, discovery is unwarranted.

In sum, the United States has no constructive custody over the transferred petitioners, and their habeas petitions should be dismissed as moot.

## II. THE PETITIONERS HAVE NOT MET THEIR BURDEN OF SHOWING THAT THEY SUFFER COLLATERAL CONSEQUENCES OF THE TYPE COGNIZABLE IN HABEAS

The transferred petitioners also argue that they continue to suffer collateral consequences flowing from their enemy combatant designation such that their release from U.S. custody did not render their habeas petitions moot. According to the petitioners, because the Libyan government is alleged to engage in torture, petitioners Rimi and Hamoodah's allegations that they are in the custody of "a country known for torture more than satisf[y] the collateral consequences doctrine . . . ." Pet. Mem. at 14. The transferred petitioners further allege that the enemy combatant designation exposes them to stigma and jeopardizes their employability, freedom to travel, and other liberty interests. *See id.* at 15.

As respondents fully demonstrated in their brief filed on August 12, 2008 [1:05-cv-2427, dkt. no. 25], however, not only are such speculative and intangible repercussions insufficient to prevent the habeas cases from becoming moot, but the consequences petitioners allege are not legally cognizable here, because they are based on the discretionary decisions of a foreign authority or individuals and are not legally prescribed statutory consequences that were imposed by state or federal law. In short, for a collateral consequence to be legally cognizable in a habeas case, the injury must be traceable to the respondents and redressable by a favorable judicial

12

decision. Thus, this Court has held that "non-statutory consequences" – such as damage to a petitioner's professional reputation and denial of parental visitation rights – that depend on the discretionary acts of third parties do not amount to legally cognizable collateral consequences that would allow a habeas petitioner to continue challenging his prior alleged unlawful detention by the United States. *See Idema v. Rice*, 478 F. Supp. 2d 47, 51 (D.D.C. 2007) (citing *Lane v. Williams*, 455 U.S. 624, 631-33 (1982) and *Carafas v. La Vallee*, 391 U.S. 234, 237-38 (1968)).

Similarly, in *Al Joudi v. Bush*, a case involving Guantanamo detainees transferred to a foreign government, this Court found the alleged collateral consequences – which included potential future monitoring by the foreign government, travel restrictions, and/or future prosecution – insufficient to prevent the case from becoming moot because, among other things, they were "totally dependent upon the actions of a non-party sovereign authority beyond the control of this Court." No. 05-CV-0301, 2008 WL 821884 at *1 (D.D.C. March 26, 2008). This Court found that even if the transferred petitioners were subjected to the collateral consequences alleged, "such injury would result from the actions of the [foreign] Government, not the U.S. Government, and therefore would not give rise to an injury that is redressable in this *habeas* action against Respondents." *Id.*

Here, the transferred petitioners do not allege that they suffer any collateral consequences by operation of U.S. federal or state law or any injury that is redressable by a favorable judicial decision in this *habeas* action. As discussed above, the United States has no control over the detention, prosecution, or conviction of the transferred petitioners by the Governments of Libya, Tunisia, and Afghanistan, nor would a favorable decision in these habeas cases secure the transferred petitioners' release from the custody of those governments. To the contrary, these

transferred petitioners' future status is a matter entirely within the discretion of those foreign governments. Accordingly, there is no case or controversy, and the habeas petitions are moot.

### III. THIS COURT HAS NO JURISDICTION TO HEAR PETITIONERS' CHALLENGE TO THEIR TRANSFERS

Finally, the transferred petitioners summarily request "an adjudication and determination on the lawfulness of their transfers" under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, which provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." CAT, Art. 3. Petitioners allege that their transfers "could well mean torture, execution, and/or prolonged arbitrary detention," and thus, potentially in violation of the CAT. Pet. Mem. at 17.

This Court, however, has no jurisdiction to hear this new claim because the underlying habeas petitions are already rendered moot by the transfers, and because the transfers have already occurred, the Court cannot now provide petitioners with any relief. Moreover, the CAT does not apply extraterritorially,[5] nor does it create judicially enforceable rights. The law is

---

[5] The record of proceedings related to U.S. ratification of the CAT demonstrates that at the time of ratification, the United States did not interpret Article 3 to impose obligations with respect to individuals located outside of U.S. territory. When the Secretary of State transmitted the CAT to the Senate for its advice and consent to ratification, the State Department's analysis of Article 3 indicates that it understood that the non-refoulement obligations it was undertaking related to removal or extradition from the United States, and not to extraterritorial action by U.S. officials. *See* Message from the President of the United States Transmitting the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Adopted by Unanimous Agreement of the United Nations General Assembly on December 10, 1984, and Signed by the United States on April 18, 1988. Treaty Doc. 100-20, at 6. This analysis was subsequently adopted by the Senate in its report recommending that the Senate provide its advice and consent to ratification of the CAT. See S. Exec. Rep. No. 101-30 at 16-17.

well-settled that treaties, such as the CAT, are presumed not to create individually enforceable rights because a treaty "is primarily a compact between independent nations," *Head Money Cases*, 112 U.S. 580, 597 (1884), and absent a clear contrary intent, a treaty "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Id.*; *see also Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937 (D.C. Cir. 1988). If a treaty is violated, this "becomes the subject of international negotiations and reclamation," not the subject of a lawsuit. *Head Money Cases*, 112 U.S. at 597. And "[i]t is obvious that with all this the judicial courts have nothing to do and can give no redress." *Id.*; *see also Holmes v. Laird*, 459 F.2d 1211, 1213, 1222 (D.C. Cir. 1972).

Lest there be any doubt, Congress's intent was articulated explicitly. The United States Senate conditioned its advice and consent to the CAT upon a Resolution of Ratification declaring "that the provisions of Articles 1 through 16 of the Convention are not self-executing." 136 Cong. Rec. S17486-01, at S17492 (Oct. 27, 1990); S. Exec. Rep. 101-30, at 31. The Senate Report regarding the CAT, to which the Resolution of Ratification was appended, included the Executive's analysis that the term "competent authorities" in Article 3 of the CAT "appropriately refers in the United States to the competent administrative authorities who make the determination whether to extradite, expel, or return. . . . *Because the Convention is not self-executing, the determinations of these authorities will not be subject to judicial review in domestic courts*." S. Exec. Rep. 101-30, at 17-18 (emphasis added).

To be sure, the CAT's implementing statute, the Foreign Affairs Reform and Restructuring Act ("FARR Act"), § 2242, Pub. L. No. 105-177, div. G, 112 Stat 2681-822 (codified at 8 U.S.C. § 1231 note), does create a judicially enforceable private right of action, but

judicial review is carefully limited to only a final order of removal in an immigration proceeding. The FARR Act expressly provides that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the [CAT] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a) [prohibiting the return of persons when there are substantial grounds for believing they will be tortured], except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252)." FARR Act § 2242(d).

The transfers at issue here do not involve final orders of removal under the Immigration and Nationality Act. Therefore, this Court has no jurisdiction to review the transferred petitioners' claim here. *See O.K. v. Bush*, 377 F. Supp. 2d 102, 118 n.17 (D.D.C. 2005) ("[A]s this Court explained in *Al-Anazi*, [the FARR Act] is expressly limited to claims arising out of a final order of removal . . . . [the FARR Act] is quite explicit that no legal rights can be derived from its rules outside of the removal setting, by analogy or otherwise."); *Al-Anazi*, 370 F. Supp. 2d at 194.

In sum, this Court has no jurisdiction to hear the transferred petitioners' new claim under the CAT or the FAAR Act.

## CONCLUSION

For the foregoing reasons, and the reasons stated in respondents' brief filed on August 12, 2008, this Court should deny the transferred petitioners' request for discovery and dismiss their habeas petitions as moot.[6]

---

[6] Should this Court nevertheless find jurisdictional discovery appropriate under the circumstances, respondents respectfully request that such discovery, and any further related proceedings, be stayed until the Government is able to first focus its resources on the habeas

Dated: August 19, 2008				Respectfully submitted,

						GREGORY G. KATSAS
						Assistant Attorney General

						JOHN C. O'QUINN
						Deputy Assistant Attorney General

						    /s/   Jean Lin
						JOSEPH H. HUNT
						VINCENT M. GARVEY
						TERRY M. HENRY
						JUDRY L. SUBAR
						JEAN LIN
						Attorneys
						United States Department of Justice
						Civil Division, Federal Programs Branch
						20 Massachusetts Ave., N.W.
						Washington, DC  20530
						Tel:  (202) 514-3716
						Fax: (202) 616-8470

						Attorneys for Respondents

---

claims of those habeas petitioners who are currently detained at Guantanamo.